UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
KIM HOLLEMAN,                                         :
                                                      :
                        Plaintiff,                    :
                                                      :         **<u>MEMORANDUM AND ORDER</u>**
            -against-                                 :
                                                      :         No. 12 Civ. 2719 (VMS)
ART CRATING INC., ROBERT FRASER                       :
LOWE, also known as ROBIN LOWE,                       :
individually, JOHN DOES 1-10 and ABC                  :
CORPS. 1-10, fictitious names for persons or          :
entities whose present roles and identities are       :
unknown,                                              :
                                                      :
                        Defendants.                   :
-------------------------------------------------------- x

**Scanlon, Vera M., United States Magistrate Judge:**

## I.      INTRODUCTION

Plaintiff Kim Holleman ("Plaintiff" or "Ms. Holleman") filed this action against

Defendants Art Crating Inc. ("ACI") and Robert Fraser Lowe ("Mr. Lowe") (collectively,

"Defendants").[1]  Plaintiff alleged that Defendants discriminated against her on the basis of her

sex and retaliated against her for complaining about sex discrimination.  Plaintiff claims that in

so doing, Defendants violated her rights under Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. § 2000e <u>et seq.</u>; the New York State Human Rights Law (the "NYSHRL" or the

"State Law"), N.Y. Exec. Law § 290 <u>et seq.</u>; and the New York City Human Rights Law (the

"NYCHRL" or the "City Law"), N.Y.C. Admin. Code §§ 8-101 <u>et seq.</u>

By way of brief introduction to the facts, Plaintiff, who worked as an art handler at ACI

at all relevant times, alleges that she suffered sex discrimination when she was terminated from

---

[1] Plaintiff also sued unnamed individuals and corporations.  Compl., ECF No. 1.  As Plaintiff has
not named any other individual or corporate defendant, this Memorandum and Order addresses
the claims against ACI and Mr. Lowe alone.  In addition, throughout the record, Mr. Lowe is
alternately referred to as Robin Lowe and Robert Lowe.

that position.  Plaintiff further alleges that Defendants retaliated against her for complaining

about that sex discrimination by, <u>inter alia</u>, sabotaging her efforts to obtain unemployment

insurance benefits.

Before the Court is Defendants' motion for summary judgment and the dismissal of this

action in its entirety.  Mot. for Summ. J., ECF No. 29.  This Memorandum and Order

summarizes the relevant facts of the case in Section II; sets forth the legal standard for summary

judgment in Section III.A; addresses Plaintiff's Title VII claims against Mr. Lowe in Section

III.B; considers Plaintiff's discrimination claims in Section III.C; and considers Plaintiff's

retaliation claims in Section III.D.  For the reasons set forth below, I **grant** Defendants' motion

for summary judgment and **dismiss** with prejudice each of Plaintiff's Title VII, NYSHRL and

NYCHRL claims against Defendants.

## II.      BACKGROUND

The following facts and descriptions of claims are derived from Plaintiff's Complaint;

Plaintiff's 56.1 Statement, Pl. 56.1, ECF No. 46;[2] the Declaration of Ms. Holleman, with exhibits

("Holleman Decl."), ECF No. 48-6; and the Declaration of Jonathan Meyers ("Mr. Meyers"),

counsel for Plaintiff, with exhibits ("Meyers Decl."), ECF No. 48.  In addition, Plaintiff

submitted a Memorandum of Law in opposition to Defendants' motion.  Pl. Mem., ECF No. 45.

Where appropriate in light of the standards applicable on a motion for summary

judgment, facts are drawn from Defendants' Rule 56.1 Statement, Defs. 56.1, ECF No. 29 at 3-

---

[2] Plaintiff's 56.1 Statement confusingly begins with the "additional paragraphs" permitted by
Local Civil Rule 56.1, numbered beginning with 1, and then includes the required
"correspondingly numbered paragraph responding to each numbered paragraph in the [56.1]
statement of the moving party," also beginning with number 1.  E.D.N.Y. Local Civ. R. 56.1(b).
I will refer to the former by their paragraph numbers (<u>i.e.</u>, Pl. 56.1 ¶ 1), and the latter as "Resp.
¶" (<u>i.e.</u> Pl. 56.1 Resp. ¶ 1).

9;[3] the Affidavit of Robert Lowe, with exhibits ("Lowe Aff."), ECF No. 30; the Affidavit of

Jenna Bischel ("Ms. Bischel"), the Operations Manager for ACI, with exhibits ("Bischel Aff."),

ECF No. 31; the Affidavit of Lillith Bartel ("Ms. Bartel"), the assistant to ACI's Office Manager,

Kim Sobel ("Ms. Sobel"), with exhibits ("Bartel Aff."), ECF No. 32; the Affirmation of Elliot

Schnapp ("Mr. Schnapp"), counsel for Defendants, with exhibits ("Schnapp Aff."), ECF No. 33;

the Reply Affidavit of Mr. Lowe ("Lowe Reply Aff."), ECF No. 35; and the Reply Affirmation

of Mr. Schnapp ("Schnapp Reply Aff."), ECF No. 36. In addition, Defendants submitted a

Memorandum of Law in support of their summary judgment motion, Defs. Mem., ECF No. 34,

as well as a reply Memorandum of Law in further support of that motion, Defs. Reply Mem.,

ECF No. 37.

---

[3] In violation of Local Civil Rule 56.1(d), Defendants' 56.1 Statement lacks, for each numbered paragraph a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." E.D.N.Y. Local Civ. R. 56.1(d). As a result, whenever I cite to Defendants' 56.1 Statement, I also include a supporting record citation from my own review of the record. "A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules" and may rely on its own review of the record when the parties' 56.1 statements are noncompliant. Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001); see Desclafani v. Pave-Mark Corp., No. 07 Civ. 4639 (HBP), 2008 WL 3914881, at *1 n.1 (S.D.N.Y. Aug. 22, 2008) (deciding a motion for summary judgment on its merits despite both parties' failure to include citations in their 56.1 statements); Weiss v. Delta Dallas Alpha Corp., No. 02 Civ. 2484 (GBD) (THK), 2004 WL 1636997, at *1 (S.D.N.Y. July 21, 2004) (finding that the magistrate judge "properly exercised his discretion in deciding the motion on the merits, as opposed to denying it simply because defendants failed to provide citations to the record"); IBS Ketel, Ltd. v. Korea Telecom Am., Inc., No. 98 Civ. 4856 (DC), 2000 WL 821013, at *1 n.1 (S.D.N.Y. June 22, 2000) (relying on the affidavits and documents submitted by the parties, rather than the defendant's unsupported 56.1 statement). In addition, although Defendants' 56.1 Statement lacked proper citations, Defendants included such citations in the fact section of their memorandum of law. See Fleming v. Forty, No. 05 Civ. 9746 (DLC), 2007 WL 987795, at *1 n.1 (S.D.N.Y. Apr. 4, 2007) (overlooking the defendant's failure to include citations in her 56.1 statement when she included citations in her brief).

The Parties' supporting exhibits include witness deposition transcripts, witness affidavits and documents relating to Plaintiff's employment at ACI.[4]

### A.     Facts Relating To Ms. Holleman's Sex Discrimination Claims

Ms. Holleman is a woman who is both an experienced art handler and a professional artist.  Holleman Decl. ¶ 21, Ex. C at 1-2.

ACI is an art-handling company that was founded in 1994 and that presently has approximately forty-five employees.  Lowe Aff. ¶¶ 2-3.  ACI is jointly owned by Mr. Lowe and Graham Stewart ("Mr. Stewart") (each of whom holds a 50% stake in the company), and ACI's business involves the transportation and installation of art for museums, institutions, galleries and private collectors.  Id. ¶ 2; Stewart Dep. 11:6-13, ECF No. 48-8; Lowe Reply Aff. ¶ 1; Pl. 56.1 ¶ 8.  Some of the art moved by ACI is worth "hundreds of thousands" to "millions of dollars."  Holleman Dep. 166:13-15, ECF No. 36-5;[5] Bischel Aff. ¶ 9.  Accordingly, ACI's art handlers' work requires technical skill and client contact.  Lowe Aff. ¶ 2.

In or around April 2010, Mr. Lowe met Ms. Holleman at an ACI social event, learned that she had the credentials necessary to apply for a position at ACI, and invited her to apply. Lowe Aff. ¶¶ 4, 11.  Plaintiff testified that the first time she discussed a job with Mr. Lowe, it was to build crates at $12.00 per hour, and she rejected the offer.  Holleman Dep. 106:15-25, ECF No. 36-5; but see Lowe Aff. ¶¶ 11, 11 n.2 (Mr. Lowe stated that in 2010 he offered Ms. Holleman job as an art handler.).

One year later, Rich Rivera ("Mr. Rivera"), a foreman (and later supervisor) at ACI, encouraged Ms. Holleman to apply to work as an art handler at ACI.  Holleman Dep. 116:21-24,

---

[4] When citing to witness deposition transcripts, I will use the following citation format: "[Deponent's Name] Dep. at [page]:[line]".

[5] The Parties included sections of Ms. Holleman's deposition at ECF No. 36-5 and ECF No. 48-6.

ECF No. 36-5; Lowe Aff. ¶ 12; Rivera Dep. 9:3-10:5, ECF No. 48-9.  Ms. Holleman applied, and on May 13, 2010, Mr. Lowe hired her to work as an art handler, starting at $22.00 per hour with overtime.  Pl. 56.1 ¶ 1; Meyers Decl. Ex. 3 at 9; Lowe Aff. Ex. 1; Holleman Dep. 119:2-6, ECF No. 36-5.  Initially, Mr. Lowe wished to have Ms. Holleman work some trial days, but, according to Ms. Holleman, she told Mr. Lowe "I don't do trial days," so Mr. Lowe hired her outright.  Holleman Dep. 140:14-141:11, ECF No. 36-5.  The $22.00 per hour rate Ms. Holleman received was a high rate of pay for a new hire, as ACI art handlers earned anywhere from $17.00 to $23.00 per hour.  Meyers Decl. Ex. 18; Lowe Aff. ¶¶ 13-15.  Mr. Lowe explained that he offered that pay rate in consideration of Ms. Holleman's skill and experience handling art, welding and building stage sets.  Lowe Dep. 144:18-145:1, ECF No. 48-7; Meyers Decl. Ex. 18; Lowe Aff. ¶¶ 11, 14; Pl. 56.1 ¶ 14.  Mr. Lowe asked Ms. Holleman to keep her hourly rate confidential because she would be making more than art handlers with more seniority, and even some foremen overseeing art handling crews.  Lowe Aff. ¶ 15, Ex. A.

Ms. Holleman was the only female art handler throughout her employment at ACI, which lasted from May 13, 2010 to December 11, 2011, the date of the termination of her employment.  Pl. 56.1 ¶¶ 1-2; Lowe Dep. 69:20-25; Meyers Decl. Ex. 2 at 10.

### 1.    Ms. Holleman's Performance at ACI

#### a.    The Parties' General Perceptions About Ms. Holleman's Performance At ACI

Ms. Holleman believed that she performed "well" over the course of her employment at ACI.  Pl. 56.1 ¶ 15.  For example, in June 2011, Ms. Holleman asked for a raise, but Mr. Lowe declined to give it to her, saying that he would do so in six months "if all is going well with her" at that time.  Meyers Decl. Ex. 18; Pl. 56.1 ¶ 17.  Ms. Holleman received a one-dollar raise in her hourly wage in November 2011, which she understood to mean that Mr. Lowe thought she was

doing well. Pl. 56.1 ¶¶ 18, 57; Meyers Decl. Ex. 3 at 9; but see Lowe Dep. 184:21-185:11 (denying that the raise was performance-based). On December 6, 2011, she was informed that she would receive a holiday bonus. Meyers Decl. Ex. 22; Pl. 56.1 ¶¶ 19, 57.

One of Ms. Holleman's thirteen supervisors, Philip Cheung ("Mr. Cheung"), testified about his view of Ms. Holleman's performance, which was that "[w]hen she first started with us, she didn't gel very well with everyone else because maybe she was accustomed to operating independently" in her last job; however, "toward the latter half of her time there, I felt she was a very competent, [] good person to work with." Cheung Dep. 19:20-21:7, 21:11-21, 22:12-23, 39:5-11 (Ms. Holleman was "good" and "someone [he] could trust" to work independently), ECF No. 48-10; Pl. 56.1 ¶ 15; Meyers Decl. Ex. 3 at 10.[6] In addition, on one occasion, a client was pleased with the work of an ACI team of which Ms. Holleman was a part, and the client invited the entire team to a restaurant to say thank you (approximately eleven people received the email invitation). Meyers Decl. Exs. 19-20; Pl. 56.1 ¶ 22.

In contrast, according to Defendants, over the course of her tenure at ACI, Ms. Holleman "caused more problems for the company . . . than any other art handler who ha[d] worked at ACI" since at least 2005. Bischel Aff. ¶ 5 (stating that Ms. Bischel had worked at ACI since 2005).[7]

---

[6] Mr. Cheung directed Ms. Holleman's work when they had an assignment together and, at some point, he obtained the title of supervisor. Cheung Dep. 18:8-21:1 (clarifying that referring to him as Ms. Holleman's "supervisor" was "a little bit misleading," but agreeing to use the term to the extent that he was responsible for her work when they worked together).

[7] Plaintiff argues that the Court should not consider all of her misconduct, as Defendants, in an interrogatory, cited "only one instance" of misconduct as the subject of formal discipline. Pl. Mem. 8 (referring to Meyers Decl. Ex. 3 at 20). I will summarize all instances of alleged misconduct present in the record before I discuss their relevance to the Court's analysis. I also note that, in the interrogatory to which Plaintiff refers, Defendants specified that "on at least one occasion . . . Robin Lowe counseled plaintiff on her poor work performance and lack of professionalism when he admonished plaintiff, inter alia, for making unauthorized written marks

### b. Mr. Lowe Became Aware Of Complaints About Ms. Holleman During The First Three Months Of Her Employment

Ms. Bischel, who was one of Plaintiff's supervisors, stated that "[a]lmost from the beginning of Ms. Holleman's employment," Ms. Bischel received complaints from some of Ms. Holleman's co-workers and supervisors about her job performance, and requests that they not be assigned to work with Ms. Holleman. Bischel Aff. ¶¶ 6-7. Those who requested that they not work with Ms. Holleman found that her work ethic and behavior were inconsistent; that she voiced complaints about her job assignments in front of clients; and that she would leave before work was completed, thereby creating extra work for her co-workers. Bischel Aff. ¶¶ 8-10. Ms. Holleman denied leaving before work was completed, except when her co-workers agreed she could do so. Holleman Dep. 156:2-22, ECF No. 48-6; Pl. 56.1 ¶ 55.

Ms. Bischel reported the complaints about Ms. Holleman to Mr. Lowe, and informed him that "Ms. Holleman's inability or unwillingness to act professionally on the job not only was unfair to her co-workers, but was making it harder for [Ms. Bischel] to do [her] job because [she] was having difficulty creating workable schedules with so many art handlers unwilling to work with Ms. Holleman." Bischel Aff. ¶ 11; <u>see</u> Lowe Aff. ¶ 6 (stating that "virtually from the day she started at ACI," Mr. Lowe received "numerous complaints" about Ms. Holleman's performance from her co-workers); <u>see also</u> Lowe Aff. ¶¶ 18-24; Lowe Dep. 154:7-157:8. Ms. Bischel told Mr. Lowe she did not "know what to do because I need to book [Ms. Holleman, but] I don't have anybody that wants to work with her." Lowe Dep. 154:7-157:8. According to Mr. Lowe, Ms. Holleman's co-workers complained about her "reprimand[ing] a co-worker in front of a client very loudly," "routinely[] leaving early," "not doing her paperwork," not "labelling

and comments on an ACI Bill of Lading." Meyers Decl. Ex. 3 at 20 (emphasis added). This is one of several examples in which Plaintiff misstates the record.

crates," "being in a bad mood at work," and being "so angry" that "a lot of people did not trust her handling artwork." Id.

According to Defendants, within the first few months of Ms. Holleman's employment, a registrar at one of the Gagosian Galleries—which is ACI's most important client, accounting for as much as 60% of the revenue ACI earns in a typical year—complained about Ms. Holleman's performance and asked that she not be scheduled to work at that gallery. Lowe Aff. ¶¶ 17, 37; Bischel Aff. ¶ 12; Lowe Dep. 200:7-201:21. Ms. Bischel reported the client's complaint to Mr. Lowe. Bischel Aff. ¶ 13; Lowe Aff. ¶ 17.[8] Ms. Holleman was never informed of this client's alleged complaint. Holleman Dep. 200:5-16, ECF No. 48-6.[9]

Mr. Lowe stated that because "there is a learning curve associated with becoming a competent art handler," he was not "altogether surprised or particularly alarmed that certain performance issues arose early in Ms. Holleman's tenure at ACI," but he became concerned that she "did not seem to learn from her mistakes." Lowe Aff. ¶ 16. According to Mr. Lowe, he received complaints about Ms. Holleman's performance "[a]lmost the entire time that she was with [ACI]." Lowe Dep. 155:21-24.

---

[8] Ms. Bischel's testimony as to what co-workers and clients said about Ms. Holleman is not hearsay to the extent it is not offered to prove the truth of the matter asserted in the statement, but to establish Ms. Bischel's and Mr. Lowe's state of mind. Fed. R. Civ. P. 801(c); see Cameron v. Cmty. Aid For Retarded Children, Inc., 335 F.3d 60, 65 (2d Cir. 2003) ("The inaccuracy of those reports [about the plaintiff] does not matter if [her supervisor] believed them.").

[9] Plaintiff makes the unsupported assertion that "[t]here has never been an instance in which an ACI client asked that Ms. Holleman not come back to their [sic] premises." Pl. 56.1 ¶ 23. The deposition citation Plaintiff provides for this assertion states only that Ms. Holleman did not know that the Gagosian Galleries registrar requested she not be part of the crews with which he worked. Holleman Dep. 200:5-16, ECF No. 48-6.

### c.  Mr. Lowe Counseled Ms. Holleman About The Complaints About Her

To address deviations from workplace standards, ACI used a method of counseling employees that Mr. Lowe did not consider to be discipline in the "traditional" sense of the word. Lowe Dep. 86:20-24, 88:21-89:12.[10]  Mr. Lowe stated that he generally asked employees who complained about Ms. Holleman to "address it themselves," Lowe Dep. 154:7-157:8, but that he met with Ms. Holleman "probably two or three times" during her first few months to help her to improve her performance.  Lowe Aff. ¶¶ 20 (Mr. Lowe told her to improve her patience, communication with co-workers and professionalism with clients), 24; Lowe Dep. 152:2-157:8. Mr. Lowe talked to her about her performance "very nicely," "not in a disciplinary fashion, just an informal conversation," and Mr. Lowe did not warn Ms. Holleman that she might be terminated if she did not improve.  Lowe Dep. 152:2-157:8.  Mr. Lowe offered some detail as to the first of these conversations with Ms. Holleman, stating that he addressed, for example, some of the complaints he had heard about her "moving a little too fast with our work, [being] jumpy, some communication things."  Lowe Dep. 152:11-21.

In her 56.1 Statement, Ms. Holleman does not dispute, and therefore admits, see E.D.N.Y. Local Civ. R. 56.1(c), that Ms. Bischel and Mr. Lowe received these complaints, and that Mr. Lowe spoke with her to address the complaints.  See, e.g., Pl. 56.1 ¶ 54.  For example, Defendants asserted that "Ms. Bischel received complaints from a number of ACI's art handlers

---

[10] During Mr. Lowe's deposition, Plaintiff's counsel explained to Mr. Lowe that counsel was "using the sort of traditional employment definition of discipline."  Lowe Dep. 86:20-24, 88:13-20.  Mr. Lowe repeatedly rejected counsel's use of the word discipline in relation to ACI's methods of addressing workplace standards.  Lowe Dep. 86:1-89:22.  In recognition of this, Plaintiff's counsel referred to, for example, "meetings in the sense [of] a substitute for discipline," Lowe Dep. 249:12-14; "meetings . . . of the variety that we've been talking about specifically in this case that are similar to, but not the same as formal discipline," Lowe Dep. 259:9-13; and "meetings . . . of the quasi-disciplinary type," Lowe Dep. 265:17-18.  Counsel also explained to Mr. Lowe that, "again, I'm not going to use the word discipline because that's not the word you used."  Lowe Dep. 265:8-12.

concerning plaintiff's performance on the job," Defs. 56.1 ¶ 10, <u>see</u> Bischel Aff. ¶¶ 6-11.  Ms. Holleman's denial states that Mr. Lowe had informal conversations with her about "communications things," her "interactions with co-workers," her "not completing paperwork correctly," and "leaving early," which is not a denial that Ms. Bischel received such complaints. Pl. 56.1 Resp. ¶ 10.  Ms. Holleman further stated that "Mr. Lowe's discussions about those things [her "communication" with co-workers, "her not completing paper work correctly" and her "leaving early"] with Ms. Holleman" were "informal" conversations that were not "serious enough to warn Ms. Holleman that she might be terminated if she failed to improve," Pl. 56.1 Resp. ¶ 10.  In other words, Ms. Holleman contests the significance of the complaints and conversations with Mr. Lowe, not that they occurred.[11]  Ms. Holleman testified that she did not leave jobs early or fail to complete her paperwork.  Pl. 56.1 ¶ 55.[12]

---

[11] The same language Ms. Holleman used in Pl. 56.1 ¶ 54 and Pl. Resp. ¶ 10, is repeated at Pl. Resp. ¶¶ 12-19.  Defendants, at Defs. 56.1 ¶¶ 12-19, alleged that co-workers asked not to work with Ms. Holleman; a customer complained about her during her first three months and requested that she not work at his gallery; these complaints made Ms. Bischel's job more difficult; Ms. Bischel reported the complaints to Mr. Lowe; Mr. Lowe himself received complaints from art handlers about Ms. Holleman complaining about the work, moving pieces without proper care, and complaining in front of clients; and Mr. Lowe spoke with Ms. Holleman about her job performance and professionalism.  Defs. 56.1 ¶¶ 12-19; <u>see</u> Bischel Aff. ¶¶ 5-13; Lowe Aff. ¶¶ 16-22; Lowe Dep. 154:13-24.  Plaintiff's rote denial of these allegations was not a denial that these events occurred, but an argument as to their significance.

To the extent Defendants alleged, in part, that Plaintiff specifically expressed irritation about "still having to be on the job," Defs. 56.1 ¶¶ 17-18, I do not find these allegations to be admitted.  Although the record contains evidence of Plaintiff becoming impatient and careless as the day wore on, and that she complained "about the jobs to which she had been assigned while there were client representatives present," Bischel Aff. ¶ 8; Lowe Aff. ¶ 22, there is no evidence that she specifically complained about "still having to be on the job."

[12] Plaintiff's contention that her "supervisor concluded that she improved in these areas later in her employment," Pl. 56.1 ¶ 54, Pl. 56.1 Resp. ¶¶ 10, 12-19, misstates the testimony of Mr. Cheung.  As previously described, Mr. Cheung stated that Ms. Holleman did not "gel" with her co-workers, but this improved "later on," Cheung Dep. 22:12-23, and that "toward the latter half of her time there," he believed her to be "a very competent, [] good person to work with," <u>id.</u> at 39:5-18.  There is no evidence as to what Mr. Cheung meant by "gel[ling]" with co-workers and

### d.    Defendants' Allegations That Plaintiff
### Failed To Fill Out BOLs

Defendants explain that bills of lading ("BOLs") are the legal record of where artwork and other objects being transported come from, where they go and who holds the artwork in between.  Defs. 56.1 ¶ 21; Bischel Aff. ¶ 15; Lowe Aff. ¶ 26.[13]  Ms. Holleman does not deny that "[f]illing out and maintaining [BOLs] properly is an essential part of ACI's business and of the jobs of its art handlers."  Defs. 56.1 ¶ 20; Pl. 56.1 Resp. ¶ 20 ("Plaintiff is unable to admit or deny this allegation of fact."); Bischel Aff. ¶¶ 15-16; Lowe Aff. ¶ 26; see E.D.N.Y. Local Civ. R. 56.1(c) (each paragraph of the movant's 56.1 statement "will be deemed to be admitted for purposes of the motion unless specifically controverted").

On August 2, 2010, Ms. Holleman and other art handlers received an email from Ms. Bischel explaining the purpose and procedures for BOLs, including that when "a client wants you to remove something from [a] location for delivery elsewhere, you MUST write a new BOL for this transport . . . ."  Bischel Aff. Ex. A at 2; Defs. 56.1 ¶ 24; Pl. 56.1 Resp. ¶ 24.

### i.    Defendants' Allegation That Plaintiff Did Not
### Fill Out A BOL When A Client Gifted Her With
### A Painting

On August 5, 2010, Ms. Holleman was assigned to an art installation project at the home of an ACI client who offered Ms. Holleman a painting that the client no longer wanted.  Bischel

---

whether it is the equivalent of good co-worker communication, as opposed to camaraderie; moreover, there is no evidence as to his opinion on whether the alleged paperwork and early departure problems improved over time.  There is also no evidence as to whether he expressed his opinion of Ms. Holleman to Mr. Lowe or Mr. Stewart prior to her firing.

[13] Ms. Holleman objects to this statement based on deposition testimony concerning the unrelated issue that clients would sometimes sign the BOLs in the wrong place.  Pl. 56.1 Resp. ¶ 21 (citing Holleman Dep. 168:10-25, ECF No. 48-6).  Ms. Holleman does not contest that she received an email from ACI explaining that BOLs are created so ACI "has a legally binding document that tracks the transport from one location to another."  Bischel Aff. Ex. A at 2; see Defs. 56.1 ¶¶ 23-25; Pl. 56.1 Resp. ¶¶ 23-25.

Aff. ¶ 19.  Ms. Holleman accepted this painting without noting it on the existing BOL or creating a new one.  Defs. 56.1 ¶ 26; Pl. 56.1 Resp. ¶ 26; Bischel Aff. ¶ 19.  The client later emailed ACI asking that the painting be returned.  Bischel Aff. ¶ 19.  Ms. Bischel could not find a BOL for the painting, as none existed, but eventually identified Ms. Holleman as having taken the painting.  Bischel Aff. ¶ 20, Ex. B at 2.  On August 6, 2010, Ms. Bischel wrote to Ms. Holleman that,

> [A]ny time something leaves a residence that AC[I] will be accountable for, there needs to be documentation of this movement.  [T]his piece needed a BOL to show that it left the clients and was delivered to AC[I].  [O]nce here, we would inventory it, then generate a BOL for disposal and the client will be billed accordingly.  [T]his needs to be done regardless of what message you are provided by the client.

Bischel Aff. ¶ 21, Ex. B at 2; Defs. 56.1 ¶ 27; Pl. 56.1 Resp. ¶ 27.[14]  Ms. Bischel copied Mr. Lowe on the email so that he was aware of the incident.  Bischel Aff. Ex. B at 2; Lowe Aff. ¶ 27.

### ii.     Defendants' Allegation That Plaintiff Did Not Fill Out A BOL When She Took Posters To Her Home For Personal Use

On or about November 29, 2010, a client requested that ACI pick up and store two poster reproductions of artwork by Vera Lutter (the "Lutter Posters"), which had been used as props in a film.  Bischel Aff. ¶ 23, Ex. E at 2.  The instructions written on the BOL before the crew was assigned to the job stated "hold for storage."  Lowe Aff. ¶ 46, Ex. E at 2.  According to Ms. Holleman, she took the posters for her own use after she was told by the client that they were "garbage" scheduled for disposal.  Holleman Dep. 236:3-22, 255:2-257:2, ECF No. 48-6; Defs.

---

[14] Plaintiff in her 56.1 statement asserts that the email "applied to artwork(s), and not to trash," Pl. 56.1 Resp. ¶ 27, which is not a denial that Ms. Bischel sent the email, that Plaintiff received it and that Defendants accurately quoted the email.

56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29.[15]  Ms. Holleman also wrote on the BOL, after delivering the Lutter Posters to ACI, "TBD, not sure for destruction or storage."  Lowe Aff. ¶ 46, Ex. E at 2 (crew notes section, showing "Name: Kim Holleman", "DELIVERY: Gagosian Galler[ies] c/o Art Crating, Inc.", and a "FINISH" time of 4:45 P.M.).  Ms. Holleman did not make a note on the BOL or create a new BOL to document her taking of the Lutter Posters.  Id.; Defs. 56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29.  According to Ms. Holleman, Mr. Lowe allowed her to use Defendants' van to transport the Lutter Posters to her studio.  Holleman Dep. 268:2-21, ECF No. 48-6.

In January 2012, the client instructed that the Lutter Posters be transferred from ACI's warehouse to a long-term storage facility.  Bischel Aff. ¶ 27.  After Defendants were unable to find the Lutter Posters in their warehouse, an employee who knew Ms. Holleman socially remembered that Ms. Holleman had the Lutter Posters displayed on her wall.  See Bischel Aff. ¶ 27; Lowe Dep. 234:2-237:20; Meyers Decl. Exs. 50-54.  Ms. Holleman returned the Lutter Posters.  Meyers Decl. Exs. 53-54.

---

[15] Concerning the disposal of the Lutter Posters, Mr. Lowe stated that,

> Because artists, to preserve the value of the originals, almost always try to control the dissemination of reproductions of their works, it is not uncommon for ACI to store reproductions, even if they themselves do not have great intrinsic value, while the artist decides whether she wishes to use the reproduction again or destroy it.  If the artist or [his or her] representative instructs ACI to destroy a reproduction—either when the piece is first picked up or after it has been in storage for a while—ACI must document its destruction (for example by photographing it), again to reassure the artist that there are no unauthorized reproductions "floating around" and diminishing the value of the original.

Lowe Aff. ¶ 45.

Mr. Lowe learned of this incident in or around February 2012, after Ms. Holleman had been fired.  Lowe Aff. ¶ 50 n.4; Defs. 56.1 ¶ 30; Pl. 56.1 Resp. ¶ 30.[16]  Defendants allege that, had Mr. Lowe learned that Ms. Holleman took the Lutter Posters prior to incident for which she was fired, he "almost certainly would have terminated her employment immediately."  Lowe Aff. ¶ 52.

### e.    Defendants' Allegations That Plaintiff Wrote Irritated Comments On BOLs

According to Defendants, a copy of the BOL would typically be sent to a client, and therefore any inappropriate handwritten notes on the BOL would be seen by the client or would be "whited [] out" first, to avoid offending the client.  Lowe Dep. 162:1-16; Defs. 56.1 ¶ 31; Pl. 56.1 Resp. ¶ 31.

### i.    Defendants' Allegation That Plaintiff Wrote "100% FALSE" On A BOL With Inaccurate Information

On February 17, 2011, Ms. Holleman made a delivery for ACI that was meant to occur "by 12 / after 1."  Bischel Aff. Ex. E at 2.  Another section of the BOL noted that the delivery location "no longer closes for lunch b/w 12-1pm."  Id.  After she arrived between noon and 1:00 p.m. to find that the location was closed, Ms. Holleman wrote on the BOL, in capital letters and doubly underlined, that the notation about the location being open during the lunch hour was "100% FALSE."  Defs. 56.1 ¶ 33; Pl. 56.1 Resp. ¶ 33; Bischel Aff. Ex. 5 at 2; see Bischel Aff. ¶ 32 (Ms. Bischel and Ms. Holleman exchanged text messages and Ms. Bischel "assured her that we would in the future remove the note about the warehouse being open during the lunch hour").

---

[16] Plaintiff denies this paragraph of Defendants' 56.1 Statement on the sole basis that, "[t]he foam board[s] were not artworks, but were trash," Pl. 56.1 Resp. ¶ 30, which is not responsive to Defendants' allegation that "Mr. Lowe learned of this second instance of plaintiff's having taken client artwork home without filling out appropriate documentation on or about February 2, 2012 . . . ."  Defs. 56.1 ¶ 30; Lowe Aff. ¶ 50 n.4.

Ms. Bischel testified that Plaintiff's complaint on the BOL could be read as "an accusation that either the client or ACI's office had deliberately given incorrect information to the crew," and that it was unprofessional to write such a statement on a document that would be expected to go to a client. Bischel Aff. ¶¶ 35-36. Ms. Bischel told Mr. Lowe about the incident. Bischel Aff.¶ 36; Lowe Aff. ¶ 23 (Ms. Bischel told Mr. Lowe that Ms. Holleman wrote comments that "had nasty or condescending overtones to them rather than being offered in a constructive spirit").

      **ii.**      **Defendants' Allegation That Plaintiff Wrote An Irritated Message On A BOL About A Client's Preparation Of Artwork For Handling**

On June 20, 2011, Ms. Holleman was told that the art her crew was handling that day would be ready to go without the crew needing to first write a condition report. Bischel Aff. ¶ 38. Instead, the crew found the art unwrapped,[17] and Ms. Holleman wrote the following message in large block lettering over the entirety of two BOLs: "FOR THE RECORD: <u>ALL</u> WORK FROM PHILLIPS <u>MUST</u> BE CONDITIONED AS WELL AS WRAPPED → NO "R[EADY TO GO]" FROM PHILLIPS S.O.S." and "ALL WORKS <u>NEVER</u> R[EADY] T[O] G[O], ALL WORKS REQUIRE CONDITION REPORT AS WELL AS WRAPPING." Bischel Aff. Ex. F at 2-3; Defs. 56.1 ¶ 37; Pl. 56.1 Resp. ¶ 37.[18] Ms. Holleman underlined the word "ALL" seven times, the word "MUST" three times and the word "NEVER" three times. Bischel Aff. Ex. F at 2-3.

---

[17] According to Ms. Bischel, "[t]hose sorts of 'surprises' happen every day and are simply a part of the art handler's job." Bischel Aff. ¶ 39.

[18] Plaintiff alleges, <u>see</u> Pl. 56.1 Resp. ¶ 37, that she is unable to answer this paragraph in Defendants' 56.1 because Defendants mistakenly wrote, "On June 20, 2011, wrote [sic] large handwritten notes . . . ," Defs. 56.1 ¶ 37, rather than, "On June 20, 2011, Plaintiff wrote large handwritten notes." In any event, Ms. Holleman has not denied that she wrote the notes and that Defendants accurately described those notes. Defs. 56.1 ¶ 37; Bischel Aff. Ex. F at 2-3; Holleman Dep. 221:2-23, ECF No. 48-6.

### f.    Mr. Lowe Counsels Plaintiff About
### The June 20, 2011 BOL Incident

Ms. Bischel "dreaded . . . having to present defaced documentation to the client,"

although she likely created "a cleaned up version" for the client.  Bischel Aff. ¶¶ 40, 40 n.2.  She

found Ms. Holleman's actions to be unprofessional.  Id. ¶ 40.  Ms. Bischel informed Mr. Lowe,

and Mr. Lowe spoke with Ms. Holleman about her conduct.  Bischel Aff. ¶ 40; Lowe Dep.

181:2-183:12; Defs. 56.1 ¶ 39; Pl. 56.1 Resp. ¶ 39.

According to Ms. Holleman,

> [Mr. Lowe] said, "You know that clients see this?"  And I said, "I
> didn't know that clients saw that."  He said, "They do."  And I
> said, "Okay, I won't write over the whole face of it again."  And he
> said, "Okay great," and it was a non-event.

Holleman Dep. 222:4-17, ECF No. 48-6[19]   Prior to working at ACI, Ms. Holleman had no

experience with BOLs.  Id. at 162:17-22.  After Mr. Lowe's conversation with Plaintiff about the

BOL, a male art handler "pulled [her] aside" and said, "'Don't worry about it, it's not a big deal.

You should see one BOL I made with graphic stick figures all over it and then I was promoted.'"

Id. at 333:3-16.  According to Ms. Holleman, Mr. Rivera also told her, "Don't worry about that

BOL thing . . . ."  Id.

According to Mr. Lowe, he told Ms. Holleman that the BOL was "a legal document for

the company"; that Ms. Holleman had "basically defaced" the document, making it hard "to pass

it along to the client"; that she wrote "a personal message directed at Jenna Bischel" and should

---

[19] Plaintiff testified at her deposition that, prior to her discussion with Mr. Lowe concerning the
June 20, 2011 BOL, she did not have any "conversations with Robin Lowe about [her]
performance as an art handler at Art Crating."  Holleman Dep. 223:19-22, ECF No. 48-6.  In her
56.1 Statement, Plaintiff acknowledged that Mr. Lowe had "discussions" with her about various
other performance issues, see Pl. 56.1 ¶ 54; Pl. 56.1 Resp. ¶¶ 10, 12-19, which at most raises a
non-material question as to whether those discussions happened before or after their conversation
about the BOL.  See also Meyers Decl. Ex. 24 at 1 (Ms. Holleman acknowledged that there were
"initial incidents" with her performance).

"either call or talk to Jenna personally as opposed to writing all over the invoice"; and he made

Ms. Holleman "promise [him] that this would never happen again." Lowe Dep. 181:17-183:1;

see id. ("I don't use [the word 'discipline'], but she was well aware that I was not happy about it

and it was serious."); Lowe Reply Aff. ¶ 17 ("Throughout my career at ACI, I have attempted to

run the business in a collegial way, deliberately avoiding the use of words like 'discipline' and

'counseling' . . . . [T]here is absolutely no doubt that Ms. Holleman knew that I was taking her

aside because she had done something very seriously wrong.").[20]

In contrast, Ms. Holleman testified that her handwritten notations on BOLs were "the

only way to communicate this information," and that she was "right" to make these notes.

Holleman Dep. 221:2-23, ECF No. 48-6. In opposition to Defendants' motion, Ms. Holleman

submits BOLs in which other employees made handwritten notations, such as "Did Not Do,"

"Didn't Happen," "BLANK CD," "GREAT JOB!," "CANCEL," and notes about damage or

---

[20] Plaintiff repeated states with no citation that "Robin Lowe, at his deposition, confirmed that the BOL was the only thing that ACI considered to be a prior disciplinary infraction at the time of Ms. Holleman's termination." Pl. 56.1 ¶ 54; Pl. 56.1 Resp. ¶¶ 10, 12-19. The record does not support this statement, as Mr. Lowe repeatedly rejected characterizing his actions in such terms. Mr. Meyers questioned Mr. Lowe as follows:

> Q. [ . . . ] [W]ould it be correct to say . . . you did not tell [Ms. Holleman] what [sic] you considered to be a disciplinary infraction, correct?
>
> A. I didn't use the word discipline.

Lowe Dep. 153:19-25.

> Q. Did you tell Kim [Holleman] that you considered [the conversation about defacing a BOL] to be a disciplinary infraction or words to that effect.
>
> A. Again, I don't use that word, but she was well aware that I was not happy about it and it was serious.

Lowe Dep. 182:21-183:1.

problems with packaging.  Meyers Decl. Ex. 26.  According to Mr. Lowe, these BOLs are not comparable to Ms. Holleman's BOLs, because the comments indicate, for example, that the job was not completed, in which case the BOL would not be seen by the client.  Lowe Reply Aff. ¶ 19.  One BOL, like Ms. Holleman's June 20, 2011 BOL, concerns artwork that was not wrapped.  Meyers Decl. Ex. 26 at 10.  The handwritten note says in small capital letters, across a relatively small portion of the page, "* NOT WRAPPED," with a line drawn above and below the text.  Id.  Mr. Lowe contends that "none of the selected 'comparables' [sic] looks anything like the BOL's that I counseled plaintiff about."  Lowe Reply Aff. ¶ 19.

### g.    Defendants' Allegations Regarding The December 9, 2011 Client Complaint

On Friday, December 9, 2011, Taylor Franklin ("Mr. Franklin"), a representative at Gagosian Galleries, telephoned Ms. Bischel to complain about Ms. Holleman's response to a last-minute request (an "add-on job"), made while she was already working on a Gagosian Galleries job, for the ACI crew also move artwork at the residence of Larry Gagosian ("Mr. Gagosian"), owner of the Gagosian Galleries.  Defs. 56.1 ¶ 41; Pl. 56.1 Resp. ¶ 41; Bischel Aff. ¶ 44; see Lowe Reply Aff. ¶ 21 ("Mr. Gagosian is "universally recognized as the most powerful individual in the art world and [is] the owner of ACI's most important client.").  According to Ms. Bischel, Mr. Franklin told her that Ms. Holleman complained about the extra work to such an extent that "Mr. Franklin was so alarmed . . . he did not trust [Ms. Holleman] to handle the expensive piece of art [that] was to be installed at Mr. Gagosian's residence."  Bischel Aff. ¶ 45.  Ms. Bischel "viewed this complaint as being one of the most serious complaints [she] ever received from a client about an [ACI] art handler."  Bischel Aff. ¶ 47; see Lowe Aff. ¶ 37 ("It would be hard to overemphasize the seriousness of [Mr. Franklin's] complaint.").

Within a few minutes of receiving the call, Ms. Bischel memorialized the phone call from Mr. Franklin in an email sent to Mr. Stewart and Mr. Lowe, stating,

> [S]o I just got a call from [Mr. Franklin] at [Gagosian Galleries] – [Ms. Holleman] apparently is complaining about how the add on at [Mr. Gagosian's residence] has ruined her day and [she is] being very vocal about not wanting to be there to complete the job.
>
> [Mr. Franklin] said that he understands that [Gagosian Galleries] asks us to do stupid stuff all the time and that there's nothing he can do about [that], but to have to listen to someone complaining to him about it [is] not professional.
>
> [Mr. Franklin] said that listening to someone complain like that doesn't make him feel comfortable that they [sic] are going to have their head[s] in the game and that they will be focused on the task at hand.
>
> I am presently trying to get another crew over there and just tell [Ms. Holleman] to go home base[d ]on this. [The] other crew is pissed because they then have to cover for [Ms. Holleman] when she has actually had some down time and not as stressful a day as they are having.

Bischel Aff. ¶ 44, Ex. G at 2.

Ms. Holleman testified that what she said in Mr. Franklin's presence was, "Hey, we only have fifteen minutes. I wish we could have more time. This is our best client. We really don't have time. Can we get this done? Yes we can." Holleman Dep. 290:19-291:8, ECF No. 48-6; Pl. 56.1 ¶ 26.

## 2. Ms. Holleman's Termination

### a. Ms. Holleman Is Terminated

Ms. Holleman asserts that both Mr. Lowe and Mr. Stewart "participated" in the decision to fire her. Pl. 56.1 ¶ 30; see Meyers Decl. Ex. 3 at 11 (according to Defendants, "The decision to terminate Plaintiff's employment with ACI was made by the owner Robin Lowe. Prior to implementing that decision, Mr. Lowe communicated with Graham Stewart, the co-owner of

ACI, to determine if Mr. Stewart had any objection to his decision."); Stewart Dep. 25:16-21

("My opinion was asked and I gave my opinion."); but see Defs. 56.1 ¶ 47 (Mr. Lowe "made the

decision to terminate plaintiff's employment with ACI."); Lowe Aff. ¶ 39.  Mr. Stewart

answered Ms. Bischel's December 9, 2011 email later that day, copying Mr. Lowe on the

correspondence, and writing "I want her gone!!!!!"  Meyers Decl. Ex. 12.

 Mr. Lowe testified that he "spent a good day-and-a-half at home thinking about [Ms.

Holleman's potential firing] because I don't take these things lightly at all.  Personally she is a

fine person.  It has nothing to do with her as a person.  It has to do with her as a worker at

[ACI]."  Lowe Dep. 192:19-193:20.  In firing Mr. Holleman, he considered her "defacing the

BOL"; her "complaining about a job" and Mr. Franklin's call subsequent call to Ms. Bischel; and

that it was "very difficult" to book Ms. Holleman on jobs "because certain people would not

work with her."  Id. at 192:19-193:20.  In addition, Mr. Franklin's complaint "reminded [Mr.

Lowe] of all the complaints [he] heard from Kim Holleman's co-workers that she would often

get very irate and be in a bad mood and not perform well in terms of communication on the job."

Id. at 194:14-195:10.  He felt that "the complaint from Mr. Franklin, and Ms. Bischel's summary

of what she had needed to do after receiving it, fit right into the pattern of unacceptable behavior

and performance that had been reported to [him] about Ms. Holleman throughout her tenure."

Lowe Aff. ¶ 38.

 Mr. Lowe agrees that he never called Mr. Franklin to speak to him directly about the

incident because he "did not want to upset [Mr. Franklin] further."  Lowe Dep. 197:5-22; Pl.

56.1 ¶¶ 35-37.  In Mr. Lowe's experience, Mr. Franklin "was one of the more easy-going people

with whom ACI dealt at Gagosian [Galleries]."  Lowe Aff. ¶ 37.  Mr. Lowe believed that "[i]f

Ms. Holleman's behavior was bad enough to lead him to complain and also to become

uncomfortable about letting Ms. Holleman complete the job, it must truly have been beyond the pale." Id. ¶ 37.  In addition, he considered Ms. Bischel to be "one of ACI's most trusted employees."  Lowe Reply Aff. ¶ 21.

On Sunday, December 11, 2011, Mr. Lowe sent Ms. Holleman an email terminating her employment with ACI, copying Mr. Stewart.  Meyers Decl. Ex. 15 at 1.  The email read as follows:

> Kim,
>
> Unfortunately, I have decided that we can no longer employ you at [ACI], effective today, due to the circumstances surrounding last Friday's job.  Complaining to [the] clients about work that [ACI] is performing for them is something that I do not tolerate.  This always results in immediate complaints by the client and can put us in a difficult position regarding our compan[y's] reputation.  If this was the first time that I had an issue with something you did while working for us, I might have treated this differently, but there seems to be a pattern to the way you work and communicate with others that is not consistent with what [Mr. Stewart] and I consider professional behavior in the work place. Due to the length of your stay with us, I will ask [Ms. Sobel] to send you 2 weeks['] pay based on average earnings.  If you wish further explanation of my decision, you may call me Tuesday between 10 and 12.
>
> Sincerely, Robin Lowe

Meyers Decl. Ex. 15 at 1; Pl. 56.1 ¶¶ 24-25.

### b.  Ms. Holleman's Unsuccessful Effort To Be Reinstated To Her Job

Ms. Holleman claims that she did not initially know what incident triggered her termination, and, on December 12, 2011, she wrote to Ms. Bischel to inquire.  Meyers Decl. Ex. 23; Pl. 56.1 ¶ 34.  She told Ms. Bischel that "there has never been an incident involving a client as described by [Mr. Lowe]" and she had "no client interaction" on December 9, 2011.  Meyers Decl. Ex. 23.

Ms. Holleman also wrote a lengthy email to Mr. Lowe and Mr. Stewart on December 13, 2011, expressing her confusion over the termination because she "felt [that her] recent raise was an indication that all . . . things were good . . . ." Meyers Decl. Ex. 24 at 1. Ms. Holleman wrote, in part:

> Dear Robin and Graham,
>
> I wanted to send this before speaking so you would know no matter what—I am grateful. Art Crating is my life. There is no other job that could fulfill me and give me a sense of purpose more. This job is everything I could ever desire or want in a job that I didn't even know was possible to have in one job or at one company. Art Crating is everything to me, as I have felt personally changed for the better by my involvement with everyone and every thing we do.
>
> I have literally blossomed as a human being working for your company and with the family I consider Art Crating to be. [I had] a huge wake up call . . . a year ago and . . . transform[ed] my attitude and performance as well as my relationship to all the people I work with including crew and beyond. Everyone has echoed this sentiment with nothing but positivity and praise to me verbally and directly for at least an 8 month period. My "personal transformation" is something many people have commented positively on, and I thought it was something you were seeing as well. [ . . . ]
>
> Over these past 8 months I have had what I thought to be a spotless record. I have doubled down, met with supervisors, Rich [Rivera] and Philip [Cheung] to directly discuss changes I can make and solicit constructive criticism and have enacted all the changes I was told to make. [ . . .]
>
> I feel devastated and remorseful that this has occurred. The manner in which I was let go reveals to me that I was not in good standing to begin with and I'm saddened to find out I was on such thin ice for so long a period, when things have been so consistently good. The initial incidents were so long ago, that it shows me I have somehow failed to convey to you the change in me and all the investments I've made into [sic] myself and my work. This bothers me tremendously, as nothing has been a higher priority to me for the past 8 months than doing a great job at AC[I] and becoming a part of the AC[I] family. [ . . . ]

> This is the greatest job and nothing has had a more positive impact
> in my life. I have literally become a more beautiful and happy
> person due to my association to this work and company. I'm
> totally grateful. . . . I deeply apologize for any recent infractions or
> issues with any client at all. [ . . . ]

Meyers Decl. Ex. 24 at 1.

Mr. Lowe decided not to reverse his decision on Ms. Holleman's firing, and he discussed

that fact with Mr. Stewart, who did not object. Meyers Decl. Ex. 3 at 14. Mr. Lowe responded

to Ms. Holleman's email and told her that she would not be reinstated. Meyers Decl. Ex. 24 at 2.

Ms. Holleman later wrote to Mr. Lowe to say,

> [T]hank you very much for offering to give me a reference. I think
> that's really cool of you and I truly appreciate it . . . [Also,] if you
> think it's ok, [can Ms. Sobel] write me a termination letter that is
> somewhat neutral so that if I was unable to find work, I might
> apply for unemployment. I'm not entitled to either one, I know,
> I'm just trying to think of the future.

Meyers Decl. Ex. 24 at 2.

### c. Ms. Holleman's Telephone Call To The ACI Client Whose Complaint About Her Prompted Her Termination

Ms. Holleman argues that her firing was a rash decision, and that "[i]t would have been

reasonable to investigate a complaint made by [Mr.] Franklin, as he ha[d] a reputation [among

ACI's staff] . . . [for] being 'a stressful type of person' and 'a bit neurotic.'" Pl. 56.1 ¶¶ 27, 39;

Holleman Dep. 289:12-290:6; but see Bischel Aff. ¶¶ 43, 47 (Ms. Bischel could not "recall

hearing [Mr. Franklin] complain about any ACI art handler" prior to Ms. Holleman, and Ms.

Bischel found Mr. Franklin to be "one of the most accommodating" of all the Gagosian staff);

Lowe Aff. ¶ 37 (same).

Shortly after her termination, Ms. Holleman telephoned Mr. Franklin directly to tell him

that she had been fired because of his complaint to Ms. Bischel. Holleman Dep. 292:1-293:16,

ECF No. 48-6.  According to Plaintiff (Mr. Franklin does not appear to have been deposed in connection with this action), Mr. Franklin apologized for making the complaint, saying, "That's something I could have said to you in private.  I feel horrible;" asked if he could call Mr. Lowe on her behalf; and told her, "Nothing I said could have possibly gotten you fired."  Holleman Dep. 292:1-293:16, ECF No. 48-6; Pl. 56.1 ¶¶ 28, 38.

Mr. Franklin called Mr. Lowe and said he hoped that Ms. Holleman's firing had "nothing to do with the incident on Friday."  Lowe Dep. 198:5-199:17.  Mr. Lowe assured Mr. Franklin that he need not feel personally responsible because Mr. Lowe's "decision [was] not solely based on  [the December 9, 2011 incident]" but on "a series of incident[s] during the course of [Ms. Holleman's employment]."  Id. at 198:5-199:17.

Separately, when Mr. Lowe told Mr. Cheung that he had fired Ms. Holleman, Mr. Cheung told him to "consider" that decision to be sure "this is what he wanted to do."  Cheung Dep. 26:2-29:22 (specifying that he told Mr. Lowe to "consider," not "reconsider[]" his decision).  Mr. Lowe told Mr. Cheung that the decision was based on "one incident that kind of instigated this, but it was always part of this other bigger thing that [Mr. Lowe] felt was a problem and had to be addressed."  Id. ("[Mr. Lowe] had been thinking about [the matter] for quite a while. . . . It wasn't like, oh, you know, this one thing went wrong . . . . [A]ll these other things had kind of already occurred at least as it was presented to me.").

According to Ms. Holleman, she called Mr. Cheung "probably within minutes" of being fired, and Mr. Cheung told her he would phone Mr. Lowe on Ms. Holleman's behalf.  Holleman Dep. 302:3-25, ECF No. 48-6.  Ms. Holleman testified that Mr. Cheung later told her that he told Mr. Lowe that Ms. Holleman was "perfectly professional, [that] he loved working with [her], [that she] was one of AC[I]'s top installers, and [that Mr. Lowe] was definitely not considering

all of the relevant information about the decision regarding [Ms. Holleman's] termination."

Holleman Dep. 303:25-304:5, ECF No. 48-6.  Mr. Cheung's deposition testimony corroborates

only that Mr. Cheung asked Mr. Lowe "to consider" his decision "and to be sure that . . . [that

was] what he wanted to do."  Cheung Dep. 28:15-25.

### 3. Plaintiff's Allegations Of Fact Relevant To Her Sex Discrimination Claims

Plaintiff alleges that there are material issues of fact in dispute, in addition to the issues

already discussed, as to whether she was the victim of sex discrimination.  Generally speaking,

Plaintiff's position is that a rational fact finder could conclude that she was the victim of sex

discrimination based on alleged evidence in the record of (1) statements by ACI employees about

Ms. Holleman being subjected to discrimination; (2) anti-female sentiment as part of ACI's

culture; (3) examples of male comparators who committed misconduct but were not fired; and

(4) ACI demonstrating such marked unprofessionalism that it cannot reasonably claim that it

fired Ms. Holleman on the basis of unprofessionalism.

### a. Plaintiff's Evidence Of Alleged Statements From Two ACI Employees That Plaintiff Suffered Discrimination

### i. Mr. Rivera's Alleged Statements Regarding Plaintiff's Firing

According to Plaintiff, she asked Mr. Rivera whether she could get her job back if she

"grovel[ed]," and Mr. Rivera allegedly responded "Not really . . . . You know why you got fired,

right?"  Holleman Dep. 309:19-25, ECF No. 36-5.  Plaintiff testified that "that's when it sort of

became the understanding that he was referring to the fact that I was female."  Holleman Dep.

309:23-310:1; Pl. 56.1 ¶ 6.  Plaintiff acknowledges that Mr. Rivera never actually said that

Defendants fired her because she is a woman.  Holleman Dep. 310:7-15, ECF No. 36-5.

In a declaration, Eric Ayotte ("Mr. Ayotte"), a former ACI art handler, stated that he asked Mr. Rivera about Ms. Holleman's firing out of curiosity, as Ms. Holleman was Mr. Ayotte's "fellow art handler." Ayotte Decl. ¶¶ 2, 9, ECF No. 48-4. Ms. Holleman also describes Mr. Ayotte as an "art handler who was curious about her sudden absence from work." Pl. 56.1 ¶ 4. In fact, Mr. Ayotte was no longer working at ACI when Plaintiff was terminated, as he had resigned from that post three months prior. Ayotte Decl. ¶ 2. Nonetheless, in response to Mr. Ayotte's question about the dismissal of his "fellow" art handler, Mr. Rivera purportedly responded that Ms. Holleman was terminated because she "is a woman" and Mr. Lowe "does not like women." Ayotte Decl. ¶ 10; Pl. 56.1 ¶ 5. Mr. Ayotte's declaration does not state that Mr. Rivera had first-hand knowledge as to the reasons for Plaintiff's termination from employment.

In contrast, Mr. Rivera testified during his deposition that he never said that Plaintiff was terminated because she was a woman or that Mr. Lowe did not like women. Rivera Dep. 58:1-5.

### ii. Ex-Employee Mr. Ayotte's Opinion That Plaintiff Experienced Disparate Treatment Because She Is A Woman

Mr. Ayotte worked at ACI as an art handler for approximately nine months from January 2011 until September 2011, when he resigned. Ayotte Decl. ¶ 2. Mr. Ayotte stated in his declaration that he "observed that [Plaintiff] was treated differently by ACI's management than male art handlers," including that Plaintiff was not permitted to do certain tasks that male art handlers were permitted to do. Id. ¶¶ 6-7. Without identifying to which tasks he was referring, Mr. Ayotte contended that "this was a detriment to [Plaintiff] . . . [and] mark[ed] [her] by ACI as being less valuable to the company, and something of a 'second class' [art handler]." Id. ¶ 7. Mr. Ayotte also alleged that male art handlers with "attitude issues, performance issues, and [who] engaged in misconduct" were not fired. Id. ¶ 11. The only such male art handler whom Mr. Ayotte identified with such problems was himself, stating that Mr. Lowe addressed his

"attitude problem," but that Mr. Lowe did not fire him.  Id. ¶ 11.  Mr. Ayotte does not describe the nature of his "attitude problem" or how it manifested such that Mr. Lowe saw the need to address it.  Mr. Ayotte "conclude[d] that ACI treated Ms. Holleman worse than male Art Handlers/Installers because of her gender."  Id. ¶ 13.

### b.    Plaintiff's Evidence Of Alleged
### Anti-Female Sentiment At ACI

#### i.    Mr. Stewart's Alleged Bias Against Women

Plaintiff alleges that Mr. Stewart has shown bias against women on various occasions. First, in October 2010, when a female ACI client wrote to Ms. Bischel about an issue relating to ACI's work, Ms. Bischel forwarded the email to Mr. Stewart.  Meyers Decl. Ex. 13 at 1.  Mr. Stewart replied to Ms. Bischel with a one-word response about the client: "Cunt."  Id.; see Pl. 56.1 ¶¶ 9-10.[21]

Second, Plaintiff states that a November 2010 email exchange is evidence of Mr. Stewart angrily and dismissively responding to an email from a female subordinate about a female applicant.  Pl. 56.1 ¶ 118.  In November 2010, when a woman applied for an internship, Mr. Stewart stated in an email to Ms. Morgan "Good idea" and asked if the intern could help Ms. Morgan or Ms. Bischel.  Meyers Decl. Ex. 44 at 1.  Ms. Morgan replied, "Neither myself [n]or [Ms. Bischel] could spare the time it would take to oversee an intern, and I don't foresee that this will change."  Id.  Mr. Stewart responded, "If we can't manage free staff how the fuck are we going to manage paid staff."  Id.

Third, on an unidentified date, Shari Zolla ("Ms. Zolla"), who was an employee of ACI client the New Museum of Contemporary Art, had an interaction with Mr. Stewart that she

---

[21] Although, in addition to the October 2010 date stamp, this email has a date stamp of October 2012, that date is a technical glitch related to when ACI changed its email service provider.  Pl. 56.1 ¶ 9 n.2; Meyers Decl. Ex. 13 at 1.

described in an affidavit. Zolla Decl. ECF No. 48-5. Ms. Zolla felt that "Mr. Stewart treated me, a female, differently than others. He was dismissive of me and insulted me in front of my boss. When I tried to provide reasonable input into work his company was doing for the New Museum, he was defensive and obnoxious." Zolla Decl. ¶ 8; Pl. 56.1 ¶ 11. Ms. Zolla offers no additional information as to why she believes that Mr. Stewart treated her differently than men.

Ms. Zolla also remembers a heated argument she had with Mr. Stewart, during which Mr. Stewart exhibited "outrageous behavior" (Ms. Zolla does not describe what was so outrageous about Mr. Stewart's behavior), and Ms. Zolla told Mr. Stewart to "go fuck himself." Zolla Decl. ¶ 9. According to Ms. Zolla, the next day, Mr. Stewart "[i]ncredibly" failed to apologize to her, and instead said that he liked how Ms. Zolla told him to "go fuck himself." Zolla Decl. ¶ 10; Pl. 56.1 ¶ 12. Ms. Zolla believes that Mr. Stewart's reaction "could be reasonably interpreted as having a sexual overtone" and, as a result, Ms. Zolla does not find it "difficult to conclude . . . that [Mr. Stewart] could infuse his company's . . . decision-making process with discriminatory animus towards women." Zolla Decl. ¶ 11; Pl. 56.1 ¶ 12.

ii.     Two ACI Employees And One ACI Client Used
        The Word "Bitch" Or "Beeotches" In An Email

Plaintiff submits that three emails (one of which was authored by a client) containing the words "bitch" or "beeotches" demonstrate anti-female sentiment at ACI. Pl. 56.1 ¶ 119.

In a May 2010 email, Mike Quinn ("Mr. Quinn") wrote to Ms. Bischel an email with the subject line "5:58" stating that, at that time of day, "people go home," and that Ms. Bischel should "wrap this bitch up and get your ass to [K]ensington." Meyers Decl. Ex. 46. In his affidavit, Mr. Meyers identifies the sender, Mr. Quinn, as a ACI employee, but his position at ACI is unknown. Meyers Decl. ¶ 47; see Meyers Decl. Exs. 11 (Mr. Quinn does not appear on a

list of ACI art handlers), 46 (Mr. Quinn did not use an ACI email address in this correspondence with Ms. Bischel).

Next, in a December 2010 email, Ms. Bischel wrote to fellow female ACI employees Elizabeth Morgan and Amanda Mathis at midday to say "[Y]ou beeotches wanna order lunch?" to which they replied "Standard [deli] sound good?" and "let[']s not do sushi?"  Meyers Decl. Ex. 47.

Finally, in a June 2011 email, an ACI client wrote to Ms. Bischel that a piece of artwork was larger than he thought, and he would "crate the bitch today."  Meyers Decl. Ex. 45.

### c.      Plaintiff's Evidence That Male Comparators Committed Misconduct But Were Not Fired

Plaintiff's record includes examples of male colleagues at ACI who also committed misconduct of some sort.  Plaintiff argues that the fact that these male colleagues were not fired as a result of their misconduct proves that Plaintiff suffered disparate treatment because she is a woman.

### i.      Eric Ayotte

According to Plaintiff, Mr. Ayotte allegedly once "rummag[ed]" through the items on a client's desk, and the client called ACI and complained.  Holleman Dep. 337:21-338:25, ECF No. 48-6.  ACI sent a mass email to all employees telling them that ACI had received "a few complaints about people being too familiar [with clients' work and/or personal space] while they are on the job," but Mr. Ayotte told Plaintiff that no one at ACI ever reprimanded him specifically about the incident.  Holleman Dep. 338:4-25, ECF No. 48-6; Meyers Decl. Ex. 27; Pl. 56.1 ¶ 61.  Mr. Lowe could not recall whether he spoke to Mr. Ayotte about that particular incident, but he testified that he did counsel Mr. Ayotte about other things, such as his attitude and anger management problems.  Lowe Dep. 264:20-265:4; Pl 56.1 ¶ 62.  Mr. Ayotte testified

that he was "asked to improve" and that Mr. Lowe "addressed what he thought was an attitude problem on my part." Ayotte Decl. ¶¶ 11-12.[22] Mr. Ayotte voluntarily left ACI's employment in September 2011, after eight or nine months of employment. Ayotte Decl. ¶ 2; Pl. 56.1 ¶ 63.

### ii. Jim Rogers

In or around June 2011, Jim Rogers ("Mr. Rogers"), who was and continues to be an ACI art handler, had an altercation with a client from Gagosian Galleries. Lowe Dep. 258:21-261:24; Holleman Dep. 342:19-21, ECF No. 48-6; Pl. 56.1 ¶ 64. The client wanted Mr. Rogers to work without a lunch break, although it was "pas[t] lunch time," and "[t]hey had been working very hard." Lowe Dep. 259:21-260:4; Pl. 56.1 ¶ 64. When Mr. Rogers insisted on eating, the client asked Mr. Rogers his name, and, according to Plaintiff, Mr. Rogers shouted "My name is Jim." Holleman Dep. 340:20-341:25; Pl. 56.1 ¶ 65. Mr. Lowe asked Mr. Rogers to continue working, but Mr. Rogers said, "[W]ell I need to eat my lunch and I'm going to eat my lunch." Lowe Dep. 258:21-260:4. According to Mr. Lowe, "That was about the end of it." Id.

Ms. Holleman testified that the client asked that ACI not assign Mr. Rogers to work at that location, but that Ms. Bischel on at least one occasion scheduled Mr. Rogers to work at that gallery. Holleman Dep. 340:20-342:21, ECF No. 48-6. Ms. Holleman says that ACI employees reminded Ms. Bischel that Mr. Rogers was blacklisted at that gallery, and Ms. Holleman does not know whether Mr. Rogers ever actually returned to work there. Id. at 340:20-342:21.

---

[22] Plaintiff contends that Mr. Lowe believed his "meetings" with Mr. Ayotte were "the equivalent of discipline." Pl. 56.1 ¶ 62 (citing Lowe Dep. 264:17-265:1). This is a misstatement of Mr. Lowe's testimony, in which he was asked if he had "a meeting of the quasi-disciplinary type we've been discussing with [Mr. Ayotte]?" and Mr. Lowe responded, "I don't remember" and he then recounted meetings concerning Mr. Ayotte's attitude. Lowe Dep. 264:17-265:1. There is no evidence as to whether the meetings about attitude problems were disciplinary, quasi-disciplinary and/or of the same "informal" quality that Plaintiff characterizes her own meetings with Mr. Lowe. See, e.g., Pl. 56.1 ¶ 54.

After the incident, someone at ACI created a sheet of paper with Mr. Rogers's photo on it pointing back at himself with his thumb and the caption "MY NAME IS JIM!" at the top. Lowe Dep. 261:5-24; Meyers Decl. Ex. 28; Holleman Dep. 342:22-343:7 (Dante Geldhof ("Mr. Geldhof"), an ACI art handler, gave the picture to Ms. Holleman). Plaintiff alleges that "Mr. Rogers [] posted a picture of himself" and "[a]s a result of this misconduct," the client asked not to work with him. Pl. 56.1 ¶¶ 65-66. However, Plaintiff's citations do not support her statements that Mr. Rogers created the photo, "posted" it or that it contributed to his alleged blacklisting. Likewise, Mr. Lowe testified that he did not know who created the "MY NAME IS JIM!" picture and had not seen it before his deposition, but in any event he did not view it as a problem because "it is humor," and because there was no indication that the picture was circulated beyond ACI. Lowe Dep. 262:1-263:4.

### iii.     Dante Geldhof

Mr. Geldhof began work at ACI, where he was employed as an art handler and/or a foreman for a total of five or six years. Lowe Dep. 248:1-250:17; Meyers Decl. Ex. 3 at 10. At some point, according to Ms. Holleman, Mr. Geldhof drew sexual stick figures on a BOL and he believed that it was not "a big deal." Holleman Dep. 333:7-16, ECF No. 48-6. According to Ms. Holleman, Mr. Rivera also told her of Mr. Geldhof's drawing on a BOL. Id. at 333:3-16. Mr. Lowe testified that he did not remember any incident involving Mr. Geldhof drawing stick figures on a BOL, but that he learned about it recently in the context of this litigation. Lowe Dep. 248:1-250:17.[23] Later, Mr. Geldhof was promoted to foreman and eventually left ACI voluntarily. Stewart Dep. at 24:23-25; Pl. 56.1 ¶¶ 74-75.

---

[23] Plaintiff contends that Mr. Geldhof "received discipline (or its equivalent)," which overstates the deposition testimony on which Plaintiff relies. Pl. 56.1 ¶ 71. Mr. Lowe was asked if he "ever had any meetings with [Mr. Geldhof], I mean meetings in the sense for a substitute for discipline, formal discipline?" and Mr. Lowe replied "I don't recall, but probably because he was

The record contains no evidence that Plaintiff saw Mr. Geldhof's alleged drawings such that she has a foundation to testify that they were sexual in nature based on her personal knowledge. The record does not contain the drawing itself. The record does not contain testimony from Mr. Geldhof or Mr. Rivera about the drawing.

### iv.    Chris Kulcsar

Chris Kulcsar ("Mr. Kulcsar") was an ACI art handler who made an error on a truck pricing sheet record in August 2011. Meyers Decl. Ex. 31. Plaintiff contends that Mr. Kulcsar was "cited" for this mistake, Pl. 56.1 ¶ 79, although there is no evidence in the record that Ms. Bischel, who communicated with the billing department about the problem, informed Mr. Kulcsar or Mr. Lowe of the mistake. Meyers Decl. Ex. 31.

On or about November 17, 2011, an ACI client complained to Ms. Bischel that Mr. Kulcsar "was very vocal about his unhappiness" with an assignment. Meyer Decl. Ex. 29. Mr. Lowe then contacted the client, apologizing and explaining that Mr. Kulcsar was "new to [his] staff." Id. Mr. Lowe asked the client for the client's "feedback so we can better assess his performance" and "try to focus our training." Id. The client then described Mr. Kulcsar's unprofessional behavior. Id. Mr. Kulcsar later heard that the client asked that he not return to her location. Meyers Decl. Ex. 30. Mr. Lowe also testified to receiving complaints from Mr. Kulcsar's co-workers about him complaining about jobs in front of clients. Lowe Dep. 76:23-77:7.[24]

---

with us a long time. I'm sure in the beginning there were issues." Lowe Dep. 249:12-17. Thus, Mr. Lowe believed it "probable" that he had meetings with Mr. Geldhof, but he could not recall any such meetings, or their content.

[24] At his deposition, Mr. Lowe was asked about an employee named "Chris Colare" or "something like that." Lowe Dep. 76:16-22. Plaintiff cites to this portion of the deposition transcript as being relevant to Mr. Kulcsar, see Pl. 56.1 ¶¶ 76-81, and as Defendants have not

On or about December 10, 2011, Mr. Lowe fired Mr. Kulcsar due to a "final episode" involving a confrontation between Mr. Kulcsar and a client which resulted in Mr. Lowe receiving "an extremely angry email about [Mr. Kulcsar's] conduct" from the client, whom Mr. Lowe knew personally, and ACI lost the client's business. Lowe Dep. 74:25-81:7; Pl. 56.1 ¶ 81. Mr. Lowe's other reasons for firing Mr. Kulcsar included his "repeated misconduct both with his co-workers, the office and with clients specifically," such as "[c]omplaining about jobs, not wanting to perform some jobs, not helping co-workers in moving [and] installing, not taking instruction well, [and] deviant behavior." Lowe Dep. 74:25-81:7.

### v. Adam Payne

Adam Payne ("Mr. Payne") has worked for ACI for six years. Lowe Dep. 266:17-267:25. He has been a foreman since at least March 2011. Meyers Decl. Ex. 11. During that time, Mr. Lowe counseled Mr. Payne, on what Mr. Lowe believed to be one occasion, about his anger-management issues, which manifested as "frustrat[ion] with [certain] job[s]" and a "general anger." Lowe Dep. 266:17-267:25; Pl. 56.1 ¶ 82.

According to Plaintiff, Mr. Payne once "destroyed a work of art" and became "frightened" that he would be fired. Holleman Dep. 334:12-20, ECF No. 48-6. Instead, Mr. Lowe told Mr. Payne not to worry, and "it's okay." Id. In fact, shortly thereafter, Mr. Lowe granted Mr. Payne a raise. Id. Plaintiff also alleges that he was promoted to foreman after destroying the piece of art. Pl. 56.1 ¶ 84; Lowe Dep. at 266:17-24.

The record does not contain any testimony from Mr. Payne. The record does not contain any information about what it means that Mr. Payne "destroyed a work of art," whether the art was replaceable and/or replaced, when the incident occurred, whether the client became upset, or

---

raised any objection, the Court assumes the Parties are in agreement that Mr. Lowe was referring to Mr. Kulcsar.

indeed, any other details about the incident. The record does not contain information about when Mr. Payne's promotion to foreman occurred.

### vi. Michael Hirschfeld

In October 2011, an ACI client hired the company to move artwork to his apartment, and ACI art handler Michael Hirschfeld ("Mr. Hirschfeld") was on the two-man crew. Meyers Decl. Ex. 32. After the move, the client wrote to ACI to say that "while the two guys were very polite and nice," overall his experience with ACI "was frankly very poor" for being "inefficient." Id. Ms. Morgan forwarded the email to Mr. Lowe and Ms. Bischel. Id. She stated that the complaints were about Mr. Hirschfeld, who apparently had recently begun working because Ms. Morgan wrote that the "[j]ob was on 9/23/2011 so I don't know how close that is to when he started working," and added that "[a]s this was almost a month ago [Mr. Hirschfeld may have] picked up a lot since then." Id. According to Plaintiff, Mr. Hirschfeld was not fired. Pl. 56.1 ¶ 86.

### vii. Dave Lindsay

On October 18, 2010, an ACI client wrote to Mr. Lowe, Mr. Stewart and ACI employee Dave Lindsay ("Mr. Lindsay") about a "production-workshop idea" to say that Mr. Lindsay had missed a related deadline for ordering materials, and that the error required cancellation of one of two test projects. Meyers Decl. Ex. 34. The client complained that Mr. Lindsay's performance was "unprofessional" and asked Mr. Lowe and/or Mr. Stewart to call him to discuss next steps. Id. Mr. Lindsay forwarded to Mr. Lowe and Mr. Stewart emails showing that the client had requested cancellation of the job after the client's studio had not approved an estimate involving the materials to be ordered, and that another studio was hesitant to work with the client because that client already owed them money. Meyers Decl. Exs. 35-36. Mr. Stewart responded, "I warned you? He's a junkie," referring to the client. Meyers Decl. Ex. 35. The record contains

no other information about this incident including, for example, whether Mr. Lindsay was disciplined.

### viii. Sam Herzlinger

Mr. Lowe once took Sam Herzlinger ("Mr. Herzlinger"), an ACI employee, aside to discuss a "technical" issue related to Mr. Herzlinger's performance. Lowe Dep. 265:14-266:9. In particular, Mr. Herzlinger put a screw through a frame, and the screw was visible. Id. The record contains no other information about this incident, for example, the identity of the client and the client's significance to ACI's book of business, whether the client was upset, or whether and how easily the problem was resolved.

According to Plaintiff, she witnessed a verbal altercation between Mr. Herzlinger and a client. Plaintiff testified that Mr. Herzlinger damaged two paintings which led to the verbal altercation, "[y]elling and cussing." Holleman Dep. 343:8-344:17. There is no evidence in the record that Mr. Lowe was aware of this incident or that Mr. Herzlinger was disciplined for it.

### ix. Chris Dominic

Chris Dominic ("Mr. Dominic") is an art handler who has worked for ACI for "a long time." Lowe Dep. 268:1-13. Mr. Lowe did not recall ever counseling Mr. Dominic. Id. According to Plaintiff, a client complained that two art handlers were "smelly" while working in her home. Holleman Dep. 339:6-340:9, ECF No. 48-6. Mr. Dominic admitted to Plaintiff to not having showered and "may" have "laughed about it," id., but there is no evidence in the record as to Mr. Lowe being aware of this incident.

### x. Unidentified Male Art Handler

On November 9, 2010, Mr. Franklin of the Gagosian Galleries wrote to Ms. Bischel and Mr. Lindsay to ask, among other things, whether he could "talk to one of you about an interaction with one of your crew? Nothing too serious but there seems to be an ongoing issue I

35

am having with one of them.  I've always let it go in the past but today I feel like I need to let

you know."  Meyers Decl. Ex. 33 ("It's not a huge deal . . . .").

Plaintiff alleges that "the male Art Handler that Mr. Franklin complained about was not

fired."  Pl. 56.1 ¶ 95.  The record contains no additional evidence as to what the issue was; to

whom Mr. Franklin was referring (and whether that crew member was an art handler, a

supervisor or had another position); whether Mr. Lowe was informed; or if the crew member was

disciplined or fired.

**xi.**        **Unidentified Male Art Handlers**

On August 4, 2011, a client wrote to Ms. Bischel asking "Can't I get a tiny bit of VIP

treatment?" and to complain that the three art handlers that came to his house did not take their

shoes off as requested.   Meyers Decl. Ex. 38.  Ms. Bischel apologized, saying "I thought [P]hilip

and [M]icah were a good team to send considering their expertise and professionalism."  Id.  It is

not clear whether Ms. Bischel is naming art handlers on the three-person team; Plaintiff contends

that the three art handlers were "[u]nidentified."  Pl. 56.1 ¶ 96.  Plaintiff states, without citation,

that these art handlers were not fired.  Pl. 56.1 ¶ 97.  It is not known whether Mr. Lowe was

informed of the incident or of the identities of the three art handlers.

**xii.**        **Male Art Handlers Generally**

In June 2011, in a series of emails between Mr. Lowe, Mr. Stewart, Ms. Bischel and

supervisor Jose Krapp ("Mr. Krapp"), Mr. Krapp told Mr. Lowe that someone at an art opening

criticized "the people [from ACI] who have been working" for that person.  Meyers Decl. Exs.

11, 37.  Although Plaintiff characterized this as a complaint about male art handlers, Pl. 56.1 ¶¶

98-99, it is not clear whether a reference to "our guys" meant the problem employees were all

male.  Meyers Decl. Ex. 37.  Additionally, Mr. Krapp heard that an art handler was unable to

hang a painting, another art handler was unable to drive a forklift, and a third art handler had

36

multiple problems.  Meyers Decl. Ex. 37.  Mr. Stewart responded that Ms. Bischel needed to identify the people who needed training.  Id.

### d.   Plaintiff's Evidence That ACI Is A Generally Unprofessional Organization

Plaintiff contends that ACI is such an unprofessional organization such that it cannot credibly claim to justifiably fire an employee for unprofessionalism.  Plaintiff asserts that ACI employees used foul language in internal emails, Pl. 56.1 ¶ 101, and that ACI never asked its clients to not use foul language when communicating with ACI, Pl. 56.1 ¶ 102.  For example, Mr. Stewart wrote an email to Ms. Bischel stating that he had just emailed Mr. Lowe about an enormous project and that their summer was going to be "fucked" as a result of the project's size. Meyers Decl. Ex. 41; see Meyers Decl. Exs. 37, 44 (two other emails in which Mr. Stewart used the work "fuck").  There is no evidence that Plaintiff complained to Defendants about the use of profanity prior to this litigation.

Plaintiff also submits an email in which a male ACI client wrote to Ms. Bischel that "these guys [at ACI] don't like me very much anymore" and, in particular, that Mr. Stewart did not like him and had "insult[ed him] in front of another gallery."  Meyers Decl. Ex. 39.  The client further stated, "I run around like a maniac and I am a hard ass sometimes or most of the time," and "I really don't think I should pay this bill."  Id.  Plaintiff also complains about an email in which Mr. Stewart referred to a male client who cancelled an order as a "junkie." Meyers Decl. Ex. 35; see Meyers Decl. Exs. 34, 36.

Plaintiff additionally contends that, prior to her termination, ACI did not retain written employment records (i.e., job applications or disciplinary files) or have written employment policies (i.e., procedures to review whether employment decisions treated male and female employees consistently).  Pl. 56.1 ¶¶ 106-112, 117; Lowe Dep. 98:8-100:5, 106:1-112:3, 150:5-

24, 206:1-208:7.  Mr. Lowe stated that it was not necessary to have a procedure to analyze whether male and female employees were treated equally during employment termination decisions because ACI is "an equal opportunity employer" where "nothing is based on prejudice."  Lowe Dep. 206:1-24.  According to Plaintiff, the lack of policies, records and professionalism renders Defendants unable to dismiss an employee for unprofessional misconduct.

### B.    Facts Relating To Ms. Holleman's Retaliation Claims

As described below, Ms. Holleman complained of unlawful discrimination on or around January 9, 2012, and she makes allegations—at least one of which predates her discrimination complaint—that Defendants retaliated against her by (1) not giving her two-weeks' severance pay; (2) opposing her unemployment insurance benefits; (3) accusing her of stealing artwork; and (4) "badmouthing" her.

### 1.    Ms. Holleman Did Not Wish To Sign A Severance-Pay Agreement Such That Defendants Did Not Remit Payment

In Mr. Lowe's December 11, 2011 email to Ms. Holleman, Mr. Lowe stated that he would ask Ms. Sobel to send Ms. Holleman two-weeks' severance pay.  Meyers Decl. Ex. 15. On December 19, 2013, Ms. Sobel informed Ms. Holleman that, in order to receive the severance pay, Ms. Holleman would have to sign an agreement releasing ACI from liability for any and all claims Ms. Holleman might have.  Schnapp Reply Decl. Ex. F.  Ms. Holleman responded by requesting that Defendants also provide her with a neutral dismissal letter and a recommendation letter.  Id. at 2.  Ms. Holleman then sent a second email stating that once her lawyer had an opportunity to review the neutral dismissal and recommendation letters, Ms. Holleman would send Defendants a signed copy of the severance agreement.  Id. at 2-3.  Ms. Holleman never signed the severance agreement, and Ms. Holleman now alleges that, in retaliation for her sex

discrimination claims, Defendants reneged on a promise to give her severance pay.

### 2. Ms. Holleman Sent A Letter To Defendants On Or Around January 9, 2012 To Inform Them Of Her Sex Discrimination Claims

Ms. Holleman first complained of unlawful discrimination on or about January 9, 2012, the date that Defendants received her attorney's letter informing them of her discrimination claims. Meyers Decl. Ex. 49. Receiving this letter made Mr. Lowe feel "shocked", "insulted," and "upset[]," but he did not feel "angry." Lowe Decl. 225:3-17. Ms. Holleman also filed a Charge with the Equal Employment Opportunity Commission ("EEOC") on February 27, 2012. Compl. ¶ 15.

### 3. Defendants' Opposition To Plaintiff's Unemployment Insurance Benefits

Defendants submitted an opposition to the New York Department of Labor ("NYDOL") relating to Plaintiff's eligibility for unemployment insurance benefits, and the NYDOL made an "initial determination" to deny Ms. Holleman's application for unemployment insurance benefits. Holleman Decl. ¶ 4. The record does not indicate what reason the Defendants provided the NYDOL for their opposition. On March 20, 2012, Ms. Holleman and Mr. Lowe attended a hearing concerning the unemployment insurance benefits, and Mr. Lowe testified that Ms. Holleman was terminated due to Mr. Franklin's complaint and her co-workers' complaints about her performance. Schnapp Reply Aff. Ex. A at 25:6-26:22. After the hearing, Plaintiff's unemployment insurance benefits were reinstated. Holleman Decl. ¶ 4.

### 4. The Allegation Of An Accusation About Stolen Artwork

Ms. Holleman alleges that Defendants accused her of theft after it was discovered that Ms. Holleman took the Lutter Posters to her home for her own personal use. Holleman Dep. 236:3-22, 255:2-257:2, ECF No. 48-6. Sarah Morgan ("Ms. Morgan"), an ACI employee whose

job position is unknown, wrote to another ACI employee that "[i]t's so fucked up that [Ms. Holleman] would take these." Meyers Decl. Ex. 51 at 3 (email dated February 1, 2012). Mr. Lowe testified that he did not believe Ms. Holleman intended to steal artwork by taking the Lutter Posters. Lowe Dep. 235:21-236:5 ("[S]he is not going to steal artwork from us.").

Beyond Ms. Morgan's email comment that it was "fucked up that Ms. Holleman" took the Lutter Posters, the record does not contain any facts that arguably support the allegation that Defendants accused Ms. Holleman of theft, including who allegedly accused Ms. Holleman of stealing artwork, to whom the accusation was made, and when the accusation was made. In an email dated February 15, 2012, Ms. Holleman asked Defendants to "[p]lease have your people reverse any charges of theft made against me with the Unemployment Insurance Office." Meyers Decl. Ex. 54. When asked about this email at her deposition, Ms. Holleman admitted that she had no information or evidence that Defendants had, in fact, accused her of theft or even used the word "theft" to describe the incident involving the Lutter Posters. Holleman Dep. 277:6-279:15, ECF No. 36-5.

### 5. The Allegations of "Bad-Mouthing"

Ms. Holleman alleges that Defendants retaliated against her for her sex-discrimination claims by "bad-mouthing" her. Ms. Holleman offers the following evidence in support of her "bad-mouthing" allegation: (1) she "unusually" did not receive call backs for her job applications to art handler positions; (2) Ms. Holleman's testimony that Mr. Ayotte told her that Mr. Rivera "publicly discussed" her unemployment hearing with him; and (3) Mr. Ayotte's statement that "ACI had bad-mouthed" Ms. Holleman. Pl. Mem. 16-17; Ayotte Decl. ¶¶ 2-3, 16,; Holleman Dep. 80:5-16, ECF No. 48-6. Mr. Ayotte's assertion that "ACI had bad-mouthed Kim Holleman" does not describe any incident of alleged bad-mouthing or otherwise explain the foundation for Mr. Ayotte's knowledge. Ayotte Decl. ¶ 16. Plaintiff also alleges that

Defendants maligned her by stating that she "was fired because ACI owner Robin Lowe does not like women." Pl. 56.1 ¶ 132.

## III. DISCUSSION

Defendants move the Court to grant summary judgment as to Plaintiff's sex discrimination and retaliation claims under Title VII, the NYSHRL and the NYCHRL.

### A. The Legal Standard For Summary Judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Kwong v. Bloomberg, 723 F.3d 160, 164-65 (2d Cir. 2013); Redd v. N.Y. Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). The "mere existence of a scintilla of evidence" is not enough to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the [non-moving party]." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotations omitted); see Anderson, 477 U.S. at 252. The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000). The Second Circuit has cautioned that "[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so . . . affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would

show discrimination." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (internal citations omitted).

### B. Plaintiff's Title VII Claims Against Mr. Lowe Individually Are Dismissed As That Statute Does Not Provide For Individual Liability

As a preliminary matter, Plaintiff's Complaint raises claims under Title VII against Mr. Lowe for sex discrimination, and for aiding and abetting discrimination. Compl. ¶¶ 36-41, 54-57 (raising these discrimination claims against the "Defendants," collectively, and "including Defendant Lowe"); see id. at ¶ 68 (alleging that Mr. Lowe is individually liable for aiding and abetting discrimination, without stating under which statute Plaintiff brings this claim); see generally id. at ¶ 75 (asserting that the John Doe Defendants were "individually liable" and liable for aiding and abetting discrimination under Title VII).

Although individual and aider or abettor liability is available under the NYSHRL and the NYCHRL, N.Y. Exec. Law § 296(1), (6); N.Y.C. Admin. Code § 8-107(1), (6); see Feingold v. New York, 366 F.3d 138, 157-59 (2d Cir. 2004); Pryor v. Jaffe & Asher, LLP, 992 F. Supp. 2d 252, 257 (S.D.N.Y. 2014), "individuals are not subject to liability under Title VII," Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 221 (2d Cir. 2004) (quoting Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir. 2000)); see Abrams v. Dep't of Pub. Safety, --- F.3d ---, No. 13 Civ. 111, 2014 WL 4191178, at *9 (2d Cir. Aug. 26, 2014) (same); Pryor, 992 F. Supp. 2d at 257 (same). Therefore, all claims against Mr. Lowe under Title VII are dismissed.

### C. Plaintiff's Sex Discrimination Claims Are Dismissed

Discrimination claims brought under Title VII and the NYSHRL are "analytically identical," and "the same standard of proof" applies to both statutes. Salamon v. Our Lady of Victory Hosp., 514 F.3d 217, 226 (2d Cir. 2008), as amended (Apr. 22, 2008); Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 118 (2d Cir. 2010) (same).

Claims brought pursuant to the City Law require a separate analysis.  See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109, 113 (2d Cir. 2013) (requiring that City Law claims be analyzed separately from state and federal claims).  Following the New York City Council's Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), N.Y.C. Local L. No. 85, the City Law must be construed "broadly in favor of discrimination plaintiffs," even when such protection is not available under federal or state law.  Albunio v. City of New York, 16 N.Y.3d 472, 477-78, 947 N.E.2d 135, 137 (2011).  As the Second Circuit explained in Mihalik,

> While it is unclear whether McDonnell Douglas continues to apply to NYCHRL claims and, if so, to what extent it applies, the question is also less important because the NYCHRL simplified the discrimination inquiry: the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason. The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that "discrimination play[ed] no role" in its actions.

Mihalik, 715 F.3d at 110 (quoting Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 78 n.27, 872 N.Y.S.2d 27, 40 n. 27 (1st Dep't 2009).[25]  Summary judgment may not be granted on a City Law claim unless "no jury could find defendant liable under any of the evidentiary routes—McDonnell Douglas, mixed motive, 'direct' evidence, or some combination thereof."  Bennett v. Health Mgmt. Sys., Inc., 92 A.D.3d 29, 45, 936 N.Y.S.2d 112, 124 (1st Dep't 2011); see

---

[25] See Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843, n.3 (2d Cir. 2013) ("It is unclear whether and to what extent the McDonnell Douglas framework has been modified for claims under the NYCHRL."); Sandiford v. City of N.Y. Dep't of Educ., 22 N.Y.3d 914, 916 n.2, 999 N.E.2d 1144, 1145 n.2 (2013) (declining to determine whether the Restoration Act modified the McDonnell Douglas framework for purposes of the NYCHRL).

Melman v. Montefiore Med. Ctr., 98 A.D.3d 107, 113, 946 N.Y.S.2d 27, 30 (1st Dep't 2012) (same).

Plaintiff asserts that she should prevail on her federal, state and city claims under both a McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting analysis and a mixed-motives analysis, the elements of which are discussed below.

### 1. The McDonnell Douglas Burden-Shifting Framework

Plaintiff asserts that her claims survive summary judgment because the record satisfies the McDonnell Douglas burden-shifting framework. Pl. Mem. 5-7.

### a. The Legal Standard Under McDonnell Douglas

To state a prima facie case of employment discrimination under Title VII and the NYSHRL, a plaintiff must show: "(1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012) (quoting Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008)).

Pursuant to the familiar burden-shifting framework of McDonnell Douglas, once the plaintiff establishes a prima facie case of discrimination, the employer must articulate a legitimate, non-discriminatory reason for the adverse employment action; "[i]f the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual." Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir. 2013) (quoting Raytheon Co. v. Hernandez, 540 U.S. 44, 50 n.3 (2003)).

"[T]he final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." Abrams, 2014 WL 4191178, at *5; see Ruiz v. Cnty. of Rockland, 609 F.3d 486, 492 (2d Cir. 2010) (same). In order to demonstrate pretext, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." Id. (quoting Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004)).

Concerning Plaintiff's prima facie case of sex discrimination, there is no dispute that Plaintiff is in a protected class, that she was qualified for her position as an art handler and that her firing was an adverse employment action. Defs. Mem. 16. The Parties dispute whether Plaintiff has established the fourth element of her prima facie case. Plaintiff asserts that she has satisfied the fourth prong based on Mr. Rivera's alleged statements; the incidents involving Mr. Stewart with female clients; evidence that Defendants treated similarly situated male art handlers less harshly for comparable misconduct; evidence of Defendants' "culture of anti-female bias"; and evidence concerning the credibility of Defendants' reasons for firing Plaintiff. Pl. Mem. 4-5, 7-10. Defendants assert that Plaintiff has not made a prima facie case and cannot meet her ultimate burden under McDonnell Douglas. Defs. Mem. 16-17. Defendants have proffered a legitimate non-discriminatory reason for their firing of Plaintiff, and they argue that Plaintiff has not created a record for which a reasonable jury could conclude that Defendants' reason is pretext for sex discrimination. Defs. Mem. 17-22. For the reasons discussed below, this Court agrees that Plaintiff has not made the required showing.[26]

---

[26] Defendants raise certain defensive doctrines such as the same actor inference (Mr. Lowe's involvement in the hiring and firing decisions); the after-acquired evidence defense (the significance of Mr. Lowe's learning, in February 2012, about Plaintiff's taking of the Lutter

### b.   Plaintiff Fails To Meet Her Burden
    Under <u>McDonnell Douglas</u>

#### i.   Plaintiff's Evidence Concerning Mr. Rivera's
     And Mr. Stewart's Alleged Statements Do Not
     Raise An Inference Of Discrimination

Plaintiff asserts that an inference of discrimination is raised by Mr. Rivera's purported admissions that Plaintiff was fired due to her sex, and by the two incidents involving Mr. Stewart and female clients. Pl. Mem. 4. Defendants dispute whether Plaintiff's evidence constitutes admissions and deny that it raises an inference of discrimination. Defs. Reply Mem. 5-8.

##### (1)   The Purposed Admissions
     By Mr. Rivera

In his declaration, Mr. Ayotte asserted that, while he was at a bar with Mr. Rivera, Mr. Rivera told him that Plaintiff was dismissed "because she is a woman and ACI's President, Mr. Robin Lowe, does not like women." Ayotte Decl. ¶ 10. In addition, Plaintiff contends that Mr. Rivera once said to her "[y]ou know why you were fired, right?" which she argues is an admission that she was fired due to her sex. Holleman Dep. 309:11-310:3, ECF No. 48-6.

###### (a)   Mr. Ayotte's Allegations About
      Statements By Mr. Rivera
      Concerning Mr. Lowe's
      Motivations Are Inadmissible
      Hearsay

As a preliminary matter, Plaintiff must establish that Mr. Ayotte's declaration as to what Mr. Rivera purportedly said is not inadmissible hearsay.[27] "Evidence submitted in support of a

---

Posters); and a plaintiff's duty to mitigate her damages (whether the various actions Plaintiff took to mitigate her damages, leading to her current job as a Research Affiliate at the Massachusetts Institute of Technology, Holleman Decl. ¶¶ 6, 9-13, 31; Holleman Dep. 393:11-395:13, ECF No. 48-6, constituted a reasonable effort). Defs. Mem. 15-22. As I find that Plaintiff has not met her burden, I will not address these theories.

[27] To the extent Plaintiff offers Mr. Rivera's alleged statement to reflect something said by Mr. Lowe, no actual statement by Mr. Lowe was identified. <u>See</u> <u>Manessis v. N.Y.C. Dep't of</u>

summary judgment motion must be admissible, and the proponent of the evidence bears the burden of showing that the evidence is admissible." Vahos v. Gen. Motors Corp., No. 06 Civ. 6783 (NGG) (SMG), 2008 WL 2439643, at *4 (E.D.N.Y. June 16, 2008); see Fed. R. Civ. P. 56(c)(1)(B) (the evidence supporting a factual position on a motion for summary judgment must be "admissible"); Fed. R. Civ. P. 56(c)(4) (the affidavits and declarations submitted on motions for summary judgment must "set out facts that would be admissible in evidence"); cf. Sacks v. Gandhi Eng'g, Inc., No. 11 Civ. 5778 (DAB) (DCF), 2014 WL 774965, at *14 (S.D.N.Y. Feb. 27, 2014) ("Speculation and hearsay . . . is insufficient to support an inference of discrimination at the summary judgment stage." (citing Burke v. Evans, 248 Fed. App'x 206, 208 (2d Cir. 2007)).

Plaintiff contends that Mr. Rivera's statement, as relayed by Mr. Ayotte, is admissible as the statement of a party opponent. Pl. Mem. 5 n.1. Rule 801(d)(2)(D) provides that a statement is not hearsay if it is offered against an opposing party, and it "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Civ. P. 801(d)(2)(D).[28] Thus, for admissibility under Rule 801(d)(2)(D), the proponent must show "(1)

---

Transp., No. 02 Civ. 359 (SAS), 2003 WL 289969, at *14 n.11 (S.D.N.Y. Feb. 10, 2003) (plaintiff could not establish a hearsay exception without identifying the statement allegedly made by his supervisors), aff'd sub nom. Manessis v. Chasin, 86 F. App'x 464 (2d Cir. 2004). In addition, consideration of such a remark may create a double hearsay problem, as Plaintiff would need to establish both that what Mr. Rivera purportedly said and what Mr. Lowe purportedly said was not hearsay. See Zaben v. Air Prods. & Chems., Inc., 129 F.3d 1453, 1455 (11th Cir. 1997) (excluding as hearsay the plaintiff's testimony as to what lower-level supervisors told him higher-level supervisors said about "getting rid of the older employees"); E.E.O.C. v. Bloomberg L.P., 778 F. Supp. 2d 458, 466, n.6 (S.D.N.Y. 2011) ("two-layer hearsay" was inadmissible where the relayer was acting outside the scope of his employment in relaying the upper management declarants' statements, even assuming that the declarants' statements were made within the scope of their employment).

[28] Although Plaintiff failed to specify the provision of Rule 801(d)(2) which she believes applies, Rule 801(d)(2)(D) is the only subsection that might apply, as there is no evidence that

the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." Pappas v. Middle Earth Condo. Ass'n, 963 F.2d 534, 537 (2d Cir. 1992); see Curns v. Wal-Mart Stores, Inc., 439 F. App'x 51, 53 (2d Cir. 2011) (same). "The authority granted in the agency relationship need not include authority to make damaging statements, but simply the authority to take action about which the statements relate." Pappas, 963 F.2d at 538; see Leser v. U.S. Bank Nat. Ass'n, No. 09 Civ. 2362 (KAM) (MDG), 2012 WL 6738402, at *4 (E.D.N.Y. Dec. 29, 2012) (same). "[T]he declarant need not be the 'final decisionmaker' on employment matters for his statement on those matters to be deemed within the scope of his agency. Rather, he need only be an advisor or other significant participant in the decision-making process that is the subject matter of the statement." United States v. Rioux, 97 F.3d 648, 661 (2d Cir. 1996).

There is no dispute that Mr. Rivera was an employee of Defendants at the time he allegedly made the statement at issue. Plaintiff contends that Mr. Rivera was acting within the scope of his employment based on his testimony that he "sometimes" consulted with Mr. Lowe about termination decisions and "at least sometimes" was able to influence Mr. Lowe's decisions. Rivera Dep. 40:11-21; see Pl. Mem. 5 n.1.[29] There is no other information in the record as to the circumstances under which Mr. Rivera "sometimes" had involvement in termination decisions, or the frequency of his involvement in such decisions. Plaintiff's failure

---

Defendants authorized Mr. Rivera's statement or adopted it as required by Rules 801(d)(2)(B) and (C).

[29] Plaintiff's contention that Mr. Rivera was "among the top two employees of ACI," Pl. 56.1 ¶ 7, is unsupported by the record. Plaintiff based this statement on Mr. Rivera's listing as one of two supervisors on a March 25, 2011 email sent from Ms. Sobel to Ms. Bischel and Ms. Morgan, containing a list titled "Handlers' Ranking Status," Meyers Decl. Ex. 11. That email appears to contain a list of art handlers, not all ACI employees (for example, the employees sending and receiving the email are not on the list). Moreover, the record does not contain evidence as to the meaning of "Ranking Status" or whether this list was accurate over any time period other than March 25, 2011.

to specify a time frame for Mr. Rivera's involvement in termination decisions is particularly problematic because Mr. Rivera's job position changed over the course of his employment.[30]  It is unknown from his testimony whether he had any involvement in any firing decisions at the time of Plaintiff's firing.  Furthermore, his perception that he was able to influence Mr. Lowe's decisions is subjective.  For example, concerning Plaintiff's hiring, Mr. Lowe testified that he "consulted with" Mr. Rivera and other employees who knew Plaintiff, but that the decision to hire her was Mr. Lowe's decision alone.  Lowe Dep. 143:23-144:17; see Pl. Mem. 10 (stating that Mr. Lowe "solely made the decision to hire Ms. Holleman").  In contrast to Mr. Rivera, Mr. Stewart was not only consulted, but also had "veto power" over Mr. Lowe's decision. Lowe Dep. 192:10-13.

Assuming, arguendo, that Mr. Rivera was "sometimes" involved in termination decisions during the time period at issue, there is no evidence that Mr. Rivera had any involvement in Plaintiff's firing.  See Holleman Dep. 309:2-18 (Mr. Rivera and Mr. Cheung told Plaintiff they were not consulted about her firing), ECF No. 48-6.  Indeed, there is no evidence that Mr. Rivera was the supervisor on the assignment that led to Plaintiff's firing or on any other assignment relevant to her firing, or that he was otherwise involved in Mr. Lowe's or Mr. Stewart's evaluation of her performance.

---

[30] There is no dispute that Mr. Rivera had supervisory responsibility for Plaintiff when they worked together, see Meyers Decl. Ex. 3 at 10; Pl. 56.1 ¶ 7; Lowe Reply Decl. ¶ 29.  Mr. Rivera, however, testified at his deposition that he did not become a supervisor in title until early 2013; prior to that, he held the titles of specialist and foreman.  Schnapp Reply Decl. Ex. D (Rivera Dep. 9:3-10:5); see Lowe Reply Decl. ¶ 29 (Mr. Rivera was promoted to supervisor around January or February 2013).  Mr. Lowe stated that, as a foreman or supervisor, Mr. Rivera "had and has the authority to direct the activities of other art handlers while they are physically out on a job, but by no stretch of the imagination has he ever held a position that included anything remotely resembling executive or managerial authority or the authority to speak for the company."  Lowe Reply Decl. ¶ 29.  It is not shown whether Mr. Lowe sought Mr. Rivera's input on any termination decisions during the time period when Plaintiff was employed by ACI.

Rather, Plaintiff argues that Mr. Rivera's occasional input into Mr. Lowe's termination decisions put all termination decisions within the scope of Mr. Rivera's employment. Pl. Mem. 5 n.1. Such an approach is contrary to the case law, which requires that the speaker be at least a "significant participant in the decision-making process that is the subject matter of the statement." Rioux, 97 F.3d at 661; see Vuona v. Merrill Lynch & Co., 919 F. Supp. 2d 359, 379 (S.D.N.Y. 2013) (a branch director was "assuredly an agent of [the defendant] for some purposes," but was not acting in the scope of his employment when he said that a decisionmaker was "'particularly hard on women,'" because he "is not claimed to have played any role" in the adverse action at issue); Bloomberg, 778 F. Supp. 2d at 466 (where the speaker "was a coworker or other individual with no decision-making authority relevant to the claims, the statements were not within the scope of the employment"); Peterson v. Tri-Country Metro. Transp. Dist. of Oregon, No. 06 Civ. 1828 (ST), 2008 WL 723521, at *4-5 (D. Or. Mar. 14, 2008) (the statement of an assistant who took the minutes of a meeting concerning the plaintiff's firing were inadmissible; while she participated in the meeting, "her participation was neither significant nor instrumental to the decision-making process"); Evans v. Port Auth. of N.Y. & N.J., 192 F. Supp. 2d 247, 262 (S.D.N.Y. 2002) (statements made by an employee who was not the plaintiff's supervisor and who had no role in the employment decision were inadmissible), decision clarified on reconsideration, No. 00 Civ. 5752 (LAK), 2002 WL 1941557 (S.D.N.Y. Aug. 22, 2002).[31]

---

[31] See also Ramirez v. Gonzales, 225 F. App'x 203, 210 (5th Cir. 2007) (statements to a legal secretary did not fall within the exception where the secretary "was not involved in the decision to terminate"); Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 928 (6th Cir. 1999) (the plaintiff's supervisor's statements did not fall within the exception where he "was not involved in the actions that plaintiff claims led to her constructive discharge"); Hill v. Spiegel, Inc., 708 F.2d 233, 237 (6th Cir. 1983) (statements by three managers as to why the plaintiff was fired were not admissible; "[t]he mere fact that each of these men was a 'manager'

In the case Plaintiff relies on, <u>Zaken v. Boerer</u>, 964 F.2d 1319 (2d Cir. 1992), the court considered a statement made by a vice president of sales who had authority over the firing of sales staff; his statement about why a sales manager was fired was attributable to his employer. <u>Id.</u> at 1323. In that case, the statement was made by an employee with authority over the subject at issue. In contrast, there is no evidence that Mr. Rivera had authority over Plaintiff's firing.[32]

Here, Plaintiff has not offered evidence that Mr. Rivera played a role in Plaintiff's firing, let alone a significant role, and his occasional involvement in firing decisions unrelated to Plaintiff did not place Plaintiff's firing within the scope of his employment. Therefore, Mr. Ayotte's declaration as to what Mr. Rivera allegedly said is inadmissible hearsay that does not support Plaintiff's opposition to Defendants' motion for summary judgment.

> **(b)  Mr. Rivera's Purported Statement To Mr. Ayotte Is Not Probative Because There Is No Evidence As To The Foundation For Mr. Rivera's Assertions**

Were Mr. Rivera's purported statement admissible (which it is not), it nevertheless does not raise an inference that discrimination played a role in Plaintiff's dismissal because Mr.

---

within the [defendant's] expansive [] organization is clearly insufficient to establish that matters bearing upon [the plaintiff's] discharge were within the scope of their employment").

[32] Other cases in which courts in this Circuit have found a statement to be one of a party opponent similarly involve supervisors who were directly involved in the adverse action. <u>See, e.g.</u>, <u>Cook v. Arrowsmith Shelburne, Inc.</u>, 69 F.3d 1235, 1237-38, 1238 n.1 (2d Cir. 1995) (allowing the plaintiff's testimony that her supervisors told her she was fired because the general manager "did not have any respect for women in positions of authority; and that he wanted a man in that job," because of the supervisors' direct involvement in the firing, including that one supervisor conducted the firing and the other had refused to alter the plaintiff's performance evaluation after the general manager said, "how am I ever going to get rid of her if you keep giving her performance appraisals like this?"); <u>Garrett v. Garden City Hotel, Inc.</u>, No. 05 Civ. 0962 (JFB) (AKT), 2007 WL 1174891, at *15, 15 n.12 (E.D.N.Y. Apr. 19, 2007) (the executive housekeeper's statement that the general manager told him to fire the assistant executive housekeeper, using the words "fire that black bitch," were admissible as the statement of a party opponent).

Ayotte's declaration provides no explanation for the foundation of Mr. Rivera's alleged knowledge, and the record suggests none. For example, there is no evidence that Mr. Rivera participated in this firing decision, that he discussed the decision with Mr. Lowe or that he observed behavior on Mr. Lowe's part that might support the statement. On the record before the Court, the alleged statement that Plaintiff was fired "because she is a woman and [Mr. Lowe] does not like women" is subjective and conclusory. It is well established that such unsupported "statements of [] feelings, beliefs and opinions are insufficient to sustain [a] claim of discrimination." Rothenberger v. N.Y.C. Police Dep't, No. 06 Civ. 868 (NGG) (LB), 2008 WL 2435563, at *10 (E.D.N.Y. June 16, 2008); see Batchelor v. City of New York, No. 11 Civ. 2058 (MKB) (VMS), 2014 WL 1338299, at *13 (E.D.N.Y. Apr. 1, 2014) (collecting cases); Harris v. City of New York, No. 03 Civ. 1593 (DLI), 2006 WL 2034446, at *4 (E.D.N.Y. July 17, 2006) ("Subjective beliefs alone are not a sufficient basis for a Title VII claim."). Thus, Mr. Rivera's alleged statement does not support Plaintiff's claim of sex discrimination.

>    **(c)** **Mr. Rivera's Alleged Statement To Plaintiff Is Not Probative Of Discrimination And Plaintiff's Interpretation Is Speculation**

Plaintiff claims that "an ACI manager twice made admissions that Ms. Holleman was fired because she is a woman." Pl. Mem. 4; see id. at 1; Pl. 56.1 at 2 (headline to Section B); see also Defs. Reply Mem. 7 (disputing these "admissions"). These two purported admissions are Mr. Rivera's statement to Mr. Ayotte, discussed above, and Mr. Rivera's statement to Plaintiff, "[y]ou know why you were fired, right?" which she—for reasons unexplained in the record—surmised was a reference to her gender. Holleman Dep. 309:11-310:3. When asked at his deposition, "Did you ever have a conversation with Ms. Holleman, [in] which you told her that

she was terminated because she was a woman or anything like that," Mr. Rivera answered "No." Rivera Dep. 54:23-55:2.

As discussed <u>supra</u>, Section II.C.1.b.i.(1).(b), a witness's subjective belief that certain evidence reflects discrimination, unsupported by any basis for that belief, is not evidence of discrimination. For example, in <u>Williams v. Department of Education of City of New York</u>, No. 11 Civ. 6158 (PAE) (RLE), 2013 WL 2395850 (S.D.N.Y. June 3, 2013), <u>report & recommendation adopted sub nom.</u> <u>Williams v. N.Y.C. Dep't of Educ.</u>, No. 11 Civ. 6158 (PAE) (RLE), 2013 WL 3487613 (S.D.N.Y. July 9, 2013), <u>appeal dismissed</u> (Oct. 30, 2013), the court rejected the plaintiff's contention that her personal belief that the phrase "go get your momma" was "equivalent to a racial epithet" and evidence of "racial animus." <u>Id.</u> at *4. Courts must "carefully distinguish" between evidence of discrimination and "evidence that gives rise to mere speculation and conjecture." <u>Id.</u> (quoting <u>Mayling Tu v. OppenheimerFunds, Inc.</u>, No. 10 Civ. 4971 (PKC), 2012 WL 516837, at *6 (S.D.N.Y. Feb. 16, 2012)). As Plaintiff has not put forward any evidence suggesting that "[y]ou know why you were fired, right?" was an admission that she was fired due to her sex, this statement also does not support her claim.

> **(2)      Mr. Stewart's Comments And Actions Concerning Two Women Clients Are Not Probative Of Sex Discrimination Against Plaintiff**

Plaintiff next relies on two incidents involving Mr. Stewart: a single email in which he referred to a female client as a "cunt" in an email to another employee, Meyers Decl. Ex. 13, and his encounter with Ms. Zolla, a female client. Plaintiff argues that these documents demonstrate a decisionmaker's "history of gender bias towards female working women," from which a jury could infer discrimination. Pl. Mem. 4.

According to Plaintiff, Mr. Stewart's views on women in the workplace are of particular relevance because of his role in the adverse action. Pl. Mem. 4. The Parties do not dispute that Mr. Stewart "participated in the decision to fire Ms. Holleman," Pl. 56.1 ¶ 30, as Defendants admit Mr. Lowe solicited Mr. Stewart's opinions on the matter. However, Plaintiff characterizes Mr. Lowe and Mr. Stewart as joint decisionmakers, see, e.g. Pl. 56.1 ¶ 30, while Defendants contend that Mr. Lowe was the decisionmaker and Mr. Stewart had an advisory role, see, e.g., Meyers Decl. Ex. 3 at 11; Defs. Mem. 12; Defs. 56.1 ¶ 47. As Mr. Stewart was a 50% shareholder in ACI, Mr. Lowe did not act without determining whether Mr. Stewart had "any objection," Meyers Decl. Ex. 3 at 11, and Mr. Stewart had "veto power" over firing employees, Lowe Dep. 192:10-13, and notwithstanding Defendants' arguments to the contrary, see Defs. Reply Mem. 4-5, Plaintiff has adduced sufficient evidence that Mr. Stewart was a decisionmaker. The Court will treat Mr. Lowe and Mr. Stewart as joint decisionmakers for purposes of this motion.

Concerning workplace remarks, "all comments pertaining to a protected class are not equally probative of discrimination . . . ." Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 115 (2d Cir. 2007). "[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." Id. Thus, "stray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." Gioia v. Forbes Media LLC, 501 F. App'x 52, 55 (2d Cir. 2012) (quoting Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998)).

To determine whether a comment is a stray remark or may be probative of discrimination, courts consider "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision

at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)."  Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149-50 (2d Cir. 2010) (where a supervisor involved in an adverse action used the term "tar baby" around the time of the alleged discrimination, the remark was of nonetheless low probative value because it "was not related to the decision-making process"); see Wesley-Dickson v. Warwick Valley Cent. Sch. Dist., 973 F. Supp. 2d 386, 398-99 (S.D.N.Y. 2013) (while "a reasonable juror could view" the Assistant Superintendent's comments, such as that the plaintiff "sounded 'just like Aunt Jemima'" and "'like [she] was down on the plantation'" as racially discriminatory, they were insufficient to support a prima facie case where "there is no evidence that the comments were related to the decisionmaking process").[33]

It is undisputed that Mr. Stewart used an inappropriate and gendered term to refer to a female client in a single email he sent to one employee over a year before Plaintiff's firing.  See Defs. Reply Mem. 6 (denouncing Mr. Stewart's email as "disgusting").  No inference of discrimination arises from Mr. Stewart's email, notwithstanding that it contained an offensive word, as it does not bear any relation in content or timing to Plaintiff's firing.  See Fuentes v. City of New York, No. 12 Civ. 755 (ENV) (VVP) (E.D.N.Y. Sept. 19, 2014) (ECF No. 41 at 15)

---

[33] See also Sethi v. Narod, No. 11 Civ. 2511 (MKB), 2014 WL 1343069, at *24-26 (E.D.N.Y. Apr. 2, 2014) (listing cases in which a three-month gap between a remark and an adverse action was too long for an inference of discrimination; the supervisor's comment of "[y]ou f-king Indian, what do you think about yourself?  I will make sure you are sent back to India . . ." was a stray remark as it was unrelated to the adverse actions); Knox v. Town of Southeast, No. 11 Civ. 8763 (ER), 2014 WL 1285654, at *13 (S.D.N.Y. Mar. 31, 2014) ("[S]tray remarks . . . by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision." (quoting Schreiber v. Worldco, LLC, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004)); Walcott v. Cablevision, No. 10 Civ. 2602 (DLI) (LB), 2012 WL 4447417, at *10 (E.D.N.Y. Sept. 24, 2012) ("isolated incidents" of comments that did not occur "in connection with or in proximity to Plaintiff's termination" were stray remarks).

(occasional comments related to the plaintiff's race "may have been in poor taste, but they fall far short of raising an inference of discriminatory intent"). There is no evidence that Mr. Stewart made similar gendered remarks on other occasions. Moreover, Mr. Stewart's comment was made about a client, and not an employee, which further limits its probative value as to Mr. Stewart's alleged discriminatory animus towards an employee.

Ms. Zolla's allegation that Mr. Stewart's "outrageous" behavior "provoked" her into telling him to "go fuck himself," and that his response "that he liked how I told him that," "could be reasonably interpreted as having a sexual overtone," Zolla Decl. ¶¶ 9-10, does not bolster Plaintiff's opposition. Ms. Zolla, who is not an ACI employee, contends that Mr. Stewart treated her "differently than others," not differently from men. Zolla Decl. ¶ 8. She complains about Mr. Stewart's conduct without giving any specific example of gendered behavior or disparate treatment by Mr. Stewart. Without some explanation as to why Mr. Stewart's comment was discriminatory (rather than merely being offensive), the court is not a forum in which to speculate on what "could" be "sexual overtones" in remarks responding to a speaker's already sexually explicit language. In any event, Ms. Zolla has not identified when these alleged incidents occurred. Even if the remark was gendered or sexually harassing, Plaintiff fails to demonstrate that this evidence has any relation in content or timing to Plaintiff's firing. One or two possibly gendered comments directed at non-employees and for which there is no relevant context offered is insufficient to show that a defendant employer's decisionmaker acted with discriminatory intent towards an employee.

The cases that Plaintiff cites are inapposite, and, in fact, demonstrate what is lacking in Plaintiff's reliance on the incidents involving Mr. Stewart. Pl. Mem. 5-7. For example, Plaintiff relies on <u>Dominguez-Curry v. Nevada Transportation Department</u>, 424 F.3d 1027 (9th Cir.

2005), Pl. Mem. 5, which concerned the denial of a promotion. In that case, the decisionmaker

stated to the plaintiff and others that "'he wished he could get men to do [women employees']

jobs,' that 'women have no business in construction,' that 'women should only be in subservient

positions,' that he 'would never work for a woman,' and . . . 'if you girls were men, you would

know that.'" Dominguez-Curry, 424 F.3d at 1038; see id. at 1031. He also stated to the plaintiff

that "'he wants a man to do the job. He doesn't feel that [the plaintiff] or a female could go out

into the field and do the work that a man is required to do.'" Id. at 1032. In addition, this

supervisor told sexually explicit jokes in the workplace on a daily basis. Id. at 1031. He also

admitted "to much of the conduct [the plaintiff] allege[d]." Id. at 1036. The Ninth Circuit found

that this supervisor's conduct "overtly exhibit[ed] his hostility to women in the workplace." Id.

at 1038. Plaintiff's contention that Dominguez-Curry supports a finding that a "supervisor's

sexist comments directed to other women than plaintiff is sufficient" to evidence discrimination

in Plaintiff's case, Pl. Mem. 5, ignores that court's reliance on comments stated to and about the

plaintiff in that case, as well as that the supervisor's comments were contemporaneous with the

adverse action. Plaintiff also disregards the imbalance between the frequent comments in

Dominguez-Curry and the sparse comments in this case, as well as the content of the comments

in Dominguez-Curry, which directly expressed the supervisor's opinion of women employees'

fitness for construction work.

Plaintiff's reliance on Rose v. New York City Board of Education, 257 F.3d 156 (2d Cir.

2001), Pl. Mem. 5, is likewise misplaced, as that age discrimination case involved comments

"made directly to [the plaintiff] on more than one occasion by her immediate supervisor, who

had enormous influence in the decision-making process," that he would replace her with

someone "younger and cheaper." Rose, 257 F.3d at 162. In contrast, there are no allegations in

this case concerning comments made by a decisionmaker that reflect on the decisionmaker's view of women as employees in the workplace. See Sista v. CDC Ixis N. Am. Inc., 445 F.3d 161, 173-74 (2d Cir. 2006). In addition, in Desert Palace, Inc. v. Costa, 539 U.S. 90, 102 (2003), another case relied on by Plaintiff, Pl. Mem. 6, the facts involved a long history of disparate treatment and sex-based slurs aimed at a woman forklift driver. See Costa v. Desert Palace, Inc., 299 F.3d 838, 844-46 (9th Cir. 2002) (describing the plaintiff's work history, which involved "'so many' incidents [of sex discrimination], it was difficult for her to recount them all"; these incidents included, for example, the plaintiff being suspended for her written complaint about a co-worker calling her a "fucking cunt," although he admitted doing so, a supervisor allowing male employees to take a break while ordering the plaintiff to return to work, and that—as corroborated by three witnesses—supervisors singled the plaintiff out "for particularly intense 'stalking'"), aff'd, 539 U.S. 90 (2003). The facts in Desert Palace are not, as Plaintiff suggests, "strikingly similar to the instant case," Pl. Mem. 6, as the record in this case lacks such evidence of poor or disparate treatment. See infra Section III.C.1.b.ii.[34]

Indeed, Plaintiff relies on emails in which Mr. Stewart referred to a male client as a "junkie," Meyers Decl. Ex. 35, and in which a different male client complained that Mr. Stewart "insulted" him and "doesn't like me very much," Meyers Decl. Ex. 39. Plaintiff's argument as to Mr. Stewart's alleged anti-woman bias is not bolstered by Plaintiff's alternate argument that he is generally unprofessional, or the evidence that on rare occasions, he made rude comments about male and female clients alike. See Defs. Reply Mem. 6 n.3. It bears noting that Title VII is not "a general civility code." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).

---

[34] In addition, to the extent Plaintiff relies on Zhao v. State University of New York, 472 F. Supp. 2d 289, 307 (E.D.N.Y. 2007), for the proposition that positive stereotypes can be evidence of discrimination, Pl. Mem. 5, Plaintiff has not identified any positive stereotypes at issue in this case.

### ii. Plaintiff Has Not Adduced Evidence Of Disparate Treatment

Notwithstanding Plaintiff's identification of over twelve purported comparators, Plaintiff has not presented evidence of Defendants' disparate treatment of male and female art handlers. One form of circumstantial evidence probative of discrimination is evidence "showing that the employer subjected [the plaintiff] to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000); see Holtz, 258 F.3d at 77. Employees must be similarly situated in "all material respects," which involves consideration of "(1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." Graham, 230 F.3d at 40. "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of [the] plaintiff's and comparator's cases, rather than a showing that both cases are identical." Ruiz, 609 F.3d at 494 (quoting Graham, 230 F.3d at 40).

In this case, Plaintiff argues that male art handlers were reprimanded less harshly than she for comparable misconduct.[35]

---

[35] Concerning disparate treatment, Mr. Ayotte also stated that he "observed that Ms. Holleman was treated differently, by ACI's management, than male Art Handlers/Installers"; that she was not assigned to "certain tasks"; and that "male Art Handlers" were disciplined less harshly than Plaintiff was disciplined. Ayotte Decl. ¶¶ 6-7, 11-13. Plaintiff did not raise any claim about disparate treatment in assignments in her Complaint, nor is there any other mention of such a claim in her motion papers.

**(1)    Plaintiff's Performance Problems
And Defendants' Undisputed Response
To Those Problems**

Before discussing the employees that Plaintiff offers as comparators, the Court will briefly recount the actions Defendants took in response to what they perceived to be Plaintiff's performance problems.

Although Plaintiff contests the significance of these events, Plaintiff does not dispute that Mr. Lowe heard complaints about her performance from her co-workers, and that Ms. Bischel also reported to Mr. Lowe complaints about Plaintiff that Ms. Bischel received from co-workers and from a Gagosian Galleries registrar who asked that Plaintiff not be scheduled to work at his gallery. Plaintiff does not dispute that Mr. Lowe spoke to Plaintiff "about co-workers complaining about 'communication things,' Ms. Holleman's interactions with co-workers, her not completing paperwork correctly, and leaving early." Pl. 56.1 ¶ 54. These conversations were informal and not "disciplinary infractions," Pl. 56.1 ¶ 54, consistent with ACI's informal and conversation-based method of handling deviations from workplace standards, and Defendants' preference of not describing their methods as "discipline," see, e.g. Lowe Dep. 86:1-89:22.[36] In addition, Plaintiff does not dispute that Ms. Bischel reported an August 2010 incident to Mr. Lowe concerning Plaintiff's failure to fill out a BOL for a painting she accepted from a client.

Plaintiff concedes that in or around June 2011, she was the subject of a "disciplinary infraction," Pl. 56.1 ¶ 54, or in Defendants' parlance, "counsel[ing]," Meyers Decl. Ex. 3 at 20, for writing a complaint over the face of two BOLs. Indeed, Plaintiff's post-dismissal email to the decisionmakers describing her belief that over the past eight months she had "transform[ed]

---

[36] Although Plaintiff notes that art handling is "a physically challenging job that is usually held only by men," Pl. Mem. 1, she does not allege that Defendants raised any concerns about her physical abilities.

[her] attitude and performance as well as [her] relationship to all the people [she] work[ed] with including crew and beyond," evidences her recognition of her performance problems. Meyers Decl. Ex. 24 at 1 (admitting that she had "initial incidents" and "deeply apologiz[ing] for any recent infractions or any issues with any client at all"). Finally, there is no dispute that on December 9, 2011, Ms. Bischel wrote to Mr. Lowe to recount negative comments about Ms. Holleman concerning a job moving artwork at the residence of Mr. Gagosian, nor has Plaintiff disputed that Mr. Gagosian is the owner of ACI's single most important client.[37]

Thereafter, Mr. Lowe fired Plaintiff for "[c]omplaining to [] clients about work that Art Crating is performing for them," which was "something that [he] do[es] not tolerate"; because it was not "the first time that [he] had an issue with something [Plaintiff] did while working for [Defendants]"; and because of an unprofessional "pattern to the way [she] work[ed] and communicate[d] with others." Meyers Decl. Ex. 15.

### (2)    Plaintiff's Comparator Evidence

Plaintiff identifies more than twelve male employees whom she contends received more lenient treatment for comparable or more serious offenses. Pl. 56.1 ¶¶ 60-99. A careful review of the record shows that these ACI employees were treated similarly with regard to misconduct and discipline, and that in being let go from ACI, Plaintiff was treated the same as the sole male art handler with multiple instances of misconduct who had received counseling and yet committed another serious workplace error.

---

[37] I do not include the Lutter Poster incident in this summary because the decisionmakers were not aware of this incident until after Plaintiff's dismissal and therefore it did not factor into the termination decision.

**(a)**    **Mr. Kulcsar Was Fired After
Similar Misconduct**

The employee whose conduct was similar to Plaintiff's conduct is Mr. Kulcsar, a male art handler who was fired around the same time as Plaintiff after receiving counseling and two client complaints.

Mr. Lowe was aware of co-worker complaints about both Plaintiff and Mr. Kulcsar.  He was also aware that Plaintiff and Mr. Kulcsar were each the subject of a client's complaint early in their tenures, and that the client requested that Plaintiff and Mr. Kulcsar not return to that client's gallery. Mr. Lowe initially opted to educate Plaintiff and Mr. Kulcsar in recognition that they were new hires.  Plaintiff's circumstances also included counseling for the BOL incident. Both Plaintiff and Mr. Kulcsar were fired after a second serious client complaint.

There is no evidence from which a reasonable fact finder could conclude that Mr. Kulcsar received more favorable treatment.  Rather, Defendants' treatment of Mr. Kulcsar shows that Plaintiff has not offered sufficient evidence of a material fact in dispute as to Defendants' gender neutral handling of her employment and dismissal.[38]

**(b)**    **Mr. Ayotte, Like Plaintiff, Was
Not Fired After A Single Client
Complaint And Instead Received
Counseling**

Plaintiff does not offer evidence to put material facts in dispute that Defendants did not handle the misconduct of the other employees identified by Plaintiff in a manner consistent with how they handled Plaintiff's initial misconduct.  For example, Mr. Lowe informally counseled Mr. Ayotte about his anger and attitude problems; Mr. Lowe also informally counselled Plaintiff about her problems with communication and with co-worker interactions.  After Mr. Ayotte

---

[38] In addition, to the extent Plaintiff complains that she was fired "summarily," Pl. Mem. 4, she presents no evidence that Mr. Kulcsar was offered an opportunity to explain himself or apologize before he was fired.

received his first client complaint, which concerned Mr. Ayotte rummaging through the client's personal items, Defendants elected to educate Mr. Ayotte rather than fire him. Defendants had received "a few complaints about people being too familiar with things while they are on the job," Meyers Decl. Ex. 27, and Defendants handled this problem by educating all art handlers, including Mr. Ayotte, through a mass email. Although Mr. Ayotte was not specifically reprimanded about that client's complaint, Plaintiff was likewise not reprimanded (or informed) about her first client complaint. Mr. Ayotte was not the subject of any other incidents or client complaints before he voluntarily resigned from ACI. Mr. Ayotte's improper conduct was objectively substantially less serious in its scope and consequences for the business compared to Plaintiff's conduct, which involved a client's request that she not work for that client and a second complaint involving moving artwork at Mr. Gagosian's residence. Therefore, there is no basis in the record upon which a fact finder could reasonably conclude that Mr. Ayotte received preferential treatment.[39]

> **(c)** **Mr. Rogers, Mr. Hirschfeld and Mr. Lindsay, Like Plaintiff, Were Not Fired After A Single Client Complaint**

Likewise, Plaintiff's contentions that Defendants did not terminate Mr. Rogers's employment,[40] Mr. Hirschfeld's employment,[41] or Mr. Lindsay's employment after each

---

[39] In his declaration, Mr. Ayotte concluded that Defendants treated unnamed "male employees" more leniently than they treated Plaintiff, but the only example Mr. Ayotte provided was his own treatment, which is discussed herein. Ayotte Decl. ¶¶ 11-13. Mr. Ayotte's allegations concerning unnamed male employees do not support Plaintiff's claims, as there "is no evidence of the truth of these statements that [the jury could] consider" when "[n]o first-hand or even second-hand specifics of any such conduct are provided." Dabney v. Christmas Tree Shops, 958 F. Supp. 2d 439, 451 (S.D.N.Y. 2013). See Defs. Mem. 21.

[40] As there is no evidence that Mr. Rogers created or posted the "MY NAME IS JIM!" picture or that Mr. Lowe knew about this picture until this litigation, this event is not relevant to Mr. Rogers's performance. See Dellaporte v. City Univ. of N.Y., 998 F. Supp. 2d 214, 230

received a single client complaint is not indicative of disparate treatment, as Defendants also continued to employ Plaintiff after a single client complaint. As Mr. Lowe informed Plaintiff concerning her conduct that elicited a second client complaint, "[i]f this was the first time that I had an issue with something you did, I might have treated this differently . . . ." Meyers Decl. Ex. 15. There is no evidence that Mr. Rogers, Mr. Hirschfeld or Mr. Lindsay were involved in other infractions.

> **(d)**      **Mr. Lowe Was Not Aware Of The Single Client Complaint Against Mr. Dominic**

Similarly, Mr. Dominic was involved in a single alleged client complaint (that he had body odor). There is no evidence that Mr. Lowe was aware of this complaint. Plaintiff cannot prove disparate treatment using incidents that never came to a decisionmaker's attention. "An employee who allegedly engaged in misconduct comparable to the plaintiff's is not similarly situated to the plaintiff when the employer is unaware of what the comparator employee supposedly did." Dinkins v. Suffolk Transp. Serv., Inc., No. 07 Civ. 3567 (JFB), 2010 WL 2816624, at *10 (E.D.N.Y. July 15, 2010); see Dellaporte, 998 F. Supp. 2d at 230 (same); Littlefield v. AutoTrader.com, 834 F. Supp. 2d 163, 170 (W.D.N.Y. 2011) ("In the absence of proof that defendant was presented with a complaint or was otherwise made aware of

---

(S.D.N.Y. 2014) (a co-worker was not similarly situated to the plaintiff where the employer was unaware of the co-worker's comparable conduct at the time that conduct occurred).

[41] The complaint against Mr. Hirschfeld was also a complaint about the price charged by Defendants. Meyers Decl. Ex. 32. That complaint praised Mr. Hirschfeld for being "very polite and nice," but faulted him for being "inefficient." Meyers Decl. Ex. 32. When Ms. Morgan reported the complaint to Mr. Lowe, she stated that the inefficiency may have been due to the client being indecisive about where to install his artwork, and Mr. Hirschfeld being a new and possibly inexperienced employee. Id. As was true for Plaintiff, Defendants considered Mr. Hirschfeld's status as a new employee when considering his performance.

comparable conduct . . . no reasonable jury could find that plaintiff was subjected to disparate treatment . . . .").

(e)     **Mr. Payne, Like Plaintiff, Received Counseling For A Performance Problem That Did Not Involve A Client Complaint**

In other examples on which Plaintiff relies, there is no evidence of a client complaint. For example, the record does not contain any client complaint against Mr. Payne. Although Mr. Payne received counseling from Mr. Lowe on a single occasion for anger-management issues, Plaintiff received counseling on several occasions without being fired. Plaintiff also alleges that Mr. Payne destroyed a piece of art, but she has not provided any further description of the nature of the incident, such as evidence suggesting this event was willful misconduct. Mr. Payne and Plaintiff would not be similarly situated in all material respects if, for example, his error were an accident. Additionally, to the extent he received a raise and a promotion at some point after an infraction, Plaintiff also received a raise and a holiday bonus following misconduct that required counseling.

(f)     **Mr. Lowe Did Not Know Of The Alleged Incidents Involving Mr. Geldhof Or Mr. Herzlinger, And There Was No Client Complaint**

Concerning the remaining named male employees, there is no evidence of either a client complaint or that Mr. Lowe was aware of the alleged infraction. For example, Plaintiff has not offered any evidence that Mr. Lowe knew of Mr. Geldhof allegedly defacing a BOL. In any case, Defendants continued to employ Plaintiff after she defaced a BOL.[42] There is also no

_____

[42] Additionally, Plaintiff has not provided evidence that Defendants permitted male art handlers to write emphatic comments across, as Plaintiff described it, "the whole face of" BOLs. Holleman Dep. 222:4-17, ECF No. 48-6; see Section II.A.1.f. Plaintiff submitted other employees' BOLs, see Meyers Decl. Ex. 26), but most of the comments on these BOLs were

evidence of client complaints or other infractions involving Mr. Geldhof.[43]  There is similarly no

evidence that Mr. Lowe knew of the verbal altercation between Mr. Herzlinger and a client that

Plaintiff witnessed.[44]  There is also no evidence of other comparable incidents or any client

complaints involving Mr. Herzlinger.

In addition, Mr. Geldhof, Mr. Herzlinger and Mr. Payne were identified as Plaintiff's

supervisors.  Meyers Decl. Ex. 3 at 10.  Plaintiff has not established that her supervisors were

similarly situated to her in all material respects.  For example, she has not established that

supervisors and their subordinates were subject to the same performance standards.  See Hesse v.

Dolgencorp of N.Y., Inc., No. 10 Civ. 421 (WMS), 2014 WL 1315337, at *21 (W.D.N.Y. Mar.

31, 2014) (the plaintiff was not similarly situated to her supervisor); Ortiz v. Brookstone Co.,

274 F. Supp. 2d 456, 463-64 (S.D.N.Y. 2003) (same); Prescod v. Am. Broad. Cos., Inc., No. 77

Civ. 6125 (JFK), 1985 WL 430, at *14 (S.D.N.Y. Mar. 19, 1985) ("Supervisors are not 'similarly

situated employees.'").

---

written within a small portion of the designated comment area, and none contain the threefold
and sevenfold underlining used by Plaintiff.  To the extent some of these BOLs contain larger
handwritten comments about the job being cancelled, like "DID NOT DO" or "CANCEL"
Meyer Decl. Ex. 26 at 3, 8, Defendants explained that the BOLs for cancelled jobs were not seen
by clients.  Lowe Reply Aff. ¶ 19.  One BOL contained an obscenity,  Meyer Decl. Ex. 26 at 21,
but as Defendants explained, the obscenity was the name of the artwork.  Defs. Reply Mem. 9.

[43] To the extent Mr. Lowe did not recall ever counseling Mr. Geldhof, but thought it "probabl[e]"
that he counseled Mr. Geldhof "in the beginning" of his employment about "issues," Plaintiff
was also counseled in the beginning of her employment without adverse consequences.

[44] Although Mr. Lowe testified to counseling Mr. Herzlinger about a "technical" issue
concerning putting a screw through a frame, Plaintiff does not contend that this technical mistake
was comparable to the complaints about her attitude and professionalism.

**(g) Plaintiff Does Not Provide Relevant Details About Other Alleged Comparators**

Finally, concerning the several allegations involving unidentified art handlers, see Pl. 56.1 ¶¶ 94-99, Plaintiff's failure to provide sufficient evidence means that no reasonable fact finder could determine that these persons were similarly situated to Plaintiff. As to the November 2010 client complaint about an art handler, the record does not show the content of this complaint except that it was "ongoing," "[n]othing too serious" and "not a huge deal," Meyers Decl. Ex. 33; whether Mr. Lowe was informed of the complaint; whether the art handler had any prior complaints or performance problems or was the subject of other complaints; and how Defendants addressed the incident with the art handler. With the exception of knowing the content of the complaint, the same is true for the August 2011 client complaint about three art handlers who did not take off their shoes as requested. As to the complaint about ACI's art handlers generally, Plaintiff has not offered any evidence or argument as to the identity of the particular art handlers at issue[45] or their performance histories. Moreover, the issues complained of concerned technical aspects of the job, such as driving a forklift and hanging paintings. Plaintiff has not established, nor does she argue, that knowledge-based performance problems were comparable to misconduct.

---

[45] Plaintiff treats the art handlers referred to by this email as anonymous "[m]ale [a]rt [h]andlers [g]enerally," Pl. 56.1 ¶¶ 98-99, although the email complaint references "[C]hris [B]rown," "[E]ric," and "[J]im." There are no other complaints in the record concerning a Chris Brown and Plaintiff has not offered any evidence suggesting that "Eric" is Mr. Ayotte or that "Jim" is Mr. Rogers. Indeed, Mr. Ayotte's and Mr. Rogers's performance problems were discussed in detail during Plaintiff's and Mr. Lowe's depositions, and in Mr. Ayotte's declaration, with no mention of such a complaint.

**(h)** **There Is No Evidence Of Disparate Treatment Concerning The Investigation Of Misconduct Allegations**

Plaintiff also argues that "allegations of misconduct about [male art handlers] were typically investigated by management." Pl. 56.1 ¶ 59; see Pl. Mem. 4, 7-8. Plaintiff does not provide any citation for this assertion. Her descriptions of more than twelve alleged comparators do not contain a single assertion that management (or anyone else) investigated an allegation of misconduct, let alone that they "typically" did so. Pl. 56.1 ¶¶ 60-99. To the extent that Mr. Lowe asked a client to provide feedback on Mr. Kulcsar's performance, Meyers Decl. Ex. 29, and Mr. Graham asked Ms. Bischel to identify employees who might need more training, Meyers Decl. Ex. 37, these inquiries were not investigations into the truth of the client's complaint.[46] There is also no evidence in the record that Mr. Lowe investigated the truth of the client complaint, emailed directly to him, that precipitated Mr. Kulcsar's firing. Thus, Plaintiff's contention that the failure to investigate Mr. Franklin's complaint evidences discrimination must fail. Pl. 56.1 ¶¶ 35, 37; Pl. Mem. 4.

Thus, notwithstanding the quantity of examples that Plaintiff asks the Court to consider, no reasonable fact finder could conclude that Defendants treated male art handlers more leniently for comparable misconduct.

---

[46] Plaintiff mischaracterizes the evidence by stating that "ACI allowed Mr. Lindsay to explain himself" after a client complaint. Pl. 56.1 ¶ 88. The client emailed his complaint to Mr. Lindsay, Mr. Lowe and Mr. Stewart. Meyers Decl. Ex. 34. Mr. Lindsay then emailed Mr. Lowe and Mr. Stewart about the "backstory." Meyers Decl. Ex. 35. There is no evidence that Mr. Lowe or Mr. Stewart requested or waited for Mr. Lindsay's apparently unsolicited explanation. Likewise, to the extent Ms. Morgan told Mr. Lowe that Mr. Hirschfeld's alleged inefficiency during one assignment may have been due to a combination of his inexperience and the client's inefficiency, Meyers Decl. Ex. 32, Mr. Lowe did not ask for her opinion, nor is there any indication as to what weight he gave her opinion, if any.

### iii.    There Is No Evidence Of A Culture Of Anti-Female Bias At ACI

Plaintiff argues that a jury could infer discrimination from Defendants' "culture of anti-female bias." Pl. Mem. 4-5. Notably, Plaintiff does not allege that she believed there was a culture of anti-female bias or that she witnessed such a workplace culture while she was an employee of ACI. In fact, her email to Mr. Lowe and Mr. Stewart after her she was fired makes clear that she believed the environment at ACI to be supportive and positive. She wrote, "I have felt personally changed for the better by my involvement with everyone;" "I have literally blossomed as a human being working for your company;" "[t]his is the greatest job and nothing has had a more positive impact in my life;" and "I have literally become a more beautiful and happy person due to my association to this work and company." Meyer Decl. Ex. 24. Plaintiff has not disclaimed anything she wrote in this email. Plaintiff's theory of an anti-female culture at ACI is further undermined by the undisputed facts that Defendants hired Plaintiff at a higher pay rate than many of her comparators; treated her more favorably than her comparators by not requiring her to work trial days; and awarded her a raise and a holiday bonus, favorable treatment that is inconsistent with anti-female bias.

Nonetheless, Plaintiff points to five emails as evidence of a discriminatory workplace culture. Pl. Mem. 4-5. The first email is Mr. Stewart's October 2010 email to a female client using the word "cunt," which is discussed <u>supra</u> Section III.C.1.b.i.(2). Pl. 56.1 ¶ 119; Meyers Decl. Ex. 13. The second email is Mr. Stewart's November 2010 communication with Ms. Morgan and Ms. Bischel, objecting to their refusal to work with a female intern. Pl. 56.1 ¶ 118. It is difficult to understand why Mr. Stewart's championing of a female intern is anti-woman, but Plaintiff argues the email was "dismissive and profanity-laden" (it contains one use of the word "fuck"). Pl. 56.1 ¶ 118; Meyers Decl. Ex. 44. To the extent Mr. Stewart used foul language, and

Ms. Bischel found his response to be "a bit offensive," Ms. Morgan disagreed, writing "I think he means it half humorously . . . ." Meyers Decl. Ex. 44. There is no indication that the female employees interpreted the email as either "dismissive," Pl. 56.1 ¶ 118 or gendered, and nothing in the content of the email suggests animus towards women. Moreover, this email was sent more than a year before the adverse action at issue in this case. See Sethi, 2014 WL 134069, at *24-26.

As to the other three emails, Plaintiff argues that the use of the word "bitch" or some variation thereof in two emails sent to Ms. Bischel and one email sent by Ms. Bischel is evidence of an anti-female culture. Pl. 56.1 ¶ 119. In a May 2010 email, a male employee uses the term "bitch" to refer to the workday. Meyers Decl. Ex. 46 ("wrap this bitch up"). In a June 2011 email, a male client uses the term "bitch" to refer to a piece of heavy artwork. Meyers Decl. Ex. 45 ("crate the bitch"). In the third email, dated December 2010, Ms. Bischel refers to two female co-workers as "beeotches". Meyers Decl. Ex. 47 ("you beeotches wanna order lunch?"). This email between women is the only instance in which the word refers to a woman.

In Pucino, the Second Circuit stated that there was no categorical rule that the word "bitch" constitutes evidence of sex discrimination. Pucino, 618 F.3d at 118. The court stated that "the use of that word in many contexts reflects . . . hostility [toward women]. However, we cannot say that use of the word 'bitch' always and in every context has that meaning or that its usage need not be viewed in context." Id. at 118.

Here, the three instances of the use of this word "may have been in poor taste, but they fall far short of raising an inference of discriminatory intent." Fuentes, No. 12 Civ. 755 (ENV) (VVP) (ECF No. 41 at 15); see Oncale, 523 U.S. at 80. None of the emails involves

decisionmakers or any individual whom Plaintiff alleges discriminated against her.[47]  In

Zubulake v. UBS Warburg LLC, 382 F. Supp. 2d 536 (S.D.N.Y. 2005), the court stated that a co-

worker's "stray remarks" are "not evidence of discrimination and [are] therefore excluded."

Zubulake, 382 F. Supp. 2d at 548 (citing Minton v. Lenox Hill Hosp., 160 F. Supp. 2d 687, 695

(S.D.N.Y. 2001), for the proposition that "[a]s a general matter, stray comments are not evidence

of discrimination if . . . they are made by individuals without decision-making authority").

Moreover, the male employee's and client's use of the word "bitch," however ill-advised, refers

to a long day ("this is when people go home . . . wrap this bitch up") and an unexpectedly large

piece of artwork ("I will crate the bitch today"), respectively, not Plaintiff or any other woman.

Similarly, Ms. Bischel's email to two female colleagues asking "[Y]ou beeotches wanna

order lunch?" is not evidence of sex discrimination.  Although Ms. Bischel's use of the word

"beeotches" does refer to actual women, it was not directed at Plaintiff.  See Beale v. Mt. Vernon

Police Dep't, 895 F. Supp. 2d 576, 589 (S.D.N.Y. 2012) (observing that a supervisor had not said

"bitch" to or about the plaintiff and that while the one-time comment was sophomoric, it was not

actionable under Title VII).  Moreover, the email reveals that Ms. Bischel is inviting two female

colleagues to join a group of three other female ACI employees in planning their lunches.

Meyers Decl. Ex. 47 (containing a thread of back and forth emails musing over food

possibilities, i.e., "I kind of want a sandwich . . .", "[the deli] has soup which would be good –

I'm down with sushi, too," "let's not do sushi," "[does the deli] sound good?").  In Murray v.

Visiting Nurse Services of New York, 528 F. Supp. 2d 257 (S.D.N.Y. 2007), the court found

similar verbal exchanges between the plaintiff's male co-workers (e.g., "you're such a bitch,"

"good morning ladies") "not even hostile" because, insofar as they were delivered like "good

---

[47] Although Ms. Bischel was Plaintiff's supervisor, see Meyers Decl. Ex. 3 at 10, Plaintiff does
not allege that Ms. Bischel was a decisionmaker.

morning" and "everyday how do you do," "they are more accurately classified as friendly, even if they made [the] plaintiff uncomfortable." Murray, 528 F. Supp. 2d at 278-79 (quoting Goldman v. Admin. for Children's Servs., No. 04 Civ. 7890 (GEL), 2007 WL 1552397, at *10 (S.D.N.Y. May 29, 2007)); see Garone v. United Parcel Serv., Inc., 436 F. Supp. 2d 448, 469 (E.D.N.Y. 2006) (the plaintiff's allegations that the manager's occasional use of the terms "office bitch," "brooklyn bimbettes," and "cat fight" were "trivial" where there was "not a trace of either maliciousness, lewdness, or inequity" in the manager's actions). In this case, there is no indication that anyone, including Plaintiff, was made uncomfortable by the use of the term "beeotches." The incident is best described as trivial.

Considering the emails as a whole, they do not suggest a culture of anti-female bias. There are only five emails; all but one of the emails was sent a year or more before Plaintiff's dismissal; and the remaining email was sent six months prior to her dismissal, by a non-employee. Due to the emails' content and scarcity, no reasonable juror could find, based on these emails, that Plaintiff's dismissal was motivated by discriminatory animus.

iv.     **Defendants' Reasons For Firing Plaintiff Neither Raise An Inference Of Discrimination Nor Demonstrate Pretext**

As described above, no reasonable juror could draw an inference of discrimination from the evidence Plaintiff offered in support of her prima facie case, notwithstanding Plaintiff's de minimis burden at that stage. Although a failure to state a prima facie case is fatal to a discrimination claim, the Court will next consider Plaintiff's arguments as to pretext. Defendants have offered, as a legitimate, non-discriminatory reason for their actions, that Plaintiff was fired due to the December 9, 2011 client complaint as well as her history of past performance problems. Defs. Mem. 17-21. In response, Plaintiff makes several arguments as to why Defendants' reason is not credible and is therefore pretextual. Such arguments are typically

analyzed in the third stage of the <u>McDonnell Douglas</u> framework, as Plaintiff has done in this case.  Since Plaintiff has not established the fourth prong of her <u>prima</u> <u>facie</u> case and, as she is entitled to rely on the same evidence to support her <u>prima</u> <u>facie</u> case and to demonstrate pretext, <u>see, e.g.</u>, <u>Kerzer v. Kingly Mfg.</u>, 156 F.3d 396, 402 (2d Cir. 1998), the Court will consider these additional arguments as they relate both to an inference of discrimination and to pretext.

Plaintiff asserts that Defendants' reasons for terminating her employment are not credible because Defendants' reasons have allegedly changed over the course of the litigation; Defendants did not characterize her misconduct as "disciplinary infractions" or Mr. Lowe's counseling of her as "discipline"; Defendants' lack documentation of her misconduct and their employment policies; the December 2011 client complaint was, according to Plaintiff, not serious; Plaintiff had recently received a raise and a bonus; and "ACI's management applied a vague and amorphous standard of professionalism to Ms. Holleman . . . which they did not even apply to themselves."  Pl. Mem. 8-10.

### (1)     Defendants' Reasons For Plaintiff's Dismissal Have Not Changed

First, Plaintiff asserts that Defendants' allegedly changing reasons for her dismissal demonstrates pretext.  "The inconsistency between the justifications offered" by a defendant for an adverse action may raise a "genuine issue of material fact with regard to the veracity of this non-discriminatory reason."  <u>Carlton v. Mystic Transp., Inc.</u>, 202 F.3d 129, 137 (2d Cir. 2000). In the absence of other evidence of discrimination, courts have not found an inference of discrimination or pretext where "[t]he multiple reasons defendant raised for [the adverse action] are not conflicting, but complementary."  <u>Warren v. N. Shore Univ. Hosp. at Forest Hills</u>, No. 03 Civ. 0019 (DGT) (RML), 2006 WL 2844259, at *10 (E.D.N.Y. Sept. 29, 2006), <u>aff'd</u>, 268 F. App'x 95 (2d Cir. 2008); <u>see</u> <u>McDowell v. T-Mobile USA, Inc.</u>, No. 04 Civ. 2909 (DGT), 2007

WL 2816194, at *16 (E.D.N.Y. Sept. 26, 2007) (where the defendant's reasons for an adverse action in one context did "not align perfectly with defendant's proffered reasons or with all of the evidence in the record," and where there was no other evidence of discriminatory intent, the discrepancy was not evidence of pretext), aff'd, 307 F. App'x 531 (2d Cir. 2009).

According to Plaintiff, "[a] credibility issue exists as to which of Defendants' version[s] of [Plaintiff's] employment history should or could be believed." Pl. Mem. 9. Plaintiff complains that in their interrogatory responses, Defendants "listed only one instance in which ACI issued discipline to [Plaintiff] before her termination – specifically with reference to her writing notes on a bill of lading," while Defendants now "recite a litany of virtually everything that they can think of that [Plaintiff] did wrong, or supposedly did wrong, during the entirety of her employment—all to make it seem as though [Plaintiff] was the subject of near-constant discipline through her employment." Pl. Mem. 8-9.

In making the above argument, Plaintiff misstates Defendants' interrogatory responses. In response to one of Plaintiff's interrogatories, Defendants stated that "among the reasons [P]laintiff's employment was terminated" are "poor work performance, poor skills and abilities, and/or a lack of professionalism." Meyers Decl. Ex. 3 at 17. In another interrogatory, as discussed previously, Plaintiff asked Defendants to identify "any form of disciplinary action" to which Plaintiff was subjected, and Defendants responded "on at least one occasion . . . Robin Lowe counseled [P]laintiff about her poor performance and lack of professionalism when he admonished [P]laintiff, inter alia, for making unauthorized written marks and comments on an ACI Bill of Lading." Meyers Decl. Ex. 3 at 19-20 (emphasis added). Thus, Defendants' interrogatory responses do not suggest that the second BOL incident was the only incident for which Plaintiff received some form of discipline.

Defendants' interrogatory responses are consistent with Mr. Lowe's December 11, 2011 email dismissing Plaintiff "due to the circumstances surrounding [the December 9, 2011 job]" and because "this was [not] the first time that [Mr. Lowe] had an issue with something [Plaintiff] did while working for [ACI]." Meyers Decl. Ex. 15. Mr. Lowe provided substantially the same explanation to Mr. Cheung within days of the adverse action. Cheung Dep. 28:15-29:1 (Mr. Lowe told him that, "[i]t wasn't like . . . this one thing [on December 9, 2011] went wrong . . . . [Instead,] all these other things had kind of already occurred . . . ."). He also provided the same explanation during the March 2012 unemployment insurance hearing. Schnapp Reply Aff. Ex. A at 25:6-26:22 (in making the termination decision, Mr. Lowe considered Mr. Franklin's complaint, "the previous incident and [his] conversation with [Plaintiff], and "an avalanche of complaints from coworkers [and] in one other instance . . . people that have hired us").

In <u>Carlton</u>, the Court found evidence of pretext where the defendants originally stated that the plaintiff was terminated for economic reasons while "the issue of performance wasn't addressed," then later stated that the plaintiff was terminated for poor performance. <u>Carlton</u>, 202 F.3d at 137. In this case, Mr. Lowe has consistently stated that his reasons for firing Plaintiff involved the December 9, 2011 incident as well as prior misconduct. <u>See</u> <u>Mangaroo v. Boundless Techs., Inc.</u>, 253 F. Supp. 2d 390, 399 (E.D.N.Y. 2003) (finding no inconsistency in the defendants' proffered reason where the defendants "consistently stated" that the reasons for the plaintiff's termination involved several events). Plaintiff has not identified any conflict or change in Defendants' reasoning, and so there is no issue on this point to present to a jury.

        **(2)**    **It Is Immaterial Whether Defendants' Termed Their Handling Of Plaintiff's Misconduct As Discipline**

Plaintiff argues that Defendants' reasons for terminating her employment are not credible because they did not refer to her past counseling as "discipline." Pl. Mem. 9. Plaintiff asserts

that she committed no "disciplinary infractions," "was never disciplined at ACI, except for her termination," and "[e]ven the matter regarding the BOL that she wrote notes on was not characterized as a disciplinary issue when ACI owner Robin Lowe spoke to her about it." Pl. Mem. 9.

Inconsistencies in a defendant's reasons for an adverse action must be "material" and not "minor" to raise a triable factual dispute. <u>Dister v. Cont'l Grp., Inc.</u>, 859 F.2d 1108, 1116 (2d Cir. 1988); <u>see</u> <u>Lukasiewicz-Kruk v. Greenpoint YMCA</u>, No. 07 Civ. 2096 (ARR) (LB), 2009 WL 3614826, at *9-10 (E.D.N.Y. Oct. 30, 2009) (that the "defendants at various times referred to the restructuring as a 'reorganization,' 'staff restructure,' and 'job elimination,'" did not "raise a triable issue of fact" because "[a]ll terms used by defendants when describing plaintiff's termination connote a change in staff positions and responsibilities"), <u>aff'd</u>, 404 F. App'x 519 (2d Cir. 2010).

In this case, as described <u>supra</u> Sections II.A.1.a and II.A.1.c, Mr. Lowe explained at his deposition that Defendants avoided using the term "discipline" to describe their handling of employee performance problems.[48]  Plaintiff attempts to raise a triable issue by asserting that the

---

[48] Plaintiff alleges that "discipline was not important to ACI." Pl. 56.1 ¶ 106.  To the contrary, the deposition testimony to which Plaintiff cites—in which Plaintiff's counsel, Mr. Meyers, questioned Mr. Lowe, with Mr. Schnapp defending the deposition—states as follows:

> Q. So would it be correct to say that during Ms. Holleman's employment, discipline was not important to the company? [ . . . ]
>
> A. I disagree with that. [ . . . ] You're saying it is not important.  It is not in the vocabulary, it doesn't exist. [ . . . ]
>
> MR. SCHNAPP: You previously in one of your exchanges with your witness, you were referring to discipline in the traditional and conventional sense.  Is that how you're still referring to it[?]

counseling she received was not "discipline," while describing the counseling male employees received as "discipline," even though Mr. Lowe did not describe it as such.  See, e.g., notes 22 and 23, supra.  This is not a case in which the plaintiff or other employees received no warning of performance problems.  Cf. Flores v. Buy Buy Baby, Inc., 118 F. Supp. 2d 425, 431-32 (S.D.N.Y. 2000) (finding a triable issue of fact as to whether poor performance was a pretextual justification where the defendant had never formally or informally "verbally reprimanded, warned, or even spoken to [the plaintiff] about these behaviors," while similarly situated employees were issued warnings).  Rather, Plaintiff admits to being counseled multiple times by Mr. Lowe.

Additionally, Plaintiff argues that without Defendants expressly deeming the BOL incident a "disciplinary infraction," a reasonable jury might question how Mr. Lowe could credibly claim that it factored into his decision to terminate Plaintiff.  Pl. Mem. 9 ("ACI behaved in a manner consiste[nt] with [Plaintiff's] understanding that everything was good."); see Pl. 56.1

---

MR. MEYERS:  That's how I'm still referring to it.

Q.  So I just want to know from your perspective, was discipline important to Art Crating during the time that Ms. Holleman worked there? [ . . . ]

A.  In the traditional sense, no.

Q.  Why not?

A.  Because we had other methods.

Q.  What were the methods?

A.  The methods were to have--if there was a problem with an employee to meet with that employee [to] discuss those problems, discuss how they can be corrected and come to an agreement that they would be corrected.

Lowe Dep. 87:18-89:10.

¶ 53.  Again, Plaintiff does not discuss or offer case citations to support her belief that a specific label of this sort is legally relevant.  Whether Plaintiff knew that writing on a BOL was not allowed is not proof that her actions were not misconduct, not least because Mr. Lowe took issue with both the fact of the writing as well as the tone, which included words that were underlined three to seven times.  In addition, Defendants had educated Plaintiff and other art handlers about the importance of BOLs.  Bischel Aff. Ex. A at 2.

Plaintiff's subjective beliefs that the counseling she received was a "non-event" and that she was "right" to write on the BOL are irrelevant to whether Mr. Lowe perceived her actions to be misconduct.  It is undisputed that during the counseling conversations between Plaintiff and Mr. Lowe—however informal—Plaintiff was made aware of problems with her performance that Mr. Lowe required her to change.  Whether Defendants referred to their actions as "discipline" or some other term is a minor issue that does not raise a triable material dispute.  There is no requirement that an employer use certain terminology to describe the actions taken in response to employees' performance problems, nor, in this case, was there any requirement that Defendants explicitly state to Plaintiff that she might be fired for her misconduct.

          **(3)**     **Defendants' Lack Of Written Reprimands And Written Policies Does Not Raise A Triable Issue Of Fact**

Plaintiff argues that a fact-finder could find Defendants' legitimate, non-discriminatory reasons for dismissing Plaintiff to be pretextual because Defendants did not document her discipline or follow written employee policies concerning discipline or anti-discrimination procedures during the time of her employment.  Pl. Mem. 10; Pl. 56.1 ¶¶ 106-114.

A "lack of contemporaneous documentation" is not, by itself, sufficient to demonstrate pretext.  Harding v. Wachovia Capital Mkts., LLC, No. 10 Civ. 3496 (JPO), 2012 WL 4471543, at *9 (S.D.N.Y. Sept. 21, 2012), aff'd, 541 F. App'x 9 (2d Cir. 2013).  In this case, no inference

of discrimination or pretext is raised by Defendants' failure to document Plaintiff's infractions, as there is no evidence that Defendants documented any employee's misconduct.

Plaintiff also argues that, without written employment and anti-discrimination policies, Mr. Lowe had "complete discretion to fire [an employee] for any reason at all" and that as a result, "a jury could find that the owners exercised that discretion against [Plaintiff] to fire her for a preference for males over females in their male-dominated industry." Pl. Mem. 10. "[T]he general rule [is] that an employer can suspend or discharge an employee at will for any reason, wise or unwise, fair or unfair, as long as this decision is not based on discrimination." Baldwin v. N. Shore Univ. Hosp., 470 F. Supp. 2d 225, 233 (E.D.N.Y. 2007). The fact that an employment relationship is at-will and the employer utilizes non-written, informal policies is not sufficient to raise an inference that the relationship is inherently discriminatory where, as here, Plaintiff has not offered evidence of material facts in dispute to show that Defendants treated comparators inconsistently or otherwise failed to apply their informal practices in a non-discriminatory manner.

Thus, Defendants' failure to document Plaintiff's misconduct or follow written employment policies does not support an inference of discrimination or a pretext finding.[49]

### (4) Plaintiff's Subjective Disagreement With Defendants' Business Decisions

Plaintiff argues that Mr. Franklin's December 2011 complaint was not "serious," and "in actuality, [she] had not done anything wrong," based on her own estimation and what Mr.

---

[49] Plaintiff redacted a portion of the allegation at Pl. 56.1 ¶ 116 and a section of the cited deposition testimony at Lowe Dep. 74:9-16. That paragraph of the 56.1 statement concerns an incident involving "an employee's use of company computers" that "may have been prevented by the existence of formal personnel policies and procedures." Pl. 56.1 ¶ 116. As the Court finds that Defendants' lack of written policies does not evidence discrimination, and as the use of company computers has no relevance to Plaintiff's claims, the Court has not considered the redacted text on this motion.

Franklin said to her when she confronted him after her firing. Pl. Mem. 4, 9; Pl. 56.1 ¶¶ 28 ("Mr. Franklin did not believe that anything Plaintiff said . . . was sufficiently problematic to justify Plaintiff's termination"), 34 ("nothing happened that day that [Plaintiff] thought to be upsetting to a client"), 36, 38.[50] Plaintiff further asserts that it would have been "reasonable" to question Mr. Franklin's complaint due to some ACI employees' alleged belief that he is "stressful" and "neurotic." Pl. 56.1 ¶¶ 27, 39.

"In a discrimination case," the court is "decidedly not interested in the truth of the allegations against [the] plaintiff," but rather the court is "interested in what '<u>motivated</u> the employer.'" <u>McPherson v. N.Y.C. Dep't of Educ.</u>, 457 F.3d 211, 216 (2d Cir. 2006) (quoting <u>USPS Bd. of Governors v. Aikens</u>, 460 U.S. 711, 716 (1983)). "The question in any discrimination case is not whether defendant's decision to fire plaintiff was correct but whether it was discriminatory." <u>DeFina v. Meenan Oil Co.</u>, 924 F. Supp. 2d 423, 435 (E.D.N.Y. 2013) (collecting cases); <u>see</u> <u>Tuccio v. FJC Sec. Servs., Inc.</u>, No. 12 Civ. 5506 (JFB) (GRB), 2014 WL 4438469, at *2 (E.D.N.Y. Sept. 8, 2014) (same). "Whether job performance was satisfactory depends on the <u>employer's</u> criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge." <u>Rothenberger</u>, 2008 WL 2435563, at *10 (quoting <u>Thomley v. Penton Publ'g Inc.</u>, 104 F.3d 26, 29 (2d Cir. 1997)). "Federal courts do not have a 'roving commission to review business judgments . . . .'" <u>Rosenberg v. Chesapeake Pharm. & Health Care Packaging</u>, 888 F. Supp. 2d 302, 309 (E.D.N.Y. 2012) (quoting <u>Montana v. First</u>

---

[50] Plaintiff also claims that it was discriminatory for Defendants not to reverse the termination decision after Mr. Cheung spoke with Mr. Lowe. Pl. 56.1 ¶¶ 40-41. As described <u>supra</u> Sections II.A.1.a and II.A.2.c, Plaintiff's testimony as to what Mr. Cheung told her he said to Mr. Lowe is markedly more positive than what Mr. Cheung testified that he said to Mr. Lowe. In any event, Mr. Cheung's discussion with Mr. Lowe occurred after the termination decision was made and executed, and the discrimination statutes do not require that employers conduct any additional review of their employment decisions involving women if the employer does not take such actions in regards to men.

Fed. Sav. & Loan Ass'n of Rochester, 869 F.2d 100, 106 (2d Cir. 1989)). A court does not sit as a reviewing human resources department because it lacks sufficient information about the entire business operation of a defendant company to be able to assess the company's needs and whether the plaintiff employee helps meet those needs sufficiently to merit continued employment. The only issue before the court in a discrimination analysis is whether there is sufficient information by which a reasonable fact finder could decide that the employer's decision was discriminatory, not whether it was wise.

Thus, a plaintiff's subjective disagreement with the employer's assessment of her performance is not actionable under the discrimination statutes. See White v. Pacifica Found., 973 F. Supp. 2d 363, 382 (S.D.N.Y. 2013) ("[Plaintiff]'s fundamental disagreement with the conclusions [his] supervisors drew from incidents which [he] admits occurred, and [his] subjective belief that they should not have reflected badly on [his] performance because they were someone else's fault, is not evidence that [his] supervisors' appraisals were a sham, invented to mask discrimination." (quoting Taylor v. Polygram Records, No. 94 Civ. 7689 (CSH), 1999 WL 124456, at *10 (S.D.N.Y. 1999)); see also Potash v. Florida Union Free Sch. Dist., 972 F. Supp. 2d 557, 592 (S.D.N.Y. 2013) ("Plaintiff's personal disagreements with [the defendants'] evaluation of her job performance are insufficient, as a matter of law, to preclude summary judgment."); Adam v. Glen Cove Sch., No. 06 Civ. 1200 (JFB) (MLO), 2008 WL 508689, at *9 (E.D.N.Y. Feb. 21, 2008) (the plaintiff's disagreement with the employment decision was not actionable); Silva v. Peninsula Hotel, 509 F. Supp. 2d 364, 385 (S.D.N.Y. 2007) (the employer, not the employee, decides what constitutes satisfactory performance); cf. McNamee v. Starbucks Coffee Co., 914 F. Supp. 2d 408, 420 (W.D.N.Y. 2012) ("Plaintiff's

subjective belief that she was performing satisfactorily, by itself, is not sufficient to create a triable issue of fact as to pretext.").

Neither Plaintiff's nor Mr. Franklin's personal belief that Defendants should not have fired Plaintiff, or should have investigated or reinstated her, is relevant to whether Defendants were motivated by discriminatory animus when they fired Plaintiff. See Soderberg v. Gunther Int'l, Inc., 124 F. App'x 30, 32 (2d Cir. 2005) (Title VII does "not make employers liable for petty, 'stupid,' or 'even wicked decisions'; 'it makes them liable for discriminating, for firing people on account of [a protected category]'" (quoting Norton v. Sam's Club, 145 F.3d 114, 120 (2d Cir. 1998)). Plaintiff has not provided any evidence that a reasonable fact finder could find counters Mr. Lowe's statements that he relied on Ms. Bischel's summary of Mr. Franklin's complaint, as she was one of his "most trusted employees." Lowe Reply Aff. ¶ 12. The fact that Mr. Franklin's alleged statement to Plaintiff differs from Ms. Bischel's summary is immaterial. The relevant inquiry is what information Mr. Lowe had at the time, not whether he might have taken additional actions, or whether Mr. Franklin agreed with Defendants' decision. There is also no evidence suggesting that Mr. Lowe did not actually believe that Mr. Franklin was easy-going and rarely complained. Indeed, Ms. Bischel shared his opinion.

Finally, as discussed supra Section III.C.1.b.ii.(2).(h), the record does not reflect that Defendants ever conducted an investigation before firing an employee, and thus Plaintiff's complaint that Mr. Lowe's failure to investigate Mr. Franklin's contentions is discriminatory is meritless. The question in a discrimination case is whether Defendants treated the plaintiff equally to employees outside her protected class, not whether Defendants' actions were correct, courteous, just or otherwise fair to the plaintiff. Whether or not Plaintiff believes it would have

been "reasonable" for Defendants to investigate and reconsider her termination, Defendants had no legal obligation to do so in these circumstances.

**(5)**      **Plaintiff's Raise And Bonus Are Not Sufficient To Demonstrate Pretext**

Plaintiff further argues that her receipt of a one-dollar per hour raise and a holiday bonus shortly before her December 11, 2011 dismissal demonstrates that Defendants' reasons for firing her were pretext, as she would not have received these benefits if she had the myriad "issues," problematic "patterns," and unprofessional behavior that Defendants claim. Pl. Mem. 9. Accepting Plaintiff's disputed contention that these rewards were performance-based, Plaintiff nevertheless ignores that the major event precipitating her firing—Mr. Franklin's complaint— occurred after she received the raise and bonus. The record shows that the last time Mr. Lowe counselled Plaintiff prior to Mr. Franklin's complaint was for the June 2011 BOL incident. Approximately six months later, Defendants gave Plaintiff a raise and bonus. To the extent this suggests that Defendants believed Plaintiff's performance was improving, "prior favorable performance does not, without more, prove [that] subsequent poor reviews [] were unwarranted." Mattera v. JP Morgan Chase Corp., 740 F. Supp. 2d 561, 577 (S.D.N.Y. 2010); see Hirschberg v. Bank of Am., N.A., 754 F. Supp. 2d 500, 518 (E.D.N.Y. 2010) ("Plaintiff's claim that she received good performance evaluations in the past does not demonstrate that her final performance reviews were unjustified."); Iverson v. Verizon Commc'ns, No. 08 Civ. 8873 (SAS), 2009 WL 3334796, at *5 (S.D.N.Y. Oct. 13, 2009) ("Demonstration of past positive performance is insufficient to raise a genuine issue of disputed fact with respect to pretext.").

Furthermore, the raise and bonus are not an indication that Defendants believed Plaintiff's prior misconduct was trivial, especially when viewed cumulatively with the December 9, 2011 incident. Plaintiff offers no argument or legal citation suggesting that by giving the raise

and bonus, Defendants were thereafter precluded from considering Plaintiff's past misconduct in their employment decisions.

### (6) Plaintiff's Allegations Of Unprofessionalism On Defendants' Part Do Not Demonstrate Pretext

Plaintiff argues that Defendants' conduct was unprofessional and that it was therefore pretextual for Defendants to fire Plaintiff for, in part, her lack of professionalism. Pl. Mem. 10; Pl. 56.1 ¶¶ 100-105. In addition to Mr. Stewart's conduct discussed supra, Section III.C.1.b.i.(2), and the three emails using the term "bitch" discussed supra, Section III.C.1.b.iii, Plaintiff's evidence of this unprofessionalism consists of three emails in which Mr. Stewart used the word "fuck", Meyers Decl. Ex. 37, 41, 44; the email in which Mr. Stewart called a male client who cancelled a job a "junkie," Meyers Decl. Ex. 35; and the email in which a male client complained that Mr. Stewart insulted him and did not like him, Meyers Decl. Ex. 39. The fact that the occasional foul language is tolerated in a workplace is not evidence that the employer has abandoned all workplace standards.[51] Putting aside the emails and conduct that were previously discussed, see supra Sections III.C.1.b.i.(2) and III.C.1.b.iii, Plaintiff makes no attempt to tie the "fuck" emails and two emails involving male clients to Plaintiff's firing and her sex discrimination claims. These minor communications are insufficient for Plaintiff to raise an issue of material fact that Defendants' proffered reason was pretext for discrimination.

On the record before the Court, Plaintiff has not identified any evidence from which a reasonable juror could draw an inference of discrimination, nor has she met her ultimate burden under McDonnell Douglas to identify evidence that Defendants' performance-based reason was

---

[51] Moreover, Plaintiff ignores that most of the blue language was uttered by Mr. Stewart, a 50% shareholder. That he used occasional obscenities to or about clients does not mean that a low-level employee like Plaintiff was permitted to behave in a fashion that resulted in a complaint from ACI's most important client.

pretext for sex discrimination, for purposes of Title VII or the NYSHRL. In addition, as to

Plaintiff's aiding and abetting claims against Mr. Lowe under the NYSHRL, as Plaintiff failed to

demonstrate a primary violation of the NYSHRL, her aiding and abetting claims must also be

dismissed. See Benson v. Otis Elevator Co., 557 F. App'x 74, 77 (2d Cir. 2014) (citing Strauss

v. N.Y.S. Dep't of Educ., 26 A.D.3d 67, 805 N.Y.S.2d 704, 709 (3d Dep't 2005)).

### 2. A Mixed-Motives Analysis

Plaintiff also asserts that summary judgment must be denied based on a mixed-motives

analysis. Pl. Mem. 5-7.

### a. The Legal Standard For A Mixed-Motives Analysis

Under a mixed-motives analysis, the plaintiff bears the initial burden to show that "an

impermissible criterion was in fact a 'motivating' or 'substantial' factor in the employment

decision.'" Raskin v. Wyatt Co., 125 F.3d 55, 60 (2d Cir. 1997) (quoting de la Cruz v. N.Y.C.

Human Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 23 (2d Cir. 1996)). Although direct

evidence (as opposed to circumstantial evidence) is not required, the plaintiff must "present

sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that

'race, color, religion, sex, or national origin was a motivating factor for any employment

practice.'" Desert Palace, 539 U.S. at 101 (quoting 42 U.S.C. § 2000e-2(m)). "[T]he plaintiff

must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support h[er]

allegations of discriminatory treatment." Raskin, 125 F.3d at 60-61. Such evidence may

include, "inter alia, policy documents and evidence of statements or actions by decisionmakers

that may be viewed as directly reflecting the alleged discriminatory attitude." Sista, 445 F.3d at

173-74 (quoting Raskin, 125 F.3d at 60-61); see Bloomberg, 967 F. Supp. 2d at 834 (same);

Barney v. Consol. Edison Co. of N.Y., No. 99 Civ. 823 (DGT) (SMG), 2009 WL 6551494, at *20 (E.D.N.Y. Oct. 1, 2009) (same), aff'd, 391 F. App'x 993 (2d Cir. 2010).

"[I]f the plaintiff establishes that a prohibited discriminatory factor played a 'motivating part' in a challenged employment decision, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway." Raskin, 125 F.3d at 60 (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989)). The defendant "must show that its legitimate reason, standing alone, would have induced it to make the same decision." Price Waterhouse, 490 U.S. at 252. If the plaintiff meets her initial burden, she may thus use the mixed-motives analysis to shift the burden to the defendant to prove "that it would have taken the same action in the absence of discrimination." Fields v. N.Y.S. Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 122 (2d Cir. 1997). Compared to McDonnell Douglas, the mixed-motives analysis sets a higher initial bar for what is required from the plaintiff. See Raskin, 125 F.3d at 60 (contrasting the de minimis showing required to establish a prima facie case under McDonnell Douglas with the showing of sufficient evidence required for a mixed-motives analysis); Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1181 (2d Cir. 1992) (same); Cramer v. Pyzowski, No. 04 Civ. 1122 (SLT) (SMG), 2007 WL 1541393, at *10 (E.D.N.Y. May 25, 2007) (same).[52]

### b. Plaintiff Fails To Meet Her Initial Burden Under A Mixed-Motives Analysis

Plaintiff contends that she presented sufficient evidence of discrimination to demonstrate that it played a motivating factor in her firing, including: purported admissions by Mr. Rivera

---

[52] Plaintiff incorrectly suggests that the fourth element of a McDonnell Douglas prima facie case (circumstances giving rise to an inference of discrimination) is a relevant prerequisite to her mixed-motives analysis. Pl. Mem. 3-5; see Humphreys v. Cablevision Sys. Corp., 553 Fed. App'x 13, 16 (2d Cir. 2014) (citing and quoting de la Cruz, 82 F.3d at 23 for the proposition that a plaintiff's burden under a mixed-motives theory, "is greater than the level of proof necessary to make out a McDonnell Douglas prima facie case").

that Plaintiff was fired due to her sex, and the two incidents involving Mr. Stewart and female clients. Pl. Mem. 1, 5-6. Defendants contend that this evidence is insufficient to establish a discriminatory motivation. Defs. Reply Mem. 4.

As the record lacked evidence from which a juror could infer an inference of discrimination, see supra Section III.C.1.b, Plaintiff's arguments fare no better under the more demanding mixed-motives standard. See Raskin, 125 F.3d at 60. Mr. Ayotte's statements as to what Mr. Rivera purportedly said are hearsay, see supra Section III.C.1.b.i.(1).(a), under either analysis, and the record lacks any foundation for his belief. Moreover, as discussed above, on the record before the Court, the alleged comments by Mr. Rivera are conclusory speculation by an employee who had no involvement in the adverse action at issue. Plaintiff's unsupported and subjective interpretation of Mr. Rivera's "[y]ou know why you were fired, right?" comment likewise does not offer a basis from which to find that discrimination motivated Plaintiff's dismissal.

Moreover, Mr. Stewart's remarks about two female clients must still be classified as stray remarks. "[S]tray remarks in the workplace," "statements by nondecisionmakers" and "statements by decisionmakers unrelated to the decisional process itself," will not suffice to satisfy the plaintiff's initial burden on a mixed-motives analysis. Price Waterhouse, 490 U.S. at 277 (O'Connor, J., concurring). Thus, courts in this Circuit have found a mixed-motives analysis appropriate when a decisionmaker makes a statement directly indicative of discriminatory motive, but courts have rejected a mixed-motives analysis when the speaker was not a decisionmaker or the statement was made in a context unrelated to the employment

decision.[53]  Although Mr. Stewart was a decisionmaker, his comments bear no connection to the

employment decision which might support a finding of discriminatory motive.

Although Plaintiff chiefly relies on these comments to state her case under a mixed-

motives analysis, the Court has considered all of the evidence discussed above and finds no basis

from which a reasonable fact finder could conclude that Plaintiff has met her initial burden under

either theory under Title VII or the NYSHRL.

### 3.    Plaintiff's City Law Discrimination Claims

As discussed <u>supra</u> Section II.C, a defendant may not prevail on summary judgment on a

City Law claim unless "no jury could find defendant liable under any of the evidentiary routes—

<u>McDonnell Douglas</u>, mixed motive, 'direct' evidence, or some combination thereof."  <u>Bennett</u>,

92 A.D.3d at 45, 936 N.Y.S.2d at 124.  Although the City Law requires a liberal interpretation, a

plaintiff cannot prevail without offering evidence from which a jury could infer that the

defendant was motivated by discriminatory animus.  <u>See</u> <u>Levitant v. City of N.Y. Human Res.</u>

<u>Admin.</u>, 558 F. App'x 26, 30 (2d Cir. 2014) (where the record failed "to show [] discriminatory

animus," the plaintiff's NYCHRL claims were properly dismissed on summary judgment);

<u>Gioia</u>, 501 F. App'x at 56 (the plaintiff's NYCHRL claim was properly dismissed on summary

---

[53] <u>Compare</u> <u>Greenidge v. Costcos Wholesale</u>, No. 09 Civ. 4224 (RRM) (LB), 2012 WL 1077455, at *4 (E.D.N.Y. Mar. 30, 2012) (where plaintiff was allegedly told, during her firing, that "there was no way they could keep [her] working there in [her] state of pregnancy and that in time [she] would not be able to do any work," a mixed-motives analysis was warranted), <u>and</u> <u>St. Louis v. N.Y.C. Health & Hosp. Corp.</u>, 682 F. Supp. 2d 216, 230 (E.D.N.Y. 2010) (applying a mixed-motives analysis where the plaintiff's employer told her, "'she did not like working with females'" and recommended plaintiff for firing), <u>with</u> <u>Beauchat v. Mineta</u>, 257 F. App'x 463, 466 (2d Cir. 2007) (a non-supervisor's statement that "we have been picking and choosing long before you got here and we will continue to do it long after you're gone. And if you don't like it, sue us," was insufficient evidence to warrant a mixed-motives analysis), <u>and</u> <u>Price v. Cushman & Wakefield, Inc.</u>, 808 F. Supp. 2d 670, 688 (S.D.N.Y. 2011) (in a religious discrimination case, a supervisor's statement, accompanied by a chopping motion, that "an 'evil spirit' had taken her soul which he would not allow to inhabit the department," was not evidence sufficient for a mixed-motives analysis).

judgment where, under a mixed-motives analysis, there was no evidence "[s]hort of speculation" that discrimination "played even a partial motivating role in the decision to terminate [the plaintiff]").

Under the City Law, as under Title VII and the State Law, "stray discriminatory comments without any basis for inferring a connection to the termination [are] insufficient to defeat [a] motion [for summary judgment]." Sandiford, 22 N.Y.3d at 916, 999 N.E.2d at 1146; see Serdans v. N.Y. & Presbyterian Hosp., 112 A.D.3d 449, 977 N.Y.S.2d 196, 198 (1st Dep't 2013) (dismissing a City Law disability discrimination claim for failure to raise an inference of discriminatory animus, as remarks that plaintiff "'brought [her situation] upon [herself]'" and should "'take [her] assets elsewhere'" were stray remarks, "not of themselves derogatory or indicative of discriminatory animus"); Melman, 98 A.D.3d at 125, 946 N.Y.S.2d at 39 (in an action under the City Law, "[s]tray remarks . . . even if made by a decision maker, do not, without more, constitute evidence of discrimination").

Like its federal and state counterparts, the City Law also requires that, to show disparate treatment, the plaintiff identify appropriate comparators and present a sufficiently developed record from which a jury could conclude that the comparators received preferential treatment. See LeBlanc v. United Parcel Serv., No. 11 Civ. 6983 (KPF), 2014 WL 1407706, at *15 (S.D.N.Y. Apr. 11, 2014) (under the City Law, the plaintiff could not demonstrate disparate treatment where he was not similarly situated in all material respects to his purported comparators); Melman, 98 A.D.3d at 123, 946 N.Y.S.2d at 38 (in a City Law age discrimination case, the "bare collateral circumstance [that other protected-age physicians were replaced by younger physicians], without a developed factual record illuminating why the other physicians were asked or encouraged to leave, cannot defeat a summary judgment motion based on

uncontroverted evidence of legitimate, nondiscriminatory reasons for the employment decisions concerning plaintiff that are directly at issue in this action"); see generally Simmons v. Akin Gump Strauss Hauer & Feld, LLP, 508 F. App'x 10, 14 (2d Cir. 2013) (affirming dismissal of a City Law race discrimination claim where the plaintiff "failed to raise a triable issue as to whether she was treated less well than other employees based in whole or in part on discrimination"); Askin v. Dep't of Educ. of City of N.Y., 110 A.D.3d 621, 622, 973 N.Y.S.2d 629, 630 (1st Dep't 2013) (on a motion to dismiss, dismissing a City Law claim where the plaintiff did not allege that she was "treated differently under circumstances giving rise to an inference of discrimination").

Additionally, under the City Law, a plaintiff cannot prevail by arguing that the employer made the wrong decision. Kaiser v. Raoul's Rest. Corp., 112 A.D.3d 426, 976 N.Y.S.2d 59, 60 (1st Dep't 2013) ("Plaintiff's attempt to conflate the purported falsity of the [defendant's reason for firing him] with the legitimacy of defendants' belief in [its reason for firing him], is not availing."); Melman, 98 A.D.3d at 120, 946 N.Y.S.2d at 36 (under the City Law, the plaintiff "must do more than challenge the employer's decision as contrary to 'sound business or economic policy,' since such an argument does not give rise to the inference that the [adverse action] was due to age discrimination" (quoting Bailey v. N.Y. Westchester Sq. Med. Ctr., 38 A.D.3d 119, 124, 829 N.Y.S.2d 30 (1st Dep't 2007))).

In this case, Plaintiff has identified several stray remarks that are too remote in time and context to bear any relation to the termination decision, and she has not adduced any evidence that male art handlers were treated more favorably or that Defendants were motivated by animus rather than by the performance-based reasons they advanced. See supra Section III.C.1.b. Plaintiff cannot prevail even under the more lenient standard of the City Law because she has not

identified evidence that discrimination played any role in her dismissal. Furthermore, as there is no evidence of an underlying violation, Plaintiff's City Law aiding and abetting claim against Mr. Lowe is dismissed.

### D. Plaintiff's Claims of Retaliation Are Dismissed

Plaintiff brings claims for unlawful retaliation under Title VII, the NYSHRL and the NYCHRL. Compl. ¶¶ 54-65.

### 1. The Legal Standard For Retaliation Claims

The same analysis applies to retaliation claims under Title VII and the NYSHRL. See Lore v. City of Syracuse, 670 F.3d 127, 165 (2d Cir. 2012); Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006). These retaliation claims, like discrimination claims, are evaluated using the McDonnell Douglas burden-shifting analysis. See Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010); Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).

To make out a prima facie case of retaliation, the plaintiff must demonstrate "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Jute, 420 F.3d at 173. "Once a prima facie case is made out, the burden shifts to defendant to demonstrate a legitimate non-discriminatory reason for its decision. If such a reason is articulated, plaintiff must then prove that the proffered reason was a pretext for retaliation and that defendant's real motivation was the impermissible retaliatory motive." Donato v. Plainview-Old Bethpage Cent. School Dist., 96 F.3d 623, 634 (2d Cir. 1996); see Cox v. Onondaga Cnty. Sheriff's Dep't, --- F.3d ---, No. 12-1526, at 13 (2d Cir. Feb. 20, 2013) ("The employee at all times bears the burden of persuasion to show a retaliatory motive.").

The Supreme Court recently held that retaliation claims under Title VII "must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful

retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013).

"Requiring proof that a prohibited consideration was a 'but-for' cause of an adverse action does not equate to a burden to show that such consideration was the 'sole' cause."  Kwan, 737 F.3d at 846 n.5.  "[A] plaintiff's injury can have multiple 'but-for' causes, each one of which may be sufficient to support liability."  Id.[54]  Courts in this Circuit have generally applied the but-for causation standard from Nassar to NYSHRL claims.[55]

In the context of a retaliation claim, an adverse action need not be related to the plaintiff's workplace or employment.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006).  The "plaintiff must show that a reasonable employee would have found the challenged action materially adverse," which means that the adverse action was not trivial and would deter a reasonable person from engaging in protected activity.  Id. at 67-68 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.").

---

[54] Both Parties in this case misstated the standard applicable to retaliation claims.  Plaintiff erroneously applied a motivating factor standard, Pl. Mem. 12-13, while Defendants mistakenly asserted that retaliation must be the employer's "only" motivation, Defs. Reply Mem. 10.

[55] See Taylor v. Seamen's Soc. for Children, No. 12 Civ. 3713 (PAE), 2013 WL 6633166, at *23 (S.D.N.Y. Dec. 17, 2013) ("The 'but for' causation standard . . . applies to [the plaintiff's] Title VII and NYSHRL retaliation claim); Weber v. City of New York, --- F. Supp. 2d ---, No. 11 Civ. 5083 (MKB), 2013 WL 5416868, at *24 (E.D.N.Y. Sept. 29, 2013) (same); Ellis v. Century 21 Dep't Stores, --- F. Supp. 2d ---, No. 11 Civ. 2440 (MKB), 2013 WL 5460651, at *27 n.25 (E.D.N.Y. Sept. 28, 2013) (same); see also Richardson v. Bronx Lebanon Hosp., No. 11 Civ. 9095 (KPF), 2014 WL 4386731, at *16 n.16 (S.D.N.Y. Sept. 5, 2014); but see Kwan, 737 F.3d 834, 847 n.7 (2d Cir. 2013) ("Because the plaintiff's claims survive under the Nassar 'but-for' standard, we do not decide whether the NYSHRL claim is affected by Nassar, which by its terms dealt only with retaliation in violation of Title VII.").  To the extent that there is an open question as to whether but-for causation applies to NYSHRL claims, the Court need not resolve the issue in this case, as Plaintiff's NYSHRL retaliation claims would fail under a but-for or motivating-factor standard, for the reasons discussed below.

Concerning the fourth element of the prima facie case, "[a] plaintiff can demonstrate a causal connection 'indirectly by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.'" Blythe v. City of New York, 963 F. Supp. 2d 158, 180 (E.D.N.Y. 2013) (quoting Gangadeen v. City of New York, 654 F. Supp. 2d 169, 184 (S.D.N.Y. 2009)). Although the Second Circuit has not established a bright line rule for when protected activity is too temporally remote to demonstrate a causal connection, "courts in this circuit have typically measured that gap as a matter of months, not years." Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 131 (2d Cir. 2012). Furthermore, concerning the plaintiff's ultimate burden, "temporal proximity alone is not enough to establish pretext in this Circuit." Abrams, 2014 WL 4191178, at *8.

Retaliation claims brought pursuant to the City Law, like discrimination claims, require a separate and more liberal analysis. See Mihalik, 715 F.3d at 109, 113; Albunio, 16 N.Y.3d at 477-78, 947 N.E.2d at 137. "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." Mihalik, 715 F.3d at 112.

### 2.   Plaintiff Fails To Demonstrate A Prima Facie Case Of Retaliation

In this case, there is no dispute that Plaintiff established the first two elements of her prima facie case, in that her attorney mailed a demand letter outlining her discrimination claims to Defendants and Defendants received that letter.[56] Instead, the Parties dispute whether Plaintiff

---

[56] Concerning her retaliation claims, Plaintiff argued only that the McDonnell Douglas test applied, not a mixed-motives analysis. For the reasons discussed below, the Court finds that she cannot meet her burden under the de minimis standard of McDonnell Douglas to state a prima facie case. Plaintiff would have fared no better under the more demanding mixed-motives

has established the adverse action and causation elements of her <u>prima</u> <u>facie</u> case. The Court will consider each of the alleged acts of retaliation separately.

### a. Defendants' Opposition To Plaintiff's Unemployment Insurance Benefits

Plaintiff alleges that Defendants retaliated against her by opposing her application for unemployment insurance benefits. Pl. Mem. 12-17. Defendants contend that their actions were not materially adverse within the meaning of the anti-discrimination laws and that Plaintiff has not demonstrated a causal connection between her protected activity and Defendants' opposition to her unemployment insurance benefits. Defs. Mem. 23-24.

### i. Plaintiff Demonstrated An Adverse Action

As to the third element of Plaintiff's <u>prima</u> <u>facie</u> case, which requires demonstrating that the employer took an action that would deter a reasonable person from engaging in protected activity, Defendants contend that an employer's opposition to an application for unemployment insurance benefits is not cognizable as an adverse employment action because "[e]mployers 'are entitled to exercise [their] legal rights and engage in legal advocacy.'" Defs. Mem. 23-24 (quoting <u>Burnett v. Trinity Inst. Homer Perkins Ctr., Inc.</u>, No. 10 Civ. 681 (GLS) (DRH), 2011 WL 281023, at *3 (N.D.N.Y. Jan. 25, 2011); citing <u>Jenkins v. St. Luke's-Roosevelt Hosp. Ctr.</u>, No. 09 Civ. 12 (RMB MHD), 2009 WL 3682458, at *9 (S.D.N.Y. Oct. 29, 2009) (collecting cases in which an employer's opposition to unemployment insurance benefits was not considered an adverse action); <u>Belardo v. Con-Way Transp. Servs., Inc.</u>, No. 02 Civ. 5406 (SLT) (SMG), 2005 WL 885016, at *8 (E.D.N.Y. Mar. 28, 2005) (same); <u>Whalley v. Reliance Grp. Holdings, Inc.</u>, No. 97 Civ. 4018 (VM), 2001 WL 55726, at *12 (S.D.N.Y. Jan. 22, 2001) (the employer's

analysis. As there is no direct or circumstantial evidence from which a reasonable fact finder could infer discrimination, there is also no "thick cloud of smoke" from which a juror could conclude that Defendants were, in fact, motivated in part by discrimination.

opposition was not retaliatory where it "merely addressed the assertions of its former employee and argued that [he] was terminated for cause")).[57]

Following <u>Burlington Northern</u>, several courts in this Circuit and others have found that an employer's opposition to unemployment insurance benefits may qualify as an adverse action. <u>See</u> <u>Brown v. JPMorgan Chase Bank, N.A.</u>, No. 12 Civ. 544 (RRM) (LB), 2013 WL 4009795, at *8 (E.D.N.Y. Aug. 5, 2013) (recognizing that a challenge to a plaintiff's unemployment insurance benefits could constitute an adverse action under the ADA; denying a motion to dismiss the retaliation claim); <u>Quintanilla v. Suffolk Paving Corp.</u>, No. 09 Civ. 5331 (SJF) (AKT), 2011 WL 1323033, at *7 (E.D.N.Y. Feb. 10, 2011) (in a FLSA retaliation case, rejecting the defendant's contention that challenging unemployment insurance benefits could not be an adverse action, and denying the motion to dismiss), <u>report & recommendation adopted</u>, No. 09 Civ. 5331 (SJF) (AKT), 2011 WL 1253248 (E.D.N.Y. Mar. 28, 2011); <u>Electchester Hous. Project, Inc. v. Rosa</u>, 225 A.D.2d 772, 773, 639 N.Y.S.2d 848 (2d Dep't 1996) (the defendant's opposition to unemployment insurance benefits was "a disadvantaging employment action for the purpose establishing a claim of retaliation"); <u>see also</u> <u>Steele v. Schafer</u>, 535 F.3d 689, 696 (D.C. Cir. 2008) (finding that conduct contesting unemployment insurance benefits can be materially adverse); <u>Williams v. W.D. Sports, N.M., Inc.</u>, 497 F.3d 1079, 1092 (10th Cir. 2007) (the defendant's opposition to unemployment insurance benefits, which would "stymie [plaintiff's] receipt of income" was an adverse action under Title VII); <u>Wermann v. Excel Dentistry, P.C.</u>, No. 13 Civ. 7028 (DAB), 2014 WL 846723, at *3 (S.D.N.Y. Feb. 25, 2014)

---

[57] The main reason the court in <u>Burnett</u> found opposition to unemployment insurance benefits to not be an adverse action was that the conduct "occurred after [the plaintiff's] termination and did not bear a relationship to her present or future employment conditions." <u>Id.</u> The Supreme Court in <u>Burlington Northern</u> explained that "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." <u>Burlington Northern</u>, 548 U.S. at 67.

(collecting cases in which opposition to unemployment insurance benefits was considered an adverse action under the NYSHRL and NYCHRL); Koger v. Woody, No. 09 Civ. 90, 2009 WL 2762610, at *4 (E.D. Va. Aug. 28, 2009) (on a motion to dismiss, finding it "plausible that a former employer's false challenge to a former employee's unemployment compensation benefits" could be an adverse action for purposes of a retaliation claim).

These decisions comport with Burlington Northern, which advised applying a "broad" interpretation to Title VII's antiretaliation provision, provided that the conduct in question involved a material harm. Burlington Northern, 548 U.S. at 67. "[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." Id. at 69. In Burlington Northern, the Supreme Court upheld a jury's finding that a 37-day suspension without pay demonstrated material adversity, even though that plaintiff was reinstated with backpay. Id. at 71-73 ("Many reasonable employees would find a month without a paycheck to be a serious hardship."). The loss of unemployment insurance benefits presents similar consequences to the temporary loss of wages at issue in Burlington Northern. For example, in this case, Plaintiff's unemployment insurance benefits were suspended for "many weeks," and Plaintiff did not know when, or if, her benefits would be reinstated. Holleman Decl. ¶ 4.

To the extent that Defendants were exercising a legal right to oppose Plaintiff's unemployment insurance benefits, courts have found in the context of lawsuits filed by a defendant after a plaintiff engaged in protected activity that (at least after Burlington Northern), such conduct qualifies as an adverse action. See Marchiano v. Berlamino, No. 10 Civ. 7819 (LBS), 2012 WL 4215767, at *5 (S.D.N.Y. Sept. 20, 2012) (denying a motion to dismiss that involved ADEA, NYSHRL and NYCHRL claims of a retaliatory lawsuit, as "a lawsuit may dissuade a reasonable worker from filing charges against his or her employer"); Illiano v.

Mineola Union Free Sch. Dist., 585 F. Supp. 2d 341, 352 (E.D.N.Y. 2008) (denying a motion to

dismiss a NYSHRL retaliation claim involving the defendant's defamation lawsuit against the

plaintiff); see generally Bill Johnson's Rests., Inc. v. N.L.R.B., 461 U.S. 731, 740 (1983) (stating

in the context of a labor dispute that "[a] lawsuit no doubt may be used by an employer as a

powerful instrument of coercion or retaliation").  As noted below, there may be constitutional

limitations on retaliation claims involving the exercise of such legal rights, but this is a separate

issue from the preliminary inquiry into whether the complained-of conduct meets Burlington

Northern's definition of an adverse action.  As an opposition to unemployment insurance

benefits would create much the same hardship as the Supreme Court found actionable in

Burlington Northern, this Court finds that Plaintiff adequately demonstrated an adverse action.

### ii. Plaintiff Has Not Adduced Evidence Raising An Inference Of Retaliation

Nevertheless, Plaintiff has not established the fourth element of her prima facie case as to

the unemployment insurance benefits.  Plaintiff advances two reasons why a jury could infer a

causal connection between her protected activity and the adverse action: the adverse action

occurred shortly after Plaintiff raised her discrimination claims and Plaintiff was the first

employee whose unemployment insurance benefits Defendants challenged.  Pl. Mem. 16.

On the record before the Court, no reasonable jury could infer retaliation from the

temporal proximity of Plaintiff's discrimination complaint and Defendants' opposition to her

benefits application.  Plaintiff did not identify the date Defendants made their opposition (or the

date she made her benefits application).[58]  Plaintiff thus failed to establish that Defendants'

---

[58] Since the NYDOL hearing occurred on March 20, 2012, at least some part of Defendants'
opposition (the March 2012 hearing) occurred after the discrimination complaint, the relevant
question is when the opposition began.  Plaintiff does not contend, nor could she, that it is an
adverse action to continue to pursue a pending opposition to employment benefits once a
discrimination complaint is made.  Cf. Chamberlin v. Principi, 247 F. App'x 251, 254 (2d Cir.

opposition occurred after Defendants' January 9, 2012 receipt of her discrimination complaint. Although Defendants do not raise this oversight, the burden is on Plaintiff to make her case.

Even assuming that the Defendants' opposition followed Plaintiff's discrimination complaint, Plaintiff presents insufficient evidence from which to infer a causal connection. As explained in a case Plaintiff relies on, Pl. Mem. 14, "[t]he fact that Defendants opposed [the plaintiff's] claim for unemployment compensation benefits after [s]he filed a discrimination complaint, with nothing more, is insufficient to establish the requisite causal link." Petrunich v. Sun Bldg. Sys., Inc., No. 04 Civ. 2234 (TIV), 2006 WL 2788208, at *8 (M.D. Pa. Sept. 26, 2006). Courts in this Circuit may exercise "judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009); see generally Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001), as amended (June 6, 2001) (finding no inference of retaliation, despite close temporal proximity, where the adverse action was part of an extensive period of discipline).

In this case, no inference of retaliatory animus could be drawn from temporal proximity alone because Plaintiff does not claim that anything about Defendants' opposition—other than the fact that Defendants' asserted an opposition—was retaliatory. For example, Plaintiff does not identify any statements Defendants made to the NYDOL that were untrue or that otherwise evidence retaliation, nor does she identify any statements made to her that would indicate retaliatory animus, such as a threat to oppose her benefits if she filed a lawsuit.

Plaintiff relies entirely on her assertion that she was the first employee for whom Defendants contested unemployment insurance benefits. First, Plaintiff does not offer evidence

---

2007) (a retaliation claim was properly dismissed on summary judgment where the adverse action "began well before the filing of the first EEOC complaint and [] continued after the complaint was filed").

to support her position that Plaintiff was the only employee for whom Defendants contested unemployment insurance benefits. Plaintiff relies on an interrogatory response in which Defendants answered "None" to the question "Identify every individual whose application for unemployment benefits was opposed by either or both Defendants during the time period of January 1, 2003 [sic] . . . ." Meyers Decl. Ex. 3 at 15. It may be that the question should have read "January 1, 2003 to the present," in conformity with other interrogatories Plaintiff posed, but it did not. Subsequently, it is unknown what time period was encompassed by Defendants' answer. Defendants' answer of "None" clearly does not account for Plaintiff's benefits application. Additionally, when asked whether Art Crating had opposed any other art handlers' applications for unemployment insurance benefits, Mr. Lowe responded, "I don't recall." Lowe Dep. 227:11-15.

Assuming Plaintiff was the only employee whose unemployment insurance benefits were contested, Plaintiff did not offer any evidence that might make that fact significant, including whether other employees applied for unemployment insurance benefits; whether those employees were terminated for cause (as opposed to, for example, economic reasons); and whether Defendants had any grounds for opposing their applications (such as misconduct) that Defendants elected not to pursue. The only evidence as to the content of Defendants' opposition—the excerpt from Mr. Lowe's testimony at the NYDOL hearing—shows Defendants asserting to the NYDOL that Plaintiff was fired due to a customer's complaint and past performance issues, which Plaintiff does not dispute occurred. The Court cannot draw all reasonable inferences in Plaintiff's favor where Plaintiff has failed to provide the facts from which such inferences might reasonably be drawn. Thus, the mere fact that Defendants contested Plaintiff's unemployment insurance benefits is not, by itself, sufficient to raise an

inference of retaliation, as such oppositions are not necessarily retaliatory.  See generally United States v. N.Y.C. Transit Auth., 97 F.3d 672, 677 (2d Cir. 1996) ("[A]n employer's control over the handling of claims against it serves several essential purposes that have nothing to do with retaliation, malice, or discrimination.").  Indeed, on December 14, 2011, Plaintiff wrote to Defendants asking for a "termination letter that is somewhat neutral," although she believed she was "not entitled to [it]," to use in her unemployment insurance benefits application.  Meyers Decl. Ex. 24 at 2.  Her statements reflect her own belief that Defendants' reasons for dismissing her, as stated in her actual termination letter, were incompatible with receiving unemployment insurance benefits.

As Plaintiff has not established the fourth prong of her prima facie case, her claim as to the opposition to her unemployment insurance benefits fails for that reason.  I note, however, that had Plaintiff met her burden under McDonnell Douglas (which she did not), there may be constitutional reasons, unaddressed by the Parties in their briefs, as to why Plaintiff's claim could not proceed.  The Petition Clause of the First Amendment "protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes."  Borough of Duryea, Pa. v. Guarnieri, 131 S. Ct. 2488, 2494 (2011).  Specifically, Noerr-Pennington immunity is a First Amendment-based doctrine that protects litigants such as Defendants from liability in connection with efforts to petition the government for resolution of a dispute.  See Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 233 (2d Cir. 2004) (citing E.R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961), and United Mine Workers of Am. v. Pennington, 381 U.S. 657 (1965)).  In sum, Noerr-Pennington assures that Defendants' "right to file a lawsuit without liability is unimpeachable unless the suit is a 'sham,' meaning 'objectively baseless.'"  Ginx, Inc. v. Soho Alliance, 720 F. Supp. 2d 342, 363

(S.D.N.Y. 2010) (holding that <u>Noerr-Pennington</u> analysis applied in the civil rights context and finding that the defendants' petition to the State Liquor Authority did not constitute tortious interference with a prospective business advantage); <u>see</u> <u>Primetime 24 Joint Venture v. Nat'l Broad. Co.</u>, 219 F.3d 92, 99-100 (2d Cir. 2000) (recognizing that the Supreme Court, in <u>California Motor Transp. Co. v. Trucking Unlimited</u>, 404 U.S. 508, 510-11 (1972), extended the <u>Noerr-Pennington</u> doctrine to actions before federal and state administrative agencies).[59]

The Second Circuit has not addressed whether the <u>Noerr-Pennington</u> doctrine applies to retaliation claims in employment discrimination claims, and courts that have addressed the issue have reached differing conclusions. <u>See</u> <u>Durham Life Ins. Co. v. Evans</u>, 166 F.3d 139, 157 (3d Cir. 1999) (declining to hold that the plaintiff's Title VII retaliation claim was barred by the defendant's First Amendment right to file a breach of contract action against her, "in part because the prohibition on retaliation [in Title VII] is so explicit and the public policy behind the retaliation provision so compelling"); <u>Lin v. Rohm & Hass Co.</u>, No. 11 Civ. 3158 (WY), 2014 WL 1414304, at *10 (E.D. Pa. Apr. 14, 2014), (declining to "extend a <u>Noerr-Pennington</u>-type defense to [the plaintiff's] claims under Title VII"), <u>reconsideration denied</u>, No. 11 Civ. 3158 (WY), 2014 WL 3509982 (E.D. Pa. July 16, 2014); <u>Ungureanu v. A. Teichert & Son</u>, No. 11 Civ. 316 (LKK), 2012 WL 1108831, at *8-9 (E.D. Cal. Apr. 2, 2012) (dismissing the plaintiff's Title VII retaliation claim concerning the defendant's actions during workers' compensation proceedings where those actions were not baseless under <u>Noerr-Pennington</u>); <u>Nazir v. United Air Lines</u>, No. 09 Civ. 1819 (CRB), 2009 WL 2912518, at *5 (N.D. Cal. Sept. 9, 2009) (same,

---

[59] In addition, the Supreme Court held in <u>Bill Johnson's</u> that "[t]he filing and prosecution of a well-founded lawsuit may not be enjoined as an unfair labor practice, even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the Act." <u>Bill Johnson's Rests.</u>, 461 U.S. at 743; <u>see</u> <u>id.</u> at 744 (holding that it was "an enjoinable unfair labor practice to prosecute a baseless lawsuit with the intent of retaliating against an employee for the exercise of rights protected by § 7 of the NLRA").

concerning the defendant's actions during bankruptcy proceedings); see also Delville v.

Firmenich Inc., 920 F. Supp. 2d 446, 465 (S.D.N.Y. 2013) (where the court did not find that the

defendant's counterclaims were "all baseless," it was "unclear whether [the defendant's] suit can

amount to retaliation as a matter of law"; holding that the ADEA, NYSHRL and NYCHRL

retaliation claims survived the summary judgment motion based on other evidence of retaliation

besides the counterclaims); Marchiano, 2012 WL 4215767, at *7-8; see id. (declining to decide

whether Bill Johnson's prohibited retaliation claims in employment discrimination cases

"because [the plaintiff] does not seek an injunction" and the retaliation claim is therefore "less

injurious to First Amendment rights").[60]

Moreover, Plaintiff's legal analysis of her claims ended with a discussion of her prima

facie case. Pl. Mem. 12-17. Although it is not clear Defendants were required to do so, they, in

fact, offered the non-discriminatory reason that opposing Plaintiff's unemployment insurance

benefits was a legitimate exercise of their legal rights. Defs. Mem. 23. Plaintiff did not discuss

Defendants' non-discriminatory reason or the evidence, if any, demonstrating that Defendants'

reason was pretext for retaliation. Pl. Mem. 12-17. To the extent she relies on her prima facie

case, that evidence is unavailing for the reasons discussed above. For all of these reasons,

Plaintiff has not met her burden as to the opposition to her unemployment insurance benefits.

### b.      The Allegation that Plaintiff Stole Artwork

Plaintiff's contention that Defendants "falsely alleged that she stole a piece of artwork,"

Pl. Mem. 16, fails on the third prong of her prima facie case because Plaintiff admitted at her

deposition that she had no information or evidence of such an accusation, nor is any evidence

---

[60] Whether the Noerr-Pennington doctrine suggests that Defendants need not articulate a
legitimate, non-discriminatory reason for their actions until Plaintiff meets what may be a higher
burden than a McDonnell Douglas prima facie case is an issue this Court need not reach on this
motion, as Plaintiff's claim fails prior to the stage at which the burden would shift to Defendants.

present in the record.  To support her contention, Plaintiff's 56.1 Statement cites to her own

interrogatory response claiming, in conclusory fashion, that this retaliation occurred.  <u>See</u>

Meyers Decl. Ex. 2 at 12 (Defendants retaliated by "falsely alleging that she had stolen a piece of

artwork").   There is no testimony or documents in the record, however, suggesting that an

allegation of theft was ever made.[61]   Therefore, Plaintiff cannot demonstrate that she suffered an

adverse action, and this claim must be dismissed.

### c.       Defendants' Not Providing Plaintiff Severance Pay

Plaintiff also alleges retaliation based on Defendants' "reneg[ing] on an earlier promise to

give her two weeks' severance pay."  Pl. Mem. 16.[62]  Plaintiff again cannot demonstrate that she

was subject to an adverse action.  The emails between Plaintiff and Defendants concerning her

severance pay evidence that, as of December 19, 2013, Plaintiff was attempting to negotiate

terms in which she would sign a release of her claims in exchange for severance pay, a neutral

dismissal letter and a recommendation letter.

Furthermore, there is no evidence that the failure to pay the two-weeks' wages was

causally connected to Plaintiff's protected activity.  Even if Mr. Lowe's initial statement could

---

[61] An ACI employee's opinion that "[i]t's so fucked up that [Ms. Holleman] would take [the
Lutter Posters]," Meyers Decl. Ex. 51 at 3, is not an accusation of theft, and Plaintiff admits she
took the Lutter Posters.  Plaintiff also alleged that Defendants had not "retracted" their allegation
as to the stolen artwork, Compl. ¶ 35, but Defendants cannot retract an allegation that never
occurred.  Regardless, Mr. Lowe stated, "I think Kim Holleman is a good person, she is not
going to steal artwork from us."  Lowe Decl. 235:21-236:5.

[62] This claim, like Plaintiff's retaliation claim about "bad-mouthing" Plaintiff, was improperly
raised for the first time in Plaintiff's opposition papers.  <u>See</u> <u>Dabney</u>, 958 F. Supp. 2d at 450
(quoting <u>Mahmud v. Kaufmann</u>, 607 F. Supp. 2d 541, 555 (S.D.N.Y. 2009), for the proposition
that "[g]enerally, courts will not consider, on a motion for summary judgment, allegations that
were not pled in the complaint and raised for the first time in opposition to a motion for summary
judgment.").  "[A] memorandum of law is not a proper vehicle for rewriting or amending the
complaint."  <u>Ribis v. Mike Barnard Chevrolet-Cadillac, Inc.</u>, 468 F. Supp. 2d 489, 495
(W.D.N.Y. 2007) (quoting <u>Anderson v. Aset Corp.</u>, 329 F. Supp. 2d 380, 383 (W.D.N.Y. 2004)).
The Court with nevertheless address these claims for the sake of completeness.

be read as an unequivocal promise to provide severance pay, the terms of that agreement changed by December 19, 2013. Plaintiff concedes that Defendants received her discrimination complaint on January 9, 2014. "To establish a causal connection based on temporal proximity, 'a plaintiff must, at a minimum, introduce evidence that the protected activity in question occurred <u>before</u> the adverse employment action.'" <u>White</u>, 973 F. Supp. 2d at 385 (quoting <u>Carmellino v. Dist. 20 of N.Y.C. Dep't of Educ.</u>, No. 03 Civ. 5942 (PKC), 2006 WL 2583019, at *19 (S.D.N.Y. Sept. 6, 2006)) (emphasis added). The only evidence Plaintiff offers of a causal connection is temporal proximity, <u>see</u> Pl. Mem. 16-17, and there can be no meaningful temporal proximity where the allegedly adverse act preceded the discrimination complaint.

### d. Defendants' Alleged "Bad-Mouthing" Of Plaintiff

Finally, Plaintiff alleges that Defendants retaliated against her by "bad-mouthing" her. The alleged incidents of negative comments concern Mr. Ayotte's conversation with Mr. Rivera, in which Mr. Rivera purportedly discussed the unemployment hearing and Plaintiff's firing.

Plaintiff's retaliation claim fails she has not demonstrated that the alleged negative comments made by Mr. Rivera to Mr. Ayotte were adverse actions. First, Mr. Rivera's alleged statement that Plaintiff "was fired because [she] was a girl and that [Mr. Lowe] doesn't like women," Meyers Decl. Ex. 4, is a negative comment about Mr. Lowe, not Plaintiff. Second, a discussion between two employees in a bar about Plaintiff's unemployment hearing is nothing more than a trivial annoyance. Although Plaintiff surmises that this conversation indicates that other conversations also took place, Plaintiff has presented no evidence supporting her belief. The fact that she had difficulty finding a job is not evidence that Defendants spoke negatively of her. Her personal belief "that ACI likely said bad things about [her]," Holleman Decl. ¶ 8, is not evidence on which she can support a retaliation claim. <u>See</u> <u>Memnon v. Clifford Chance US, LLP</u>, 667 F. Supp. 2d 334, 343-44 (S.D.N.Y. 2009) (dismissing the plaintiff's retaliation claim

where she provided no evidence that her former employer disseminated negative information about her to prospective employers).  Furthermore, had Plaintiff established an adverse action—and she did not—she offered no evidence from which to draw an inference of retaliation.[63]

### 3. Plaintiff Fails To State A Retaliation Claim Under The City Law

Notwithstanding the more liberal interpretation due to retaliation claims under the City Law, Plaintiff's claims must also be dismissed under that statute.

Under the City Law, as under Title VII and the State Law, a plaintiff must present evidence sufficient to create a triable issue of fact as to a "causal nexus between [the plaintiff's] protected activity and the alleged retaliation."  Brightman v. Prison Health Serv., Inc., 108 A.D.3d 739, 742, 970 N.Y.S.2d 789, 792 (2d Dep't 2013) (affirming dismissal of City Law retaliation claim on motion for summary judgment for lack of evidence of a causal nexus); see Serdans, 112 A.D.3d at 977 N.Y.S.2d at 199 (same).  For the reasons discussed above, Plaintiff failed to adduce any evidence from which a juror could infer retaliation concerning Defendants' opposition to her unemployment insurance benefits, such as evidence that Defendants provided untruthful information or evidence that Defendants did not oppose the applications of other employees fired for misconduct.

Plaintiff's retaliation claim based on her not receiving severance pay must fail as those events occurred prior to her discrimination complaint.  Brightman, 108 A.D.3d at 742, 970 N.Y.S.2d at 792 (affirming dismissal of a City Law retaliation claim where there was no triable issue of fact that "the individuals who allegedly retaliated against [the plaintiff] were aware that

---

[63] Plaintiff also alleges that Mr. Lowe's admission of feeling "shocked", "insulted," and "upset[]," but not "angry," on being accused of gender discrimination, Lowe Decl. 225:3-17, was an admission by Defendants "to harboring retaliatory animus."  Pl. Mem. 16.  There is no evidence that Mr. Lowe expressed these feelings to anyone.

she had engaged in a protected activity"). Plaintiff's retaliation claims involving the accusation of stolen artwork and badmouthing also fail under the City Law because she has not provided any evidence, only speculation, that these events actually occurred. See Joseph v. Owens & Minor Distrib., Inc., No. 11 Civ. 5269 (MKB), 2014 WL 1199578, at *19 (E.D.N.Y. Mar. 24, 2014) ("In the absence of evidence beyond Plaintiff's speculation" that retaliation occurred, the plaintiff's NYCHRL retaliation claim would be dismissed on summary judgment); Cretella v. Liriano, 633 F. Supp. 2d 54, 76 (S.D.N.Y. 2009) ("Plaintiff proffers nothing more than conclusory denials and rampant speculation, which fail to support any inference of discriminatory or retaliatory conduct" under the City Law), aff'd, 370 F. App'x 157 (2d Cir. 2010). Moreover, the allegation that Mr. Rivera discussed Plaintiff's unemployment hearing with Mr. Ayotte once at a bar is a trivial inconvenience, not reasonably likely to deter a person from engaging in protected activity and, therefore, not recognizable as an adverse action under the City Law. See Zambrano-Lamhaouhi v. N.Y.C. Bd. of Educ., 866 F. Supp. 2d 147, 164 (E.D.N.Y. 2011) (dismissing the plaintiff's City Law retaliation claim because the Defendants' failure to give her a key to her office or a bathroom key, and treating her like an outsider, were petty inconveniences); Melman, 98 A.D.3d at 131, 946 N.Y.S.2d at 43 (alleged retaliation in which the plaintiff was spoken to gruffly and not congratulated on an award was too trivial to constitute a retaliation claim under the City Law); see generally Mihalik, 715 F.3d at 113 ("[T]he NYCHRL is not a general civility code . . . and a defendant is not liable . . . if the defendant proves the conduct was nothing more than 'petty slights or trivial inconveniences'" (quoting Williams, 61 A.D.3d at 78, 872 N.Y.S.2d at 40)).

Although Plaintiff did not advance a mixed-motives theory concerning her retaliation claims, she would not be able to meet the more demanding initial burden required by a mixed-

motives analysis, as for the reasons discussed above, Plaintiff has not presented any evidence that retaliatory animus played any role in Defendants' actions. Thus, Plaintiff has failed to meet her burden under the City Law as to her retaliation claims, which are therefore dismissed.

### E. CONCLUSION

For the reasons set forth above, I **grant** Defendants' motion for summary judgment in its entirety and **dismiss** with prejudice all of Plaintiff's claims against Defendants.

Dated:  Brooklyn, New York
      September 30, 2014

*Vera M. Scanlon*
_____
VERA M. SCANLON
United States Magistrate Judge